LOVELL STEWART HALEBIAN JACOBSON LLP
John Halebian
Adam Mayes
317 Madison Avenue, 21st Floor
New York, New York 10017
Telephone: (212) 500-5010
Telecopier: (212) 208-6806



**JUDGE ROMAN**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

EUGENE L. BUSHER,

        Plaintiff,

      v.

DESMOND T. BARRY, Jr., THOMAS T. EGAN,
JOHN P. HEANUE, WILLIAM M. KELLY,
FRANCIS P. BARRON,  and WINGED FOOT
GOLF CLUB, INC.,

        Defendants.

WINGED FOOT HOLDING CORPORATION,

        Nominal Defendant.

---

**VERIFIED SHAREHOLDER'S**
**DERIVATIVE COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Eugene L. Busher ("Plaintiff"), by his attorneys, alleges upon personal knowledge as to his own acts, and upon information and belief as to all other matters, based in part upon the due investigation conducted by counsel, as follows:

## NATURE OF THE ACTION

1.      Plaintiff is a shareholder of Winged Foot Holding Corporation ("WFHC" or the "Company"), a for-profit New York business corporation which owns the valuable, 280 acre property in Westchester County (the "Property") where the exclusive and prestigious Winged Foot Golf Club, Inc. (the "Club") is located.  Plaintiff brings this shareholder's derivative action (the "Action") on behalf of the Company, against its directors and against the Club for breach of fiduciary duty under New York Business Corporation Law (BCL) Section 720 and the common law, and for unjust enrichment.  Plaintiff is among the 44% of the WFHC's shareholders who are not members of the Club, and who have no connection to the Club other than owning a share of the Company which owns the Property where the Club is located.  In contrast, the current WFHC directors (the "Director Defendants") are all long-time members of the Club, with a direct financial interest in maintaining artificially low annual dues and minimizing other expenses normally incurred by the Club's members.  (Plaintiff reserves the right to name former WFHC directors as defendants upon discovery of facts supporting wrongdoing on their part.)

2.      The Director Defendants breached their fiduciary duties owed to WFHC and its shareholders by continuing to permit the Property to be used by the Club, pursuant to a series of long term leases, for no cost other than the reimbursement of real estate taxes and insurance and other *de minimus* payments.  These sweetheart lease deals were designed solely to benefit the Club at the expense of the Company and its shareholders, and continue to cause ongoing damage to the Company in a significant dollar amount in lost rental income and other monetary benefits.

1

Within approximately the last year, the Director Defendants agreed to extend the Club's lease until 2071 for the minimal rent described above, thereby effecting a *de facto* sale of the WFHC's Property for grossly inadequate consideration. The Director Defendants' breaches of fiduciary duty violate BCL § 720 and the common law, and include, *inter alia*, waste and misappropriation in order to enrich the Club and themselves at the expense of WFHC's shareholders.

3.      In addition, the Club itself has gradually and improperly accumulated a majority position in WFHC stock, and as the controlling shareholder of WFHC owes unwavering fiduciary duties to WFHC and its shareholders, and was an active participant in the wrongdoing alleged herein. The Club is sued for breach of fiduciary duty and unjust enrichment. (The Director Defendants and the Club collectively are sometimes referred to as the "Defendants".)

4.      The Club's corporate and legal organization is substantially different from the corporate structure of most non-profit clubs. The customary structure of a non-profit golf club involves the formation of a non-profit entity, owned by the club members, that owns and controls the assets and the land upon which the golf facilities are located. The issuance of membership certificates or membership shares is then controlled by club by-laws which allow interests in the club and/or assets to be transferred only to members, and which thus require club membership to be acquired in order to gain any interest in the entity that owns the assets.

5.      Unlike the structure of most established golf or country clubs, WFHC was deliberately and intentionally organized in 1921 as a *for profit business corporation* to own the valuable Property on which one of the most famous golf courses in the country would be located. WFHC sold 600 shares to 600 investors for $1,000 each, for a total of $600,000, a sizable sum for the 1920s. This equity capitalization of WFHC was well over half of all of the money that was raised to build and develop the golf course, club house and other buildings. Thus, in

2

contrast to the more usual and traditional structure of a golf club's property being jointly owned by a non-profit organization of its members, the Property upon which the Club was located was owned by the WFHC and the shareholders who invested in it, separately and apart from the Club and its members, and the WFHC was explicitly authorized to engage in a full range of for-profit, real estate and other business activities.

6.     The Director Defendants are all members of the Club and have deep and long-standing personal and economic connections to the Club. The Director Defendants, all sophisticated business people or attorneys, had and continue to have fiduciary obligations that required and require them to seek to obtain a reasonable market rental and/or other monetary return from the Club to the Company. However, as alleged in detail below, the Director Defendants completely and intentionally failed to do so because of their substantial and irreconcilable financial and other conflicts between their interests as directors of the Company (to maximize a return to the Company) and their interests as Club members (to keep the Cub's expenses to a minimum). These conflicts caused the Director Defendants to sacrifice the monetary interests of the Company for the benefit of the Club and its members in violation of the law.

7.     The Club has effected a dominant position of influence at WFHC for many years by, *inter alia,* preemptively purchasing WFHC stock and placing its members on the WFHC board. Historically, the Club obtained voting control over WFHC through a longstanding scheme to purchase WFHC shares for the Club from heirs or successors of shareholders, effectuated by improperly limiting their ability to sell such shares elsewhere, and by representing that the purchase price offered by the Club was fair when it was not.

3

8.      For decades, the Club has consistently made materially false and misleading statements to non-Club shareholders of WFHC that their WFHC shares were never intended to be a genuine investment, they had no significant value, and that all that could be received for a share was $1,000.  This is despite the fact that WFHC's Certificate of Incorporation and By-laws stated that the Company was formed to be a for-profit corporation empowered to engage in many business activities in order to generate and maximize profits for the Company and its shareholders, not to be subservient to the interests of the Club or its members. Moreover, the Club which uses the WFHC's valuable Property could afford to pay for it, as it is one of the most prestigious and lucrative golf clubs in the United States, which has hosted the US Open on multiple occasions, and generates millions of dollars of revenue every year.

9.      The Director Defendants were elected to their positions as WFHC directors by the Club, and one of the key requirements for such designation was an undivided loyalty to the needs of the Club. In service to the Club, and in further breach of their fiduciary duties to WFHC, the Defendants, in violation of New York law, arbitrarily set unconscionably and unfair low stock prices when offering to purchase or transfer WFHC stock from departing members or heirs of deceased members. Nowhere is it contained in the by-laws or any other document available to shareholders or others how the price of the stock was or is being calculated or determined. Further, the Director Defendants actively carried out the Club's scheme to accumulate WFHC shares, by repeating and disseminating the Club's misleading statements about WFHC share value, without disclosing their own conflicts of interests.

10.     Contrary to their fiduciary obligations running to the Company, the Defendants intentionally acted to favor the Club to the detriment and substantial damage of the Company. Defendants do not desire to have the Club pay any reasonable rental or return to WFHC because

it would substantially increase the personal out-of-pocket golfing expenses (i.e. annual dues, among other things) of the Director Defendants and other Club members, who have had and continue to have their memberships wrongfully subsidized by WFHC shareholders who are not Club members.

11.     Thus, while WFHC's extraordinarily valuable real estate asset should be expected to generate a fair annual return to the Company and its shareholders, the Director Defendants' agenda has been to ensure that virtually 100% of that return is sacrificed by WFHC shareholders and misappropriated instead by the Club and its members. Plaintiff seeks equitable relief from the Court, to end the Defendants' wrongful conduct and to vitiate the unfair lease agreements between the Club and the Company, as well as damages for the Company.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. Section 1332, by virtue of diversity of citizenship. The amount in controversy, exclusive of interest and costs, is in excess of $75,000.  Plaintiff is a citizen of the State of Massachusetts. Defendants are citizens of the State of New York or of states other than Massachusetts.

13.     Venue is proper in this District because several defendants reside in this District and WFHC maintains its principal place of business in this District.

## THE PARTIES

### Plaintiff

14.     Plaintiff Eugene L. Busher is a resident of the State of Massachusetts and through an inheritance owns one share of WFHC stock, which, through a prior inheritance from his father to his mother, was transferred to his mother by the Company in or about June or July 1985.  The value placed by defendants on this share was $1,000 at the time of transfer.  Share ownership of

5

WFHC does not entitle the owner to membership in the Club, and Plaintiff is not a member of the Club.

*Defendants*

### *The Director Defendants*

15.     The Director Defendants comprise the current roster of WFHC's board of directors, as elected by its majority and controlling shareholder, the Club. In addition to serving as directors, all the Director Defendants are also officers of WFHC, which thus has no outside or independent directors. Well before being elected to the WFHC board, all the Director Defendants were longstanding members of the Club.

16.     Defendant Desmond T. Barry, Jr. is a director of WFHC and its president. He is a citizen of Connecticut. He has been a member of the Club since in or about 1978. He is not a shareholder of WFHC. Barry is a long-time partner at the law firm of Condon & Forsyth LLP, and specializes in air-crash litigation, representing airlines and aircraft manufacturers. He informally represented the interests of the Club in attempting to dissuade at least one WFHC shareholder from challenging the sweetheart lease deal in favor of the Club.

17.     Defendant Thomas T. Egan is a director and the Vice-President of WFHC. He is a citizen of New York. He has been a member of the Club since in or about 1983. He is not a shareholder of WFHC. Egan has held positions as a managing director of Salomon Smith Barney Inc., and as chairman of the board of trustees of the State University of New York.

18.     Defendant John P. Heanue is a director and the Co-Treasurer of WHFC. He is a citizen of New York. He has been a member of the Club since in or about 1987 and is not a shareholder of WHFC. He is a former managing director with Goldman Sachs & Co.

6

19.     Defendant William M. Kelly is a director and the Co-Treasurer of WHFC.  He is a citizen of New York. He has been a member of the Club since in or about 1981.  He is not a shareholder of WHFC.  He is the Chairman and chief Executive officer of Blue Tee Corp., a holding company which owns several companies in the steel fabricating business.

20.     Defendant Francis P. Barron is a director and the Secretary of WFHC.  He is a citizen of Connecticut. He has been a member of the Club since in or about 1997.  He is not a shareholder of WFHC.  Barron is a partner in the litigation department of Cravath, Swaine & Moore LLP, specializing in securities, antitrust and commercial litigation.

### Defendant Winged Foot Golf Club

21.     Defendant Winged Foot Golf Club was formed on August 17, 1921 and is a New York Domestic Not-for-Profit Corporation.  The Club is located in Mamaroneck, New York.  As the majority and controlling shareholder of WFHC, the Club owes fiduciary duties to WFHC and its minority shareholders.

### The Nominal Defendant

22.     Nominal Defendant Winged Foot Holding Corporation was formed on August 8, 1921 under the laws of the State of New York, as a Domestic Business Corporation with a board of directors comprising five members.  The Company is located in Mamaroneck, N.Y.

### Fiduciary Duties Owed By New York Corporate Directors

23.     Because the power to manage the affairs of a corporation is vested in the directors and majority shareholders, they are cast in the fiduciary role of "guardians of the corporate welfare." In this position of trust, they have an obligation to all shareholders to adhere to fiduciary standards of conduct and to exercise their responsibilities in good faith when undertaking any corporate action.  Actions that may accord with statutory requirements are still

7

subject to the limitation that such conduct may not be for the aggrandizement or undue advantage of the fiduciary to the exclusion or detriment of the stockholders.

24.     The fiduciary must treat all shareholders, majority and minority, fairly. All corporate responsibilities must be discharged in good faith and with "conscientious fairness, morality and honesty in purpose." Fiduciaries have the obligations of candor and of good and prudent management of the corporation. When a breach of fiduciary duty occurs, that action will be considered unlawful and the aggrieved shareholder may be entitled to equitable relief.

25.     The elements of a cause of action to recover damages for breach of fiduciary duty are (1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct.

26.     The business judgment rule only bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes. Indeed, members of a board of directors of a corporation owe a fiduciary responsibility to the shareholders in general and to individual shareholders in particular to treat all shareholders fairly.

27.     Determinations as to whether the directors' activities were undertaken in good faith for a legitimate corporate purpose and whether other means were available depend not only on an analysis of the objective facts but as well in part on an appraisal of defendants' motives, involving as it will issues of credibility. Good faith or bad faith as the guide or the test of fiduciary conduct is a state or condition of mind, a fact which can be proved or judged only through evidence.

28.     The Club, as WFHC's majority shareholder owes WFHC and its shareholders the unwavering fiduciary duty obligations.

8

## FACTUAL ALLEGATIONS

*Establishment of the Winged Foot Golf Club*

29.     The Club was founded in 1921 by a consortium consisting of mostly members of The New York Athletic Club. Featuring two courses designed by A.W. Tillinghast (the West Course and the East Course), the Club opened in 1923.  It has been highly successful.  In its 2013-14 rankings of America's 100 Greatest Golf Courses, *Golf Digest* rated the West Course as 8th in the Country, immediately behind the Pebble Beach golf course.  Many major championships have been held at the Club, including the U.S. Open in 1929, 1959, 1974 and 2006, as well as the 1957 U.S. Women's Open, the 1980 U.S. Senior Open, and the 1997 PGA Championship.  The Club is scheduled to host the 2020 U.S. Open.

30.     The Club's Certificate of Incorporation explicitly limits its activities "to provide and maintain for its members a clubhouse and grounds for the game of golf."  The Club was organized as a *Not-for-Profit* Corporation, and is governed in large part by New York's Not-For-Profit Law (the "N-PCL", Part III of the N.Y. Corp. Law).  Section 204 of the N-PCL, entitled *Limitation on activities,* states in relevant part, "[n]otwithstanding any other provision of this chapter . . . a corporation of any type or kind to which this chapter applies shall conduct no activities for pecuniary profit or financial gain, whether or not in furtherance of its corporate purpose, except to the extent that such activity supports its other lawful activities then being conducted."

31.     For-profit activity would threaten the Club's favorable tax status.  Social clubs such as the Club are exempt from federal income tax under Internal Revenue Code ("IRC") § 501(a), as organizations described in IRC § 501(c)(7), if they are "organized for pleasure,

9

recreation, and other nonprofitable purposes." 26 U.S.C. §§ 501. Social clubs generally are membership organizations primarily supported by dues, fees and charges paid by members.

### Establishment of the Winged Foot Holding Corporation as a For-Profit Corporation

32.    When the Club was first organized in or about August 1921, its founders decided to do something unusual. Instead of structuring and organizing their golf club to be jointly and collectively owned by its membership, as the vast majority of golf clubs are, the Club's founders instead intentionally organized a for-profit New York business corporation, the WFHC. The founders then arranged the sale by WFHC of 600 shares for $1,000 each to shareholders (most or all of whom were Club members), and vested the Club's Property in this for-profit, investor-owned legal entity, which was separate and apart from the Club.

33.    The WFHC's certificate of incorporation provided for the broadest of for-profit business activities, in stark contrast to the Club's certificate discussed above:

> [T]o acquire by purchase, lease, hire or otherwise and to hold, own, manage, improve, develop, sell, lease, exchange, mortgage, or otherwise dispose of or deal in, real estate, lands tenements or hereditaments or any interest therein;
>
> To erect or cause to be erected on any lands owned, held or occupied by the Corporation, buildings or other structures with their appurtenances, and to manage, operate, lease, rebuild, enlarge, alter or improve any buildings or other structures now or hereafter erected on any lands so owned, held or occupied;
>
> To acquire by purchase or lease or otherwise any personal property or chattels of any class or description necessary, useful or proper in the equipment, furnishing, improvement, development or management of any property, real or personal, at any time owned, held or occupied by the Corporation, and to invest, trade and deal in any personal property, and to mortgage, pledge, sell or otherwise dispose of any personal property at any time owned or held by the Corporation;
>
> To do any and all of the business above mentioned and set forth to the same extent as natural persons might or could do;
>
> To borrow money, to issue bonds, debentures, notes and other obligations secured or unsecured, of the Corporation, from time to time, for monies borrowed, or in

payment for property acquired, or for any of the other objects or purposes of the Corporation, or for any of the objects of its business, and to secure the same by mortgage or mortgages, or deed or deeds of trust, or pledge or other lien upon any or all of the property, rights, privileges or franchises of the Corporation, wheresoever situated, acquired or to be acquired, so far as permitted by law and this Certificate of Incorporation; to sell pledge or otherwise dispose of any or all such debentures or other bonds, notes and other obligations in such a manner and upon such terms as the Board of Directors may deem judicious; and to guarantee the payment of any dividends upon stocks; or the principal or interest upon bonds, or the contracts or other obligations of any corporation or individual, so far as the same may be permitted in the case of corporations organized under the Business Corporations Law of the State of New York;

The foregoing clauses shall be construed both as objects and powers; and it is hereby expressly provided that the foregoing enumeration of specific powers shall not be held to limit or restrict in any manner the powers of this corporation;

In general, to do any and all things and exercise any and all powers which may now or hereafter by lawful for the Corporation to do or exercise under and in pursuance of the Business Corporation Law of the State of New York, or of any other law that may be now or hereafter applicable to the Corporation.

34.     The founders who organized the WFHC were sophisticated and highly successful businessmen and professionals.  There is no doubt that they understood and expected that the WFHC was a for-profit corporation and would be operated accordingly.

### WFHC's Original Share Issuance to Club Members, and Subsequent, Gradual Dispersal of Share Ownership

35.     The founders of WFHC financed the Company with $623,000 in stock issuance and $387,500 in bonds, for a total of $1,010,500.  Its certificate and bylaws authorized WFHC to issue up to 600 shares, and according to the September 1923 announcement of the Club's opening, "[t]he plan for building the club membership . . . provided for the sale of one share of stock in the Winged Foot Holding Corporation on a graduated scale to each member."

36.     Thus, when the Winged Foot Golf Club opened its golf courses in 1923, only two years or less after the WFHC was organized and financed to purchase the property, it was reasonable to assume that the Company's shareholders were still virtually identical to the

11

membership of the Club. Accordingly, there was little reason for anyone to be concerned about the Club paying any type of reasonable rental to WFHC, as it would likely only take money out of one pocket and put it in the other. Then in 1929, the country experienced the stock market crash and the beginning of the Great Depression. Up to 1945, from the Depression through the Second World War, the Company's property probably declined rather than increased in value.

37.     Over the years, however, shareholders died, left the Club, moved away or otherwise terminated their involvement with the Club. According to correspondence by WFHC, "[I]t has been the [WFHC's] Board policy to approve transfers of shares to a child of a deceased stockholder." Because there was no mechanism in the WFHC certificate of incorporation or by-laws to insure that WFHC shares stayed in the hands of the Club or active members, many shares ended up in the hands of heirs and others who were not Club members, and who had no interest in sacrificing their equity interest in a company which owned valuable land and other assets for the benefit of the Club. The more shares that ended up in the hands of such non-Club members, the more acute the conflict became between the best interests of WFHC shareholders and Club members.

38.     As this trend continued and a greater number of WFHC shares were held by non-Club members, the changed circumstances should have been reflected in the management of the Company and its property, as WFHC directors were required then as now to act in the best interests of all shareholders, not just the Club. Instead, in breach of their fiduciary duties, the WFHC directors continued to act as if they were answerable only to the Club.

*Purported Limitations on the Transfers of WFHC Stock*

39.     To gain control of the WFHC, the Club exploited restrictions on transferability

that were eventually applied to WFHC shares. The June 1, 1928 bylaws of WFHC stated the

following with regard to its stock:

> Section 2. Transfers of Stock.  Transfers of stock shall be made only on the books
> of the Corporation and only by the person named in the certificate or by an attorney
> thereunder duly authorized, and upon surrender and cancelation of the old
> certificate. [1928 Bylaws]

40.     In addition, WFHC stock certificates contain the following legend on the face of

the shares:

> [N]o transfer of this share of stock shall be valid for any purpose unless and until
> the same shall be made upon the books of the Corporation kept for that purpose,
> after such transfer shall have been authorized by the affirmative vote of at least
> two-thirds of the Board of Directors of the said Corporation recorded at length in
> the minutes of said Corporation.
>
> The owner of this share and any transferee or assignee of the same shall be
> deemed to accept this certificate of stock subject to the provisions of the By-laws
> of the Corporation with respect to the certificates and shares of stock.

41.     The above restrictions on transferability are, in fact, void as against public policy

under New York law, because (among other reasons) they do not "specify a price and enable

either party to withhold consent to transfer to a third party unreasonably, thereby rendering 'the

sale of [] stock impossible to anyone except to the [Club] at whatever price [it] wishes to pay.'"

1176 Bus. L., Vol. 65, Aug. 2012 (quoting, *Rafe v. Hinden,* 288 N.Y.S.2d (App. Div. 2d Dep't),

*aff'd,* 244 N.E.2d 469 (N.Y. 1968)).

*The Club's Scheme to Acquire Control of the WFHC and*
*Ownership of the WFHC Property*

42.     As share ownership in WFHC grew more widely dispersed, the Club embarked

upon a plan and scheme to wrongfully obtain majority control of WFHC, and thereby to

13

wrongfully misappropriate the monetary value of the Company, and the equity of its shareholders, for the benefit of the Club. Taking advantage of the transfer restrictions that had been placed on WFHC stock, the Club improperly amended its by-laws to provide itself a standing option to purchase WFHC stock. Using this option, coupled with its influence over the WFHC board, the Club gradually built up what is now a controlling stake in WFHC.

43.     The scheme was described in a December 15, 1975 letter that a member of the Club and shareholder of WFHC, George J. Schaefer, wrote to the then-WFHC president, and former Club president, George Gillespie, Jr. (the "Schaefer Letter"). The Schaefer Letter explains that in or about 1949, the by-laws of the Club were "unilaterally changed by the [Club]" to read as follows:

> Section 8.2 Option. The Club shall have the option to acquire any shares of stock of Winged Foot Holding Corporation owned by a deceased or resigned member at the prevailing price then fixed by the Board as the reasonable value thereof, or at the amount paid by the member if that be less.

44.     The Club's self-created "option" to buy any WFHC shares that threaten to transfer outside its membership is *ultra vires* and otherwise null and void. Nevertheless, Mr. Schaefer reported that "[b]y the year 1952, according to former President Chambers, the [] Club claimed to have owned 76 [WFHC] shares, and now, as of 1974, claims to have 247 shares at a cost of less than $50,000. Shares are reported to have been bought at prices of $50 to $250."

45.     Thus, by buying WFHC shares pursuant to its self-declared option, the Club by 1974 succeeded in obtaining effective control of WFHC, with ownership of approximately 41% of WFHC shares. Actually, however, the Club's effective ownership percentage was much higher. A large number of shares were and continue to be held by persons for whom the WFHC simply has no record of ownership, because the original owners left, moved away or died, and WHFC management apparently makes little or no effort to find them or their successors. (There

14

is also a serious question as to whether the WFHC has appropriately addressed legal requirements to report, and potentially escheat to the State, stock that is owned by missing shareholders.)

46.    Mr. Schaefer continued in the same letter, "I have been reliably informed, that it is the purpose of the Club to secure eventually 300 shares of the stock of the Holding Corporation [*i.e.*, WFHC], thus giving it at least 50% of the stock issued..." Indeed, this goal was subsequently reached by the Club.   According to the Club's most recent 2012 Federal Tax Return, it now owns 56.3% (or 338 shares) of the 600 issued and outstanding stock of WFHC. The Club also continues to increase its holding of WFHC stock, as it reported owning fewer shares (337) only a year earlier in 2011.

### The Club's Misappropriation of the WFHC's Liquidation Value

47.    The Schaefer Letter observed that "the deed of the property is, of course, in the name of [WFHC].  If part or all of the property or assets are disposed of, let's say in the far distant future, what becomes of the monies received? Will this money be distributed among the remaining individual stockholders and the 'Johnny Come Latelies', or will some of those in charge find methods or reasons to participate in the 'pot'?"

48.    The answer to the Mr. Schaefer's question is that the proceeds from the sale, liquidation and/or dissolution of the Club and/or its assets, including those held by WFHC, could well inure to the members of the Club. *See* N-PCL, Art. 10, *Non-Judicial Dissolution.*  This is subject to "any provision in the certificate of incorporation prescribing the distributive rights of members." N-PCL §1001, *Plan of dissolution and distribution of assets.*

49.    The concerns expressed by Mr. Schaefer are even more valid today, as rumors recently circulated among Club members and others that WFHC's Board would like to dissolve

WFHC and vest the Property in the Club, presumably without paying fair value for WFHC's equity.

### Club Domination of the WFHC's Annual Shareholder Meetings

50.     Leveraging its current, controlling position in WFHC, the Club has structured the annual meetings of WFHC shareholders as *pro forma* affairs.  Shareholders receive a Notice of Meeting and no other information.  The slate of Directors is proposed at the meeting by the Club's designee and then elected by the Club.  The WFHC directors are chosen, in advance, by the Club's governing board from Club members, and owe their loyalty entirely to the Club.  The WFHC Directors are the Club's agents and do the Club's bidding.

51.     As a result, the WFHC directors are "dominated" by the controlling shareholder and acts as agents for the Club to effectuate its agenda.   From the perspective of the WFHC board, their only "boss" is the Club and their responsibility is to their friends and business associates who are Club members, and the Club management. The slate of WFHC director nominees is chosen from Club members based principally on their loyalty to the Club, in order to do the Club's bidding by insuring that the Property remains available to the Club, despite the fact that the Club does not own it.

### The Club's Sweetheart Lease Agreements with WFHC Constitute Breaches of Fiduciary Duty

52.     Currently, the only revenue that the WFHC receives is rental of the land it leases to the Club. This rental revenue is hardly a market rental. Rather it is reimbursement for necessary expenses related to the land owned by the Company, such as utilities, taxes and insurance expenses.  For 2012, the Club reported that this amount was $970,105. Accordingly, because the Club has effectively dominated the WFHC, contrary to the best interests of the WFHC and its shareholders, the Defendant Directors, and their predecessors, in breach of their

16

fiduciary duties, have perpetuated sweetheart lease deals at non-market rates and have otherwise prevented and obstructed the ability of WFHC to obtain reasonable value for its extraordinarily valuable property.

53.     The Club has very substantial sources of revenue. In addition to its originally intended activities as a membership social club, the Club makes itself available to the public for outings, at a price of up to $800 per person. Because of the popularity of the Winged Foot logo with the golfing public, the Club's pro shop also generates millions of dollars in tax-free revenue for the Club. (The Club has taken direct control of the pro shop, unlike most golf clubs which traditionally allow the pro shop to be run as the business of the head golf professional.)

54.     Club revenues have been increasing almost exponentially for several years. In 2000, reported total Club revenues were $13.1 million. In seven years, that figure grew to $20.6 million for 2007. Reported Club revenues for 2009, 2010, 2011, and 2012 were $13.7, $16.9 million, $17.4 million, and $19.0 million, respectively. In addition, total assets for the Club increased as well. Between 2000 and 2007 assets increased from $13.1 million to $20.6 million. For 2009, 2010, 2011, and 2012, assets reported by the Club were $22.3 million, $24.5 million, $26.0 million and $29.3 million, respectively.

55.     As a result of Defendants' breaches of duty, however, even though the non-profit Club is making money, the for-profit Company is not. The rent paid by the Club on the WHFC Property, worth at least $30 million (according to the Club's filings), is less than $1 million a year. And this rent is simply property taxes, utilities, and insurance expense reimbursements to the WFHC for those expenses directly related to the Property owned by the Company. The Club's consolidated financial statements and other documents indicate that, while the Club has reported net income of about $2.5 million per year, the WFHC suffers net operating losses.

17

56.     Typically, landlords that are for-profit entities, such as the WHFC, require the payment of market rent, which is, in many instances, a combination of base rent and percentage rent to achieve the highest possible return on the leased asset value.  Specifically, market rent is customarily based on a percentage of gross revenue, with a minimum base, along with other potential provisions such as (a) percentage rent calculated on food and beverage or other specific gross revenues, (b) net cash flow rent, and (c) payment of all utilities, property taxes and insurance. The critical factor in the calculation of the rent amount is the value of the assets and the underlying land being leased.

57.     This, however, is not what is occurring here.  Here, the Defendants have failed in their duties of loyalty and care to the WHFC, by failing to obtain for it a market-based rental amount for its Property leased to the Club.

**Defendants Continue to Offer to Purchase WFHC Shares**
**Based Upon Materially Misleading Statements**

58.     The Club's scheme to purchase WFHC shares for itself is founded on misleading representations to current shareholders regarding the nature of the WFHC and the value of its shares.  These misleading representations sought to denigrate and minimize the value of the shares in order to facilitate their acquisition by the Club.

59.     The Schaefer Letter noted in 1975 that "as long as 12 to 15 years ago I was asked if I would surrender my share if all the other stockholders did so."  Consistent with the Club's standing offer to purchase WFHC shares described in the Schaeffer Letter, the WFHC's then-President, George J. Gillespie, III, stated in a letter to another shareholder dated March 27, 1981, "I trust that [the shareholder] is aware that *Winged Foot Golf Club has a standing offer* to the Holding Corporation stockholders to purchase their shares for $1,000 each – *the purchase price fixed by the Board of Governors of the Golf Club*."  [Emphasis added]

60.     In or about late 2013 and continuing to early 2014, WFHC shareholder Kevin T. Hoffman met on several occasions with Defendant Barron to sell his share to the Club at market or a reasonable fair value.  Defendant Barron offered Hoffman a nominal amount, understood to be approximately $1,000 for Hoffman's share, and stated that the Club would not consider purchasing any WFHC shares for anything greater than that amount. The Club has made other recent share purchases for around $3,000.

61.     This conduct shows that the WFHC board of directors both now and historically has not been independent, but has been an agent for the Club. Defendant Barron, former president Gillespie and others communicated with WFHC shareholders not only as directors, officers or shareholders of WFHC, but also in effect as members or representatives of the Club, with unified messages advocating for the Club that:

(a)     The WFHC's sole corporate purpose is to hold title to land leased to the Club;

(b)     The Club has a continuing outstanding offer to purchase all shares of the WFHC's stock at a nominal price; and

(c)     WFHC's shareholders might as well sell their stock at the depressed price offered because, as Gillespie explained in his 1981 letter, "[i]n my judgment it is extremely unlikely that dividends will be paid on Holding corporation shares, or that the purchase price fixed by the Board of Governors [of the Club] will be increased."

62.     The Club's policy of making paltry offers for WFHC shares, which is actively implemented and advocated by the Defendant Directors, enables the Club to acquire WFHC shares at a price artificially depressed by Defendants' refusal to charge the Club a net market or fair value rental for the Property (or to contemplate a sale of the Property), and thereby protects

19

and entrenches the Club's interests in WFHC at the expense of other shareholders, allowing the Club to benefit directly from the unfairly low price at which it acquired the shares.

63.     Several documents show how undervalued the offered price of $1,000 is. First, the 2013 audited financials report that the book value of the consolidated net assets per share are worth almost 45 times the amount being offered (*i.e.*, net assets of $27,252,552 ÷ 600 shares = $45,421 per share). Even if the Property were sold for continued use as a golf club, the sale likely would yield much more for WFHC shareholders than $1,000 per share. For example, another famous golf club, Pebble Beach, although not necessarily directly comparable, was sold for $820 million in July 1999, approximately 15 years ago. Pebble Beach is ranked by *Golf Digest* for 2013-2014 as the 7th "Greatest 100 Golf Courses in America." The Club's West course is right behind it, ranking 8th in the same publication. *Golf Digest* for the same years ranked Winged Foot West as the second "Best In State Ranking" out of the 30 "top" clubs in New York State.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

64.     Plaintiff brings this action derivatively in the right and for the benefit of WFHC to redress injuries suffered, and to be suffered, by WFHC as a direct result of the breaches of fiduciary duty alleged herein. WFHC is named as a nominal defendant solely in a derivative capacity.

65.     Plaintiff will adequately and fairly represent the interests of WFHC in enforcing and prosecuting its rights. The action is not a collusive one to confer jurisdiction that the court would otherwise lack. Plaintiff was a shareholder at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current shareholder.

66.     The board of directors of WFHC at the time of the filing of this Complaint consists of the following five individuals: Desmond T. Barry, Jr., Thomas T. Egan, John P. Heanue, William M. Kelly, and Francis T. Barron.

67.     Plaintiffs have not made any formal demand on the present board to institute this action because such a demand would be futile, wasteful, and a useless act, as set forth below.

68.     The WFHC board is not independent on the issues raised herein and cannot fairly assess pre-suit demand for the following reasons:

(a)     All of the WFHC board members are controlled and dominated by the Club. The Club is WFHC's majority shareholder; the slate of WFHC directors is selected and nominated by the Club's Board of Governors.  They are chosen based on their undivided loyalty to the Club and not to WFHC, and their acts have demonstrated that they do not represent the interests of WFHC.  As a result, they can not fairly address a demand to have WFHC charge the Club a market rate for the lease of the Property, as they are opposed to any such result.

(b)     For WFHC to charge a market rent for the Property would force the Club to substantially raise its dues, require a member assessment, or incur significant debt.  Thus, all of the members of the Club, including the Director Defendants, have a strong motive to prevent WFHC from charging a market rent, despite the fact that the director defendants owe WFHC their undivided loyalty.  Accordingly, since these Defendants are interested, they could not fairly address a pre-suit demand and thus demand is futile.

(c)     The Director Defendants have orchestrated the WFHC annual meetings of shareholders and negotiated the purchase of WFHC shares for the benefit of the Club.  The former and present directors of WFHC participated in or acquiesced in the plan to have the Club acquire majority ownership of WFHC, and to do so by restricting the transfer of such shares to the Club or other Club

21

members only, allowing the Club to pay a non-market purchase price for the shares as the most likely buyer. In doing so, the current WFHC directors have conspired with the Club to breach their fiduciary duty, have not acted in good faith and could not fairly address a pre-suit demand relating to charging the Club a market rate for the use of the Property.

        (d)     To prevent any opposition being raised to the Club's abuse of WFHC, the prior directors and the current WFHC directors have acted in bad faith with respect to a large number of WFHC shareholders whose identities are presently not determined. As WFHC's share ownership changed as the original owners died, the WFHC directors made little effort to locate those who would own the shares in their place. As time went on the number of such shares, where the owners were not identifiable kept increasing, and now stands at approximately 200 shares out of the 600 shares outstanding. While the Defendant Directors owe these shareholders the highest obligations of good faith and fair dealing, they continue to have no interest in learning who the current owners are. This was and is done for the purpose of keeping these equitable owners in the dark and out of the picture lest they claim that the Property should be leased at a market rate. Given the Defendant Directors' bad faith in dealing with such equitable holders, it is clear that the WFHC board could not fairly address a demand related to charging the Club a market rent for the Property.

        (e)     Since each of the WFHC directors have agreed with the Club's position that the value of WFHC's principal asset, the Property should not be maximized for the benefit of WFHC's shareholders, but rather it should be used essentially rent-free for the benefit of the Club, the Director Defendants have demonstrated that they are disloyal to WFHC and loyal only to the Club, and do not exercise independent business judgment. Further, they have pre-judged the issue and cannot be deemed independent. As a result, they could not fairly address a pre-suit demand, since their actions are not the product of valid exercise of business judgment and thus demand is futile.

(f)     The current WFHC Directors have embraced the conduct effectuated by previous WFHC boards and failed to investigate or inform themselves that the WFHC shareholders not affiliated with the Club were being injured as a result of their conduct which was not being exercised in good faith.   Rather than address these issues, they acquiesced and then adopted the previous wrongful conduct which favored only the Club.   As a result, the Defendant Directors are uninformed and could not fairly address a demand related to charging the Club a market rent for the Property.

(g)     The Defendant Directors had the obligation to discharge all corporate responsibilities in good faith and with conscientious fairness, morality and honesty in purpose.   Such fiduciaries have the obligations of candor and of good and prudent management of the corporation.   In the instant case, the Defendant Directors have not acted honestly, with candor or in good faith and as a result cannot address a pre-suit demand relating to charging the Club a market rent for the Property.

69.     In the instant case, for the reasons alleged above, a pre-suit demand is futile.

**FIRST CLAIM FOR RELIEF**
**VIOLATION OF BCL 720**
**(Against the Director Defendants for Misconduct)**

70.     Plaintiff repeats and re-alleges each and every allegation set forth above.

71.     The Director Defendants have refused to protect the assets of the WFHC by failing to negotiate a fair lease for the Property at a market rental.   These Defendants have violated their fiduciary duties owed to the WFHC and its shareholders by appropriating the entire value of the WFHC's sole real estate asset for themselves and for the Club; by failing to properly manage the assets of the WFHC and committing waste; by facilitating the Club's offers to purchase additional WFHC shares at an unfairly low price that was artificially depressed by the various breaches of fiduciary duty, so as acquire such shares for the Club and to entrench

23

themselves and the Club in control, and ultimately to share in any sale or liquidating distribution of WFHC and Club assets.

72.     Further, the Director Defendants breached their fiduciary duties by entering into long term leases for the Property on unreasonable terms which provides the WFHC with no net rental on the Property.

73.     As a result of the Director Defendants' breaches of their fiduciary obligations, the WFHC has been damaged in an amount to be proved at trial.  These Defendants should be held personally liable for that amount, plus interest, costs, and attorneys' fees, and any illegal restrictions on the free sale of WFHC shares.

**SECOND CLAIM FOR RELIEF**
**COMMON LAW BREACH OF FIDUCIARY DUTY**
**(Against the Defendants for Breach of Fiduciary Duty, Waste and Misappropriation)**

74.     Plaintiff repeats and realleges each and every allegation set forth above.

75.     Defendants have failed to protect the assets of the WFHC by failing to negotiate a lease for the Property at a market rental.  Defendants have violated their fiduciary duties owed to the WFHC and its shareholders by appropriating the entire value of the WFHC's sole real estate asset for themselves; by failing to properly manage the assets of WFHC and committing waste; and, in the case of the Club, by offering to purchase additional WFHC shares at an unfairly low price that was artificially depressed by Defendants' breaches of fiduciary duty, so as acquire such shares and to entrench themselves in control, and in the case of the Director Defendants, by facilitating the Club's scheme.

76.     As a result of Defendants' breaches of their fiduciary obligations, the WFHC has been damaged in an amount to be proved at trial.  At the present time, the Club should be paying a fair market annual rental, and should have paid a fair market rental in previous years.

77.     The Director Defendants should be held personally liable for the damages sustained by WFHC described above, plus interest, costs, and attorneys' fees.  The Club should similarly be held liable.

78.     Further, the Court should enter a decree vitiating any lease arrangements which were the product of the Defendants' violations of fiduciary duty or of prohibitions on the free sale of WFHC shares.

**THIRD CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**
**(Against the Club for Unjust Enrichment)**

79.     Plaintiff repeats and realleges each and every allegation set forth above.

80.     As a result of the wrongdoing, the Club has been the placed in the position of retaining funds which in good conscience should have been paid to the WFHC.

81.     Plaintiff is entitled to a decree requiring the Club to pay over to the WFHC the moneys which have unjustly enriched the Club, the amount of which to be determined at trial.

**WHEREFORE,** plaintiffs demand judgment, in plaintiffs' favor and in favor of the WFHC, as appropriate, against all defendants as follows:

A.      Finding that the Defendants have breached their fiduciary duties to the WFHC its shareholders and are liable for all damages caused by their actions;

B.      Enjoining defendants from further breaches of their fiduciary duties, including further purchases of WFHC shares, and from voting any such shares already acquired;

C       Awarding the WFHC compensatory damages in an amount to be proven at trial;

D.      Awarding the WFHC punitive damages against Defendants;

E.      Entering a decree vitiating any leases which were the product of the wrongdoing alleged herein;

25

F.      Entering a decree vitiating the restrictions on the sale of WFHC shares;

G       Entering a decree setting the amount of funds to be paid to the WFHC which constitute unjust enrichment of the Club; and

E.      Granting such other or further relief as may be just and proper under the circumstances.

Dated: June 16, 2014                    **LOVELL STEWART HALEBIAN**
                                        **JACOBSON LLP**


                                        By: _____
                                            John Halebian
                                            Adam Mayes
                                            317 Madison Avenue, 21st Floor
                                            New York, New York 10017
                                            Telephone (212) 500-5010
                                            Telecopier (212) 208-6806

                                            *Attorneys for Plaintiffs*

26

## VERIFICATION

John Halebian hereby verifies that I have read the Shareholder's Derivative Complaint brought on behalf of Winged Foot Holding Corp. and that I believe that the allegations are true to best of my knowledge and belief.  As one of Plaintiff's counsel, I am providing the verification because the Plaintiff does not reside in county or the state where the action is being filed.

John Halebian