UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
EUGENE L. BUSHER,

                Plaintiff,                        14-cv-4322 (NSR)

  -against-

                                                   OPINION & ORDER

DESMOND T. BARRY, JR.,
THOMAS F. EGAN, JOHN P. HEANUE,
WILLIAM M. KELLY, FRANCIS P. BARRON,
and WINGED FOOT GOLF CLUB, INC.,

                Defendants,

WINGED FOOT HOLDING CORPORATION,

                Nominal Defendant.
-----------------------------------------------------------------X

NELSON S. ROMÁN, United States District Judge:

Eugene Busher ("Plaintiff") brings this shareholder derivative action, alleging breach of fiduciary duty, unjust enrichment, and violation of New York Business Corporation Law § 720 against defendants Desmond T. Barry, Jr., Thomas F. Egan, John P. Heanue, William M. Kelly, Francis P. Barron, Winged Foot Golf Club, Inc. (the "Club"), and, nominally, Winged Foot Holding Corporation ("WFHC") (collectively, "Defendants"). Before the Court is Defendants' motion for summary judgment. Discovery has not yet been completed. For the following reasons, Defendants' motion is DENIED.

## FACTUAL BACKGROUND

The following facts are not in dispute, unless so noted, and are derived from the parties' summary judgment submissions.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
FILED: 3/29/2016

### A. WFHC and the Club

The Club and WFHC were formed in 1921. (Plaintiff's Responses to Defendants' Rule 56.1 Statement of Material Facts, and Plaintiff's Counter-Statement of Additional Material Facts ("Pl.'s 56.1"), ECF No. 51, ¶¶ 1, 43.) WFHC was structured as a New York stock corporation and holds title to the land on which the Club was established. (*Id.* ¶ 2.) The Club was structured as a non-profit membership corporation and leased the land from WFHC. (*Id.*) The original lease for the land was signed in 1924 and covered a term of 21 years. (*Id.* ¶ 4.) The Club was entitled under the terms of the original 21-year lease to invest all available funds to keep the golf course and clubhouse furnishings "in a first class condition" and was required to pass to WFHC any funds not invested into the Club. (*Id.* ¶ 15.) The lease additionally required consent of WFHC if the Club wanted to make substantial changes to the premises and provided that all improvements to the property belonged to WFHC at lease expiration. (*Id.*) Since then, six long-term lease renewals have been granted to the Club. (*Id.* ¶ 4.) In 1947, the lease was amended to cap the lease payment at a flat annual fee of $30,000. (*Id.* ¶ 17.) The written terms of the lease have not changed since 1924, but it is unclear whether WFHC ever received consideration in exchange for the lease renewal. (*Id.* ¶ 5.) The parties dispute the reasons for this corporate structure and WFHC's purpose. (*Id.* ¶ 3.)

### B. Policies Regarding Stock Ownership

At the time of the Club's foundation, purchase of a WFHC share was a condition of Club membership. (*Id.* ¶¶ 6, 52.) It appears that new members were able to acquire stock of WFHC in manners other than by purchase from the club, such as by private sale. (*Id.* ¶ 6; Declaration of Adam C. Mayes in Opposition to Defendants' Motion for Summary Judgment ("Mayes Declaration"), ECF No. 46, Ex. 11, at 7042.) Upon death or resignation of a shareholder, the

2

stock had to be surrendered to the Club for resale to a new member. (Mayes Declaration, Ex. 3, at 5.)

The stock of WFHC was often discussed as if it was an investment for shareholders. (*Id.* ¶ 47.) For example, during the 1930s and 1940s, WFHC and Club annual meetings discussed incentivizing new members and yearly members to purchase stock by pitching the rising value of a share and the low price of equity relative to the assets and liabilities it represents. (*Id.* ¶ 47; Mayes Declaration, Ex. 7 at 6195, Ex. 8 at 6393, Ex. 9 at 5670 (Stockholders "have a financial interest in the Club to protect [their] equity and have its value rise by doing all in [their] power to help the Club operate successfully.")

During and after the Great Depression, Club membership fell sharply several times, creating financial pressure on the Club. (Pl.'s 56.1, ¶ 53.) To increase income, as an alternative to full stockholding membership, the Club began authorizing "yearly" membership without any purchase of stock sometime in the 1930s. (*Id.* ¶¶ 7, 54.) Throughout the 1940s, the Club attempted to convert all yearly members to stockholding members and sought to dispose of all stock owned by the Club by selling shares to new members and existing yearly members. (*Id.* ¶¶ 7, 54; Mayes Declaration, Ex. 3, at 17, Ex 11.)

However, the Club's strategy appears to have changed in the late 1940s. In 1949, the Club eliminated individual stockholding as a requirement for any category of membership. (Pl.'s 56.1, ¶¶ 7, 57.) In 1950, at the annual meeting, a resolution was adopted authorizing the Club to "buy in shares" of WFHC, "as opportunity offers." (*Id.* ¶ 56; Mayes Declaration, Ex. 12, at 5925.) The President of the Club acknowledged that the Club had been offering $50 per share over the previous two years, without representing what value, if any, the shares had in the market and without campaigning to "get the shares in." (Pl.'s 56.1, ¶ 56; Mayes Declaration, Ex. 12, at

5925.) The 1950 resolution formalized this practice. (Pl.'s 56.1, ¶ 56; Mayes Declaration, Ex. 12, at 5925.) In 1967, the Club strengthened this policy by resolving to enforce its option (stated in Club bylaws) to purchase shares that became available. (Pl.'s 56.1, ¶ 58.) Over the next several years, the Club and WFHC periodically discussed their policies regarding stock at annual meetings and reaffirmed their strategy of purchasing stock to gain control of WFHC in the Club. (*Id.* ¶ 59; Mayes Declaration, Ex. 14 at 5391 (1968), Ex. 15 at 5370 (1968); Ex. 16 at 4473 (1973).) At least one senior stockholder, George Schaefer, protested the stock-purchasing policy and acknowledged the financial inequity of the Club purchasing shares for significantly less than the investment value (i.e., assets less liabilities) that such shares represent. (Mayes Declaration, Ex. 18.)

    **C. Policies Regarding Stock Transfers**

In 1967, in connection with the Club's resolution to purchase shares for itself, the Club additionally determined that it would disallow any transfers of shares between individuals. (Mayes Declaration, Ex. 18, at 218 ("[The Club] will not permit transfer of shares between individuals whether they be members or non-members.") In 1975, the Club President acknowledged that these transfer restrictions were unauthorized by the charter and By-laws and therefore illegal. (Mayes Declaration, Ex. 17, at 1863.) The President additionally recommended a more flexible transfer policy on the grounds that a family member or estate whose transfer request was rejected would become less likely to sell to the Club later. (*Id.* at 1865-66.) The transfer restrictions were relaxed from around the date of the President's recommendation until 2009, when the Club again prohibited all transfers to non-members. (Mayes Declaration, Ex. 30.) When members inquired about the value of their shares and occasionally when WFHC and the Club organized solicitations for sales of stock to the Club, WFHC advised that "no market for

shares of [WFHC] exists," and that only transfers to family members of stockholders or to the Club will be approved. (Mayes Declaration, Exs. 22-26.)

### D. Outside Opinions

Sometime around 1960, WFHC obtained a lengthy legal opinion about the structure of WFHC and the Club from an outside law firm, Kelley Drye Newhall & Maginnes. (*See* Mayes Declaration, Ex. 19.) The opinion expressed concerns that many of WFHC's actions may not be legal or valid, including the original lease and amendments thereto. (*Id.* at 3-5.) The opinion did not conclude whether WFHC would be considered a for-profit, normal business corporation or a nonprofit, but it did suggest that, in the event of a shareholder suit, WFHC "would have an excellent chance of sustaining a defense based upon the fact that the Corporation was never intended to be operated for profit as a normal business corporation, but was formed simply as an adjunct of the Club, for the purpose of acquiring, developing and making available to the Club its properties." (*Id.* at 5.) Kelley Drye advised the Club that, in order to rectify the risky structure in which it currently operates, the Club should acquire all WFHC shares, seek shareholder ratification of past acts, and ultimately merge WFHC into the Club. (*Id.* at 7-8.) With regards to the buyback program, Kelley Drye suggested that the Club seek an appraisal of the value of the stock in order to set a prevailing and reasonable price. (*Id.* at 8.)

In 1975, WFHC and the Club obtained another opinion regarding their business structure, this time from Arthur Anderson & Co., an accounting firm. (*See* Mayes Declaration, Ex. 20.) The opinion suggested strategies for the Club to obtain complete control and ownership of WFHC property. (*Id.* at 1.) Arthur Anderson advised WFHC to renegotiate the lease, obtain tax exempt treatment for itself, or merge into the Club. (*Id.* at 1-3.) The WFHC President responded

that WFHC could not obtain shareholder approval to do any of these things. (*See* Mayes Declaration, Ex. 21.)

### E.  Plaintiff's Ownership

In 1928, Plaintiff's father, George Busher, purchased a WFHC share in connection with joining the Club. (Pl.'s 56.1, ¶ 9; Declaration of Kaitlin T. Farrell in Support of Defendants' Motion for Summary Judgment ("Farrell Declaration"), ECF No. 49, Exs. 15, 16.) George Busher remained a WFHC shareholder and member of the Club until his death in 1973. (Pl.'s 56.1, ¶ 10.) From 1953 to 1959, George Busher served simultaneously on the Board of Directors of WFHC and the Board of Governors of the Club and was Vice President of both Boards in 1955 and 1956. (*Id.* ¶¶ 11-12.) During George Busher's tenure on the two Boards, the Boards approved the transfer of over 100 shares to the Club. (*Id.* ¶ 13.) In or around 1951, George Busher mentioned to Plaintiff, in passing, that his share of WFHC was worth $1,000. (*Id.* ¶ 31.) Plaintiff's conclusion from his brief exchange with his father in 1951 was that the share had a set value of $1,000. (*Id.* ¶ 32.)

When Plaintiff's father died in 1973, his WFHC share passed via inheritance to Plaintiff's mother, Josephine Busher. (*Id.* ¶ 21.) The transfer was recorded on the books and records of WFHC in 1974. (*Id.* ¶ 22.) When Plaintiff's mother died in 1985, the WFHC share passed to Plaintiff by inheritance and by agreement between Plaintiff and his sister. (*Id.* ¶ 23.) Plaintiff does not recall attributing any value to the share for estate tax purposes, and there is no evidence that Plaintiff or his attorneys or accountants attributed any value to the share for estate tax purposes or otherwise. (*Id.* ¶ 25.) Plaintiff filed the instant lawsuit 29 years after inheriting a WFHC share. (*Id.* ¶ 26.) In those 29 years, Plaintiff's ownership of the stock was never recorded on WFHC's books and records. (*Id.* ¶ 27.) Plaintiff's personal attorney, Charles Reed, reached

out to the Club and WFHC regarding the transfer of the share into Plaintiff's name in 1989 and again in 2006. (*Id.* ¶ 28.) On both occasions, the WFHC President failed to respond for almost two years, and after the delay, replied with a letter conditionally approving the transfer subject to the receipt of certain documents evidencing Plaintiff's inheritance of the share. (*Id.* ¶ 29.) Such paperwork was never submitted, and Plaintiff disputes that it was legally necessary. (*Id.* ¶ 30.)

In the time that Plaintiff has held the WFHC share, he has not attended a board meeting, requested to review WFHC's financial statements, or made a request to review the corporate books and records. (*Id.* ¶ 33-35.) Plaintiff alleges that he may very well have taken these actions "but for the fact that the annual meeting notices were materially false and misleading regarding their contents and the financial events that occurred at the Club, and failed to disclose facts that would have motivated Plaintiff to seek further information." (*Id.*)

## STANDARD ON A MOTION FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents [and] affidavits or declarations," *id.* at 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may also support an assertion that there is no genuine dispute by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). If the moving party fulfills its preliminary burden, the onus shifts to the non-moving party to identify "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal citation and quotation marks

omitted). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248; *accord Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013) (summary order). Courts must "constru[e] the evidence in the light most favorable to the non-moving party and draw[ ] all reasonable inferences in its favor." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (internal quotation marks omitted). In reviewing the record, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," nor is it to determine a witness's credibility. *Anderson*, 477 U.S. at 249. Rather, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Id.* at 250. The court's role at this stage of the litigation is not to decide issues of material fact, but to discern whether any exist. *See Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

Summary judgment should be granted when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. The party asserting that a fact is genuinely disputed must support their assertion by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999). The nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation." *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (internal citation and quotation marks omitted). Moreover, "[a non-moving party's] self-serving statement, without direct or circumstantial evidence to support the charge, is insufficient to defeat a motion for summary judgment." *Fincher v. Depository Trust &*

8

*Clearing Corp.*, No. 06 Cv. 9959 (WHP), 2008 WL 4308126, at *3 (S.D.N.Y. Sept. 17, 2008) *aff'd*, 604 F.3d 712 (2d Cir. 2010) (citing *Gonzales v. Beth Israel Med. Ctr.*, 262 F. Supp. 2d 342, 353 (S.D.N.Y. 2003)).

## DISCUSSION

Defendants move for summary judgment on three grounds: laches, acquiescence, and estoppel. Plaintiff additionally submits an affidavit seeking relief under Federal Rule of Civil Procedure 56(d).

### A. Federal Rule of Procedure 56(d)

As an initial matter, Plaintiff argues that "Defendants' motion should not even be considered at this time because pursuant to the accompanying Fed R. Civ. P. 56(d) declaration, Plaintiff cannot present facts essential to justify its opposition." (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, ECF No. 43, at 1.) Plaintiff has not had an opportunity to conduct deposition discovery, but document discovery has been completed. Federal Rule of Procedure 56, which governs motions for summary judgment, provides in relevant part that:

> (d) [] If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> (1) defer considering the motion or deny it;
> (2) allow time to obtain affidavits or declarations or to take discovery; or
> (3) issue any other appropriate order.

Fed. R. Civ. P. 56. The Second Circuit, however, clearly requires that the Rule 56(d) affidavit or declaration "include the nature of the uncompleted discovery; how the facts sought are reasonably expected to create a genuine issue of material fact; what efforts the affiant has made

to obtain those facts; and why those efforts were unsuccessful." *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1138 (2d Cir. 1994) (discussing prior version of the rule) (citing *Hudson River Sloop Clearwater, Inc. v. Department of Navy,* 891 F.2d 414, 422 (2d Cir.1989); *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 926 (2d Cir. 1985).) Plaintiff's declaration in opposition to summary judgment did not meet the requirements of Rule 56(d) because it contains only conclusory allegations of incomplete discovery. (*See* Declaration of John Halebian Pursuant to Rule 56(d) in Opposition to Defendants' Motion for Summary Judgment, ECF No. 45.) The declaration states the Plaintiff seeks deposition testimony, or other discovery as appropriate, on a number of issues, which the declaration then lists. (*Id.*) The declaration does not, however, explain who would be deposed, how the facts sought would create an issue of material fact, or what efforts have been made thus far to obtain information on the listed issues. (*Id.*) In light of the fact that Plaintiff's declaration lacks the specificity required by the Second Circuit, the Court will consider the motion as currently submitted. *See Lunts v. Rochester City Sch. Dist.,* 515 F. App'x 11, 14 (2d Cir. 2013).

    **B. Laches**

Laches is an equitable defense that "bars a plaintiff's equitable claim where he is guilty of unreasonable and inexcusable delay that has resulted in prejudice to the defendant." *Ivani Contracting Corp. v. City of New York*, 103 F.3d 257, 259 (2d Cir. 1997) (reviewing de novo grant of summary judgment based on laches), *cert. denied*, 520 U.S. 1211, 117 S.Ct. 1695, 137 L.Ed.2d 821 (1997). A party asserting the defense of laches must establish that: (1) the plaintiff knew of the defendant's misconduct; (2) the plaintiff inexcusably delayed in taking action; and (3) the defendant was prejudiced by the delay. *See, e.g., Tri–Star Pictures, Inc. v. Leisure Time Prod., B.V.*, 17 F.3d 38, 44 (2d Cir. 1994). With regards to the second requirement—

knowledge—"[t]he opposing party need not have had actual knowledge of the claim; rather, it is sufficient that the opposing party should have known." *Bakalar v. Vavra*, 819 F. Supp. 2d 293, 303 (S.D.N.Y. 2011) *aff'd*, 500 F. App'x 6 (2d Cir. 2012) (citing *Philippine Am. Lace Corp. v. 236 W. 40th St. Corp.*, 32 A.D.3d 782, 822 N.Y.S.2d 25, 27 (2006); *Kraker v. Roll*, 100 A.D.2d 424, 474 N.Y.S.2d 527, 533 (1984)).

Because Plaintiff's claims were brought within the applicable statute of limitations period, "the burden is on the defendant[s] to show ... circumstances exist which require the application of the doctrine of laches." *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191 (2d Cir. 1996). Moreover, the Second Circuit has cautioned that "[w]hen a limitation on the period for bringing suit has been set by statute, laches will generally not be invoked to shorten the statutory period." *Ikelionwu v. U.S.,* 150 F. 3d 233, 238 (2d Cir. 1998). "[I]f the applicable legal statute of limitations has not expired, there is rarely an occasion to invoke the doctrine of laches and the burden remains on the defendant to prove all the elements of the defense." *Id.* Plaintiff's claims are subject to a prescribed limitations period of six years. *See* BCL 720; CPLR 213(7); 8 CPLR 213(2) (unjust enrichment). Though Plaintiff's claims are based on a series of breaches beginning over 70 years ago, Plaintiff submits evidence sufficient to create a question of material fact as to whether Defendants breached their fiduciary duties and were unjustly enriched by actions in 2009/10 and 2013 when the Defendants renewed the allegedly wasteful lease, tightened WFHC's share transfer restrictions, rejected lawful demands to transfer shares, and provided allegedly misleading information to shareholders to fraudulently induce the sale of their stock to the Club. (*See* Pl.'s 56.1, ¶¶ 4, 77; Farrell Declaration, Ex. 10; Mayes Declaration, Ex. 26.) Defendants argue that the 2009/10 and 2013 events do not constitute breaches and proof of this "rests on their ability to rebut Plaintiff's theory of WFHC's corporate purpose." (Reply

Memorandum of Law in Further Support of Defendants' Motion for Summary Judgment, ECF No. 47, at 6.) Fundamentally, the legitimacy of all of Plaintiff's allegations turns on whether or not WFHC is a for-profit or a not-for-profit entity. If WFHC is a nonprofit entity, the actions Plaintiff describes—namely the lease extension and share transfer restrictions—would not constitute wrongful activity. Resolution of the issue of WFHC's purpose is therefore required in order for the Court to determine whether the 2009/10 and 2013 actions are breaches and, accordingly, whether the instant action is within the applicable statute of limitations.

The corporate purpose issue, however, is not one that the Court can resolve on summary judgment at this juncture. As Defendants concede, in determining a corporate purpose, the Court must look to the "substance rather than form" of the corporation. *See Quinn v. Stuart Lakes Club, Inc.*, 64 A.D.2d 556, 406 N.Y.S.2d 835 (1978). Though Defendants argue that "ample circumstantial evidence demonstrates the purpose for which it was formed," the Court finds that the Plaintiff has submitted evidence to demonstrate a genuine dispute as to the corporation's original purpose. Specifically, Plaintiff provides circumstantial evidence that the shares were discussed as an investment and the annual meetings and boards of directors often discussed the value of the shares relative to assets and liabilities of WFHC. (Pl.'s 56.1 ¶ 47; Mayes Declaration, Ex. 7 at 6195, Ex. 8 at 6393, Ex. 9 at 5670.) Such actions are inconsistent with a nonprofit, and therefore an issue of material fact as to the corporate purpose of WFHC exists. If the Court were to decide that WFHC is a for-profit entity, the action would be within the applicable statute of limitations period. As noted above, where the action is within the statute of limitations period, only on a rare occasion will a defense of laches succeed. *See Ikelionwu,* 150 F. 3d at 238. Without knowledge of WFHC's corporate purpose, the Court cannot evaluate the laches defense. *See Calabro v. Fleishell*, 48 A.D.3d 206, 207, 851 N.Y.S.2d 155, 156 (2008)

12

(holding that an attempt to assert a laches defense could not "be evaluated until factual issues are resolved"). Thus, Defendants' motion on the defense of laches is denied without prejudice.

### C. Acquiescence and Estoppel

Next, Defendants argue that Plaintiff's claims are "barred for the independent reason that Plaintiff's father, the purchaser of the share and the source of Plaintiff's rights in the share, acquiesced in, participated in, and benefited from the challenged conduct for decades." (Memorandum of Law in Support of Defendants' Motion for Summary Judgment, ECF No. 40, at 14.) Defendants rest this argument on the Supreme Court's decision in *Bangor Punta Operations, Inc. v. Bangor & Aroostook Railroad Company*, 417 U.S. 703 (1974). In *Bangor Punta,* the Supreme Court held a corporation could not maintain a cause of action against the former controlling shareholders of the company based on various alleged acts of corporate mismanagement that occurred during the former shareholders' period of control of the corporation. *Id.* at 711–12. The Supreme Court observed:

> [It is a] settled principle of equity that a shareholder may not complain of acts of corporate mismanagement if he acquired his shares from those who participated or acquiesced in the allegedly wrongful transaction. This principle has been invoked with special force where a shareholder purchases all or substantially all the shares of a corporation from a vendor at a fair price, and then seeks to have the corporation recover against that vendor for prior mismanagement.

*Id*. at 710 (citations omitted). *See also Klum v. Clinton Trust Co.*, 183 Misc. 340, 342, 48 N.Y.S.2d 267, 269 (Sup. Ct. 1944) (holding that "a transferee of shares is in the same position as his transferor with respect to suing on account of transactions prior to the transfer," and therefore, "[c]onsent, participation or acquiescence of a holder of stock, sufficient to prevent him

13

from attacking a corporate act, precludes an attack by a transferee of the stock to the same extent as if he himself was the consenting stockholder.").

Importantly, the *Bangor* court held that where the purchaser acquired the shares after the commission of wrongful acts and received full value for its purchase price (i.e., the price paid reflected the wrongful acts), no injury was incurred and any further recovery would result in a windfall to the plaintiff. *Id.* at 711 ("Moreover, it would in effect allow the shareholders to recoup a large part of the price they agreed to pay for their shares, notwithstanding the fact that they received all they had bargained for.") On this basis, Plaintiff argues that the *Bangor* principle is inapplicable, because Plaintiff does not own a controlling share and "this is not a 'windfall' case providing Plaintiff with 'unjust enrichment.'" (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, ECF No. 43, at 27.) The Supreme Court, however, did not limit the principle's applicability to these circumstances and only held that it applies "*with special force*" where the plaintiff is a controlling shareholder and recovery would result in a windfall. *Id.* at 710 (emphasis added). Nevertheless, the Second Circuit in *Siegel v. Converters Transportation, Inc.* suggested that such a limitation may be proper. 714 F.2d 213 (2d Cir. 1983). Specifically, in *Siegel*, the plaintiff argued that *Bangor* "recognize[s] the principle that a stockholder may not maintain an action to recover for wrongful conduct if that stockholder acquiesced in, participated in, or ratified the wrongdoing complained of." *Id.* at 215. The Second Circuit rejected plaintiff's broad interpretation of *Bangor*, noting that the Supreme Court's "decision ultimately turned on its view that the plaintiff in *Bangor Punta*, having paid a fair price for its shares, *suffered no injury* as a result of any earlier mismanagement of the acquired corporation." *Id.* (emphasis added). In the instant case, Plaintiff submits enough evidence to create a question of material fact as to whether Plaintiff and similarly situated

14

shareholders have suffered an injury as a result of the allegedly wrongful conduct – the devaluation of their shares not reflected in any purchase price paid. (*See, e.g.,* Mayes Declaration, Ex. 18.) Thus, where an injury exists,[1] it is not immediately apparent that the "tainted shares" principle would apply.

In any event, the Court cannot conclude on the basis of evidence currently submitted that the "tainted shares" principle prevents the instant action. It is unclear based on the record if the Plaintiff's father, George Busher, participated or acquiesced in the alleged scheme. Busher served on Board of Directors of WFHC and the Board of Governors of the Club from 1953 to 1959. Though the Boards approved over 100 share transfers to the Club during that time, it may well be that the scheme to acquire control of WFHC was not devised until after Busher's tenure. Specifically, the buybacks occurring during the 1950s were done "as opportunity offers" and without campaigning to "get the shares in." Only in 1967 did the Club resolve to enforce its option to purchase *all* shares that became available and disallow *all* share transfers between individuals. Therefore, an issue of material fact may exist upon further discovery as to whether Busher approved or participated in the scheme, even if he participated in similar, but not wrongful, conduct, and the Court cannot dismiss the claims on the grounds of acquiescence or estoppel.

---

[1] The Court is not holding that an injury does in fact exist. Rather, Plaintiff has presented the Court with evidence to create an issue of material fact with regards to the alleged injury.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is DENIED in its entirety. The Clerk of Court is respectfully requested to terminate the motion at ECF No. 39.

Dated: March 28th, 2016
White Plains, New York

SO ORDERED:

_____
NELSON S. ROMÁN
United States District Judge