LOVELL STEWART HALEBIAN JACOBSON LLP
John Halebian
Adam C. Mayes
420 Lexington Avenue, Suite 2440
New York, New York 10170
Telephone: (212) 500-5010
Telecopy: (212) 208-6806

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| MEREDITH BUSHER AND ELLEN BUSHER, as Co-Personal Representatives of the Estate of EUGENE L. BUSHER, and NANCY TUMPOSKY, <br><br> Plaintiffs, <br><br> v. <br><br> DESMOND T. BARRY, Jr., THOMAS T. EGAN, JOHN P. HEANUE, WILLIAM M. KELLY, FRANCIS P. BARRON, AND WINGED FOOT GOLF CLUB, INC., <br><br> Defendants. <br><br> WINGED FOOT HOLDING CORPORATION, <br><br> Nominal Defendant. | 14 Civ. 4322 (NSR) (JCM) <br><br> **VERIFIED AMENDED <br> SHAREHOLDERS' <br> DERIVATIVE AND DIRECT <br> COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

## <u>TABLE OF CONTENTS</u>

I.   NATURE OF THE ACTION ...................................................................................1

   A.   THE CORPORATE RELATIONSHIP BETWEEN THE HOLDING CORP.
      AND THE CLUB ..........................................................................................2

   B.   DEFENDANTS' FIDUCIARY BREACHES ..................................................4

     (1) Defendants Breached Their Fiduciary Duties to the Holding Corp. and
        Non-Member Shareholders Because the Club's Self-Interested Approach to
        Managing the Holding Corp. Solely for its Own Benefit Violated New
        York Law After There Ceased to Be a Complete Identity of Interest
        between Club Members and Shareholders ..................................................5

        (a)  First, the Holding Corp. was a New York for-profit corporation, not a
           non-profit .........................................................................................5

        (b)  Second, the succession of sweetheart lease deals between the Club and
           the Holding Corp. were contrary to the interests of the Holding Corp.
           and ultimately constituted a de facto sale of the Property without
           adequate consideration ....................................................................6

        (c)  Third, the Club improperly obtained a majority position in Holding
           Corp. stock ......................................................................................7

        (d)  Fourth, over the past decades, Defendants pursued a scheme to
           affirmatively disenfranchise and neutralize non-member shareholders
           to consolidate the Club's control over the Holding Corp. and to
           eliminate entirely any shareholders or dissenting voices who opposed
           Defendants' complete misappropriation and looting of the Holding
           Corp. ...............................................................................................9

     (2) Defendants' Self-Interest to Act in the Best Interest of the Club Breached
        Their Fiduciary Duties to the Holding Corp. ..........................................10

   C.   THE CLUB HAS BEEN UNJUSTLY ENRICHED BY DEFENDANTS'
      VIOLATIONS OF THE LAW ....................................................................10

   D.   DEFENDANTS' VIOLATIONS OF THE LAW ENTITLE PLAINTIFFS TO
      COMMON LAW DISSOLUTION IN ORDER FOR THE HOLDING CORP.
      AND ITS SHAREHOLDERS TO OBTAIN APPROPRIATE RELIEF ........11

   E.   THE LEGAL AND EQUITABLE REMEDIES SOUGHT BY PLAINTIFFS .............11

II.   JURISDICTION AND VENUE...........................................................................12

III.   THE PARTIES ...............................................................................................13

    A.   PLAINTIFFS .........................................................................................13

    B.   DEFENDANTS ......................................................................................13

        (1)  The Director Defendants ..............................................................13

        (2)  Defendant Winged Foot Golf Club ...........................................15

        (3)  The Nominal Defendant ...............................................................15

    C.   OTHER PERSONS ...............................................................................15

IV.   FIDUCIARY DUTIES OWED BY NEW YORK CORPORATE DIRECTORS
      AND CONTROLLING AND MAJORITY SHAREHOLDERS ......................17

V.    FACTUAL ALLEGATIONS ........................................................................18

    A.   THE ORIGINAL HOLDING CORP./CLUB STRUCTURE OF ONE
        SHARE/ONE MEMBER, UPON WHICH THE CLUB AND HOLDING
        CORP. WERE FORMED, WAS IRREVOCABLY RUPTURED DURING
        THE GREAT DEPRESSION WHEN OWNERSHIP OF NUMEROUS
        HOLDING CORP. SHARES SHIFTED TO NON-CLUB MEMBERS ......................18

        (1)  The Initial Planning Period and the Original Solicitation of Stock Purchases .........22

            (a)  The filing of the Certificates of Incorporation of the Holding Corp. and
                the Club .............................................................................22

            (b)  The terms of the Holding Corp.'s and the Club's respective articles of
                incorporation ....................................................................23

            (c)  New York Business Corporation Law ............................25

            (d)  By-Laws of the Holding Corp. and the Club .................27

            (e)  Solicitation of the Original Shareholders .......................27

        (2)  The Holding Corp.'s and the Club's Operations in the 1920s ..................29

            (a)  The construction period and initial play ........................29

            (b)  The Original Lease: general terms ..................................30

            (c)  The Original Lease: rent...................................................30

            (d)  The Membership Structure in the 1920s ........................32

(3)   Subsequent Resales of Holding Corp. Shares Were at Higher Prices......................32

(4)   The Demise of the One Share/One Member Structure .............................................36

(5)   The Continued Market in Holding Corp. Shares........................................................38

(6)   The Reasons that Holding Corp. Shares Continued to Have Value.........................40

    (a)   Value from underlying assets............................................................................40

    (b)   The possible elimination of yearly memberships.............................................42

(7)   The Idea of the Dissolution of the Holding Corp. or its Merger into the
    Club ..............................................................................................................................44

B.   THE FUNDAMENTAL CHANGES IN THE LATER 1940S .....................................45

(1)   The Lease Extension and Modification....................................................................45

(2)   Refinancing of the Debt .........................................................................................47

(3)   The Formal End of the Requirement that Regular Members Hold One
    Share and the Problems This Posed for the Club ....................................................48

(4)   The Club Improperly Amended Its By-Laws to Give Itself an Option to
    Purchase Holding Corp. Shares ...............................................................................50

C.   THE SEPTEMBER 15. 1961 KELLEY DRYE LEGAL MEMO .................................52

D.   THE IMPLEMENTATION OF THE CLUB'S SCHEME TO CONTROL
    HOLDING CORP. FROM THE 1960S TO 2008............................................................56

(1)   The Holding Corp.'s Board Decision to Grant the Club an Option to Extend
    the Lease from 1987 to 2008....................................................................................57

(2)   The Separation of the Holding Corp. and Club Boards ...........................................58

(3)   During the 1960s and 1970s, via both Informal and Organized Stock
    Solicitations, the Club Gradually Built Up a Majority Ownership of
    Holding Corp, Stock...................................................................................................58

(4)   Complicating the Club's Efforts to Gain Control of the Holding Corp.,
    some Well-Informed Club and Holding Corp. Insiders Continued to Seek
    Shares for Themselves or Family Members, while Others Objected in
    Principle to the Club's Domination over the Holding Corp.....................................62

(5) Gillespie Admitted that the Share Transfer Restrictions Were Illegal and that the Holding Corp. Was Not Merely a Title-Holding Company Set Up to Serve the Interests of the Club ...............................................................64

(6) Gillespie's Memo Acknowledging that the Holding Corp. is Not a mere Alter Ego of the Club ...........................................................................66

(7) Gillespie's 2008 Retirement Memo .........................................................67

(8) The Holding Corp.'s New 2008 Board and the Changing of the Guard ................69

VI.   BREACHES OF FIDUCIARY DUTY BY THE HOLDING CORP. BOARD .................70

A.   THE DIRECTOR DEFENDANTS' INCORRECT UNDERSTANDING OF THE HOLDING CORP.'S PURPOSE............................................................71

B.   THE DIRECTOR DEFENDANTS' FAILURE TO  INVESTIGATE THE HOLDING CORP.'S PURPOSE ......................................................................73

(1) The Holding Corp.'s Certificate of Incorporation....................................73

C.   IGNORING RED FLAGS.......................................................................75

(1) The Kelley Drye Memos .....................................................................75

(2) The Correspondence...........................................................................78

(3) The Other Litigations .........................................................................80

(4) The Lease .........................................................................................81

D.   THE CLUB'S SWEETHEART LEASE AGREEMENTS WITH THE HOLDING CORP. CONSTITUTE BREACHES OF FIDUCIARY DUTY .................83

E.   THE CLUB'S DOMINATION OF THE HOLDING CORP.'S ANNUAL SHAREHOLDER MEETINGS.................................................................85

F.   THE CLUB AND ITS AGENTS ON THE HOLDING CORP. BOARDS SOUGHT TO ENSURE THE CLUB'S DOMINANCE OVER THE HOLDING CORP BY FAILING TO PROVIDE SUFFICIENT NOTICE OF HOLDING CORP. SHAREHOLDER MEETINGS TO NON-MEMBER SHAREHOLDERS.................................................................................86

G.   DEFENDANTS CONTINUE TO OFFER TO PURCHASE HOLDING CORP. SHARES BASED UPON MATERIALLY MISLEADING STATEMENTS AND OMITTING TO DISCLOSE MATERIAL INFORMATION...............................88

H.   THE SUBSTANTIAL FINANCIAL VALUE OF THE HOLDING CORP.'S PROPERTY, ONE OF THE MOST WORLD RENOWNED AND ICONIC GOLF PROPERTIES IN EXISTENCE, IS THE PRIMARY BASIS FOR THE SUBSTANTIAL MONETARY DAMAGES CAUSED BY DEFENDANTS..............92

I.   DEFENDANTS' ACQUISITION OF DISPROPORTIONATE AMOUNTS OF D&O LIABILITY INSURANCE AND INDEMNITYAGREEMENTS SHORTLY AFTER BEING THREATENED WITH LITIGATION OVER THEIR MANAGEMENT OF THE HOLDING CORP. EVIDENCES SCIENTER AND CULPABILITY ................................................94

J.   FALSE AND MISLEADING STATEMENTS MADE AND MATERIAL STATEMENTS OMITTED TO BE MADE TO PLAINTIFFS AND OTHER HOLDING CORP. SHAREHOLDERS.........................................97

(1)   Defendants' Knowledge of their Fiduciary Breaches Based on Share Purchases..................................................................................98

(2)   Fraudulent Motives to Commit the Fiduciary Breaches .........................99

K.   FRAUDULENT CONCEALMENT ................................................99

VII.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS.......................................101

VIII.   CLAIMS FOR RELIEF ................................................................105

FIRST CLAIM FOR RELIEF PURSUANT TO BCL 720 (Derivatively on behalf of the Holding Corp. and Against the Director Defendants for Misconduct).........................105

SECOND CLAIM FOR RELIEF COMMON LAW BREACH OF FIDUCIARY DUTY (Derivatively on behalf of the Holding Corp. and Against Defendants for Breach of Fiduciary Duty, Waste and Misappropriation) ......................................107

THIRD CLAIM FOR RELIEF UNJUST ENRICHMENT (Against the Club for Unjust Enrichment)................................................................110

FOURTH CLAIM FOR RELIEF AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES (Derivatively on Behalf of the Holding Corp. and against the Club For Aiding and Abetting Breach of Fiduciary)............................................111

FIFTH CLAIM FOR RELIEF COMMON-LAW DISSOLUTION (Against All Defendants)................................................................112

IX.   PRAYER FOR RELIEF................................................................114

Plaintiffs Meredith and Ellen Busher, as Co-Personal Representatives of the estate of Eugene L. Busher ("Busher Plaintiffs"), and Plaintiff Nancy Tumposky ("Plaintiff Tumposky") (collectively, "Plaintiffs"), by their attorneys, allege upon personal knowledge as to their own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included all of the document and testimonial discovery that has been obtained in this litigation, as follows:

## I.   NATURE OF THE ACTION

1.      Plaintiffs are shareholders of the Winged Foot Holding Corporation (the "Holding Corp."), a for-profit New York business corporation which owns the valuable, 280 acre property in Mamaroneck, in Westchester County (the "Property"), where the exclusive, world-renowned and iconic Winged Foot Golf Club, Inc. (the "Club") is located. Plaintiffs bring this action (the "Action") as a shareholder's derivative action on behalf of the Holding Corp. and against its directors and against the Club for breach of fiduciary duty under New York Business Corporation Law (BCL) Section 720, breach of fiduciary duty under the common law, and unjust enrichment and as a direct claim for common-law dissolution.

2.      Plaintiffs are among the 44% of the Holding Corp.'s shareholders who are not members of the Club, and who have no connection to the Club other than owning a share of the Holding Corp. which owns the Property on which the Club is located. In contrast, the Holding Corp. director defendants (the "Director Defendants") were the members of the Holding Corp.'s Board of Directors when this action was commenced. One has since been replaced by a non-party. Each Director Defendant is a long-time member of the Club, with a direct and substantial personal financial interest in maintaining artificially low annual dues, minimizing other expenses incurred by the Club's members, and otherwise managing the affairs of the Holding Corp. solely and exclusively for the benefit of the Club and its members to the detriment of the non-member

shareholders. None owns a share of the Holding Corp. stock. (Plaintiffs reserve the right to name former Holding Corp. directors as defendants upon discovery of facts supporting wrongdoing on their part.)

**A.      THE CORPORATE RELATIONSHIP BETWEEN
       THE HOLDING CORP. AND THE CLUB**

3.      The Holding Corp. was incorporated under the New York Business Corporations Law in 1921 as a for-profit corporation with 600 equity shares that were intended to be sold to and held by 600 Club members. The initial sales prices of the 600 shares ranged from $600 per share for the early purchasers to as much as $1,600 per share for the later purchasers. These sales of shares resulted in a total of $623,000 in equity capital raised, at an average price of just over $1,000 per share.

4.      The promotion of the original sale of shares included statements that they were an "investment" and were a bargain at their initial sale prices. Accordingly, shortly after an early member purchased a share for $600, and a later member purchased a share for $1,600, that initial $600 per share price had nearly tripled in value. As these were shares in a for-profit New York business corporation, if the proposed golf club was not financially successful and had to be liquidated, the Holding Corp.'s shareholders would receive the funds from a liquidation.

5.      A fundamental principle of corporate law is that persons who provide capital to a corporation expect a return of some kind and that the legal system needs to provide this expectation with some kind of protection. If the legal system were to fail to provide such protection, corporations would find it very difficult, if not impossible, to raise capital. When the capital contribution is in the form of debt, this protection comes from the debt holders having contract rights against the corporation. When the capital contribution is in non-debt form, such as equity shares in the Holding Corp., the expected return comes from a payout of the corporation's residuals,

i.e., wealth generated by the corporation after expenses and debt payments. The legal system provides protection for this expectation by imposing fiduciary duties on those charged with the corporation's direction.

6.    The original purchasers of the Holding Corp.'s shares provided it with a majority of its capital. The documentary and historical record in this case contains substantial evidence that the original purchasers were motivated to do so by the prospect of receiving a return rather than the desire to make a charitable contribution.

7.    This original structure of 600 members and 600 shareholders, initially with a complete identity of interests, ensured that the Holding Corp. and the Club acted in the best interests of both entities.  As long as the Club membership and the shareholder body were essentially coextensive, each investor's expectation on a return of his investment was protected whether or not the Holding Corp. dealt with the Club on an arm's length basis.  Once there was a fracturing of this identity of interests, as shares of the Holding Corp. became dispersed and owned by non-member shareholders, either by sales or by inheritance, the protection of non-member shareholders' interests in a return could only be secured by the directors of the Holding Corp. dealing with the Club on an arm's length basis.

8.    There is nothing in the early record to indicate that the Holding Corp. equity investors were any less interested in protecting a return on their investment than any other equity investors. To the extent, if any, for example, that the Holding Corp. leased the land and improvements to the Club at a submarket rent, the return to each shareholder on his investment would come in part in the form of being able to enjoy, as a Club member, the leased property and improvements for less in the way of dues than the Club would otherwise have needed to charge if it had been paying a full market rent under the lease.  As long as the one share/one member regime was maintained, allowing

3

such concessions to the Club was thus perfectly consistent with the duty of Holding Corp.'s directors to protect the shareholders' expectation of a return.

9.      There has, however, been a long-running erosion in the number of the Holding Corp. shares held by members of the Club. That number has dwindled from almost all of the 600 shares outstanding in the late 1920s to, at last count, at most, only 17 out of 600 shares outstanding. With this erosion of the identity of share ownership and Club membership, the only way that the equity investors' expectation of a return could have been protected would have been for the directors to manage the Holding Corp. so that it dealt with the Club on an arm's length basis. The failure to do this has led to the creeping expropriation of the return expected by the original equity investors.

10.      The funds that the Holding Corp. original equity investors paid to the Holding Corp. at its inception provided almost two-thirds of the funds needed for the land and improvements and still forms the backbone of the facilities that the Club has to offer. Through this creeping expropriation resulting from Defendants' breaches of fiduciary duty, today's Club members have acquired this backbone essentially for free.

**B.      DEFENDANTS' FIDUCIARY BREACHES**

11.      Once the Holding Corp.'s shares were held by non-member shareholders and the identity of interest between the Club members and Holding Corp. shareholders was ruptured, under New York State law, the Holding Corp.'s directors continued to owe a fiduciary duty to *all* of the shareholders, not just the Club-member shareholders, and the Holding Corp.'s directors were required under the law to manage the Holding Corp. in the best interests of all of the shareholders. Defendants failed to do so and, thereby, breached their fiduciary duties.

**(1)  Defendants Breached Their Fiduciary Duties to the Holding Corp.
      and Non-Member Shareholders Because the Club's Self-Interested
      Approach to Managing the Holding Corp. Solely for its Own
      Benefit Violated New York Law After There Ceased to Be a  Complete
      <u>Identity of Interest between Club Members and Shareholders</u>**

12.    When Holding Corp. shares began to be held by non-member shareholders, Club members who were purportedly elected to the Holding Corp. board of directors (there is evidence that corporate formalities regarding elections were not followed) continued to, and to this day continue to, solely serve the interests of the Club and thereby breached, and continue to breach, their fiduciary duties to the Holding Corp. and its shareholders, to the detriment of the Holding Corp. and its shareholders, particularly its non-member shareholders.

13.    These breaches of fiduciary duty were knowing and intentional, extensive and deeply rooted in the Club's management of the Holding Corp. These breaches of fiduciary duty to the Holding Corp, which began decades ago and caused substantial financial damages, have continued unabated up to the present day.

14.    The present Director Defendants are all members of the Club and have deep and long-standing personal and economic connections to the Club. The Director Defendants were nominated for and elected to their positions as Holding Corp. directors by the Club, and one of the key requirements for such designation was an undivided loyalty to the needs of the Club. As mentioned above, none of the Director Defendants is a Holding Corp. shareholder.

*(a)      First, the Holding Corp. was a New York
        <u>for-profit corporation, not a non-profit</u>*

15.    Defendants breached their fiduciary duties to the Holding Corp. and its shareholders by determining, on an *ad hoc* basis, that the primary purpose of the Holding Corp. was to operate completely for the benefit of the Club without giving any consideration whatsoever to the equity interests of non-member Holding Corp. shareholders. Defendants came to this conclusion despite

the fact that Defendants conceded in their testimony that they could not identify a single document that supported that assertion. More importantly, the Director Defendants were aware of several red flags, including a 1961 legal memorandum from a prestigious law firm, Kelley, Drye, Newhall & Maginnes (the "Kelley Drye Legal Memo") that specifically warned about the dire consequences of operating the Holding Corp. as if it were a not-for-profit entity.

(b) *Second, the succession of sweetheart lease deals between the Club and the Holding Corp. were contrary to the interests of the Holding Corp. and ultimately constituted a de facto sale of the Property without adequate consideration*

16.     Defendants breached their fiduciary duties to the Holding Corp. and its shareholders by permitting the Club to operate under illegal leases involving inadequate consideration between the Club and the Holding Corp., starting no later than with the renewal lease that took effect in 1987 at the expiration of the final renewal term of the original 1924 lease (which incorporated two twenty-one year extensions). In addition, Defendants breached their fiduciary duties in agreeing on behalf of the Holding Corp. to further extensions of the lease in later years, including, but not limited to, the lease extension in 2013, for no cost other than the reimbursement of real estate taxes and insurance and other *de minimus* payments. These sweetheart lease deals were designed solely to benefit the Club at the expense of the Holding Corp. and its shareholders and continue to cause ongoing damage to the Holding Corp. in a significant dollar amount in lost rental income and other monetary benefits. Within approximately the last five years, in 2013, the Director Defendants caused the Holding Corp. to extend the Club's lease until 2071 for the minimal rent described above, thereby effecting a *de facto* sale of the Holding Corp.'s Property for grossly inadequate consideration. This was a decision taken with little or no discussion and concededly without any interest in or concern for the damaging effect that it had on the Holding Corp.'s financial value and its shareholders.

17.     The Director Defendants, all sophisticated business people or attorneys, had and continue to have fiduciary obligations that required and require them to seek to obtain a reasonable market rental and/or other monetary return from the Club to the Holding Corp. As alleged in detail below, however, the Director Defendants completely and intentionally failed to do so because of substantial and irreconcilable financial and other conflicts between their interests as directors of the Company (to maximize a return to the Company) and their interests as Club members (to keep the Club's expenses to a minimum). These conflicts caused the Director Defendants to sacrifice the monetary interests of the Holding Corp. for the benefit of the Club and its members in violation of the law.

### (c)     *Third, the Club improperly obtained a majority position in Holding Corp. stock*

18.     Defendants breached their fiduciary duties to the Holding Corp. and its shareholders in connection with Defendants' plan and scheme, carried out over the past decades and continuing to this day, to purchase and accumulate shares from non-member shareholders for inadequate consideration. The purpose of these share purchases was to consolidate the Club's majority control over the Holding Corp. and thereby remove potential obstacles to the sweetheart lease deals described above, the net effect being the Club's misappropriation of millions of dollars of equity of the Holding Corp. for the benefit of the Club and its members, to the detriment of the Holding Corp. and its shareholders.

19.     The Club carried out this scheme by, *inter alia,* preemptively purchasing Holding Corp. shares and placing the Club's members on the Holding Corp. board. Historically, the Club obtained voting control over the Holding Corp. through its longstanding fraudulent scheme of buying shares of the Holding Corp. for the Club from heirs or successors of shareholders, which was facilitated by improperly limiting their ability to sell or transfer such shares elsewhere, and

falsely representing that the purchase price offered by the Club was fair when it was not. For decades, the Club consistently and uniformly made materially false and misleading statements to non-member Holding Corp. shareholders that their shares were never intended to be a genuine investment, that they had no significant value, and that all that could be received for a share was, depending upon the time period, anywhere from approximately $250 to $3,000. These material misrepresentations and omissions of material facts were made despite the fact that the Holding Corp.'s Certificate of Incorporation and By-laws stated that the Holding Corp. was formed to be a for-profit corporation empowered to engage in many business activities in order to generate and maximize profits for the Company and its shareholders, and said *nothing* about the Club, much less that it was to be forever subservient to the interests of the Club or its members.

20.     Furthermore, over the past decades, in violation of New York law, Defendants arbitrarily set unconscionably and unfair low stock prices when offering to purchase or transfer Holding Corp. stock from departing members or heirs of deceased members. Nowhere is it contained in the By-laws or any other document available to shareholders or others how the price of the stock was or is being calculated or determined. Further, the Director Defendants actively carried out the Club's scheme to accumulate the Holding Corp. shares by repeating and disseminating the Club's misleading statements about the Holding Corp. share-value, without disclosing their own conflicts of interests or that the Club had a plan in place to specifically accumulate shares in order to consolidate its control over the Holding Corp.

>    **(d)**     ***Fourth, over the past decades, Defendants pursued a scheme to affirmatively disenfranchise and neutralize non-member shareholders to consolidate the Club's control over the Holding Corp. and to eliminate entirely any shareholders or dissenting voices who opposed Defendants' <u>complete misappropriation and looting of the Holding Corp.</u>***

21.    Defendants breached their fiduciary duties to the Holding Corp. and its shareholders by effectively disenfranchising over 200 shareholders, more than one-third of the total shareholders, and crippling the ability of the Holding Corp. to function, in certain critical respects, under the New York BCL. Although the Holding Corp. was organized with 600 shares, and still has only 600 issued shares, over the years, due to intentional wrongdoing or conscious and willful neglect by the Club and the various directors of the Holding Corp., Defendants lost track of well over 200 shareholders, i.e., more than one-third of all the Holding Corp. shareholders. Defendants' wrongful conduct, as detailed below, caused this incomprehensible loss of contact with shareholders, many of whom were affluent and successful business persons with children and heirs otherwise known to the Club, who should not have been difficult to locate. Over the past years there are documented instances whereby the Club intentionally failed to provide notice of annual Holding Corp. meetings to non-member shareholders and otherwise failed to make a reasonable effort to locate or provide notice of shareholder meetings. Defendants were motivated to commit such wrongdoing in order to neutralize non-member shareholders who would be primarily interested in protecting the best interests of the Holding Corp. at the expense of the Club. Since the Holding Corp. is incapable of communicating with more than one-third of its shareholders it has crippled the ability of the Holding Corp. to function under the New York BCL to the extent that the Holding Corp. is incapable of engaging in any transaction that requires a two-thirds majority vote of its shareholders. Accordingly, Defendants' breaches of fiduciary duty have irrevocably damaged the Holding Corp.

**(2)  Defendants' Self-Interest to Act in the Best Interest of the Club**
  **Breached Their Fiduciary Duties to the Holding Corp.**

22.    Contrary to their fiduciary obligations running to the Holding Corp., Defendants intentionally acted to favor the Club to the detriment and substantial damage of the Holding Corp. Defendants do not desire to have the Club pay any reasonable rental or other type of return to the Holding Corp. because it would substantially increase the need for higher initiation fees for new members and other personal out-of-pocket golfing expenses, such as annual dues, of the Director Defendants and other Club members, who have had and continue to have their memberships wrongfully subsidized by the Holding Corp. shareholders who are not Club members. Thus, while the Holding Corp.'s extraordinarily valuable real estate asset should be expected to generate a fair annual return to the Holding Corp. and its shareholders, the Director Defendants' agenda has been to ensure that 100% of that return is sacrificed by the Holding Corp. shareholders and misappropriated instead by the Club and its members.

**C.    THE CLUB HAS BEEN UNJUSTLY ENRICHED BY**
  **DEFENDANTS' VIOLATIONS OF THE LAW**

23.    Throughout its history, the Club has been unjustly enriched by paying a rent for the Holding Corp.'s property that is well below what a fair-market rent would be, at the expense of the Holding Corp., dollar for dollar. Insofar as the Holding Corp. does not otherwise have a direct claim against the Club on a contractual or tort basis, the Holding Corp. asserts, derivatively via Plaintiffs, a claim for unjust enrichment to recover from the Club the benefits enjoyed by the Club at the Holding Corp.'s expense because under all of the circumstances recited herein those benefits are such that in equity and good conscience the Club may not retain. This Complaint's unjust-enrichment claim is asserted in the alternative.

10

**D.  DEFENDANTS' VIOLATIONS OF THE LAW ENTITLE PLAINTIFFS TO COMMON LAW DISSOLUTION IN ORDER FOR THE HOLDING CORP. AND ITS SHAREHOLDERS TO OBTAIN APPROPRIATE RELIEF**

24.    Defendants have acted, and will continue to act, in a manner that ignores the proper interests of the Holding Corp. and its shareholders to such an extent that they have effectively looted the value of the Holding Corp. for the Club and have rendered the shares of the Holding Corp. virtually worthless, notwithstanding the significant value that those shares have, or would have in the absence of Defendants' breaches, as a result of which the Holding Corp. should be judicially dissolved, as permitted under the common law, with its assets liquidated and equity distributed to its shareholders on a pro rata basis.

**E.   THE LEGAL AND EQUITABLE REMEDIES SOUGHT BY PLAINTIFFS**

25.    Plaintiffs acting derivatively for the Holding Corp. seek both legal and equitable relief from the Court. They seek legal monetary damages in several alternative forms.

26.    Plaintiffs seek legal relief on behalf of the Holding Corp.

(a)   *First*, Plaintiffs seek monetary damages on behalf of the Holding Corp. for breach of fiduciary duty by Defendants for improperly causing the Holding Corp. to enter into long-term leases with the Club for inadequate consideration for every year going back to 1987, the final year of the original lease and the two extensions provided for therein. The basis for the Holding Corp.'s entitlement to damages going back to 1987 is that the facts underlying the breach of fiduciary duty claims that sound in fraud were fraudulently concealed by Defendants and the predecessors of the Director Defendants until being exposed in the course of discovery in this Action, and therefore the statute of limitations was indefinitely tolled for this period of time.

(b)   *Second*, and in the alternative, Plaintiffs seek damages on behalf of the Holding Corp. measured by the entire value of the Property, as the measure of damages for Defendants' wrongfully

extending a series of leases between the Club and the Holding Corp. until 2071, as a *de facto* sale of the Property without adequate consideration.

27.    Plaintiffs also seek equitable relief for the Holding Corp.

(a)    *First*, Plaintiffs derivatively for the Holding Corp. seek an order that invalidates all leases after 1987 to permit damages to be assessed for all years since 1987.

(b)    *Second*, Plaintiffs derivatively for the Holding Corp. seek an order of the Court that requires the Winged Foot Golf Club Property be sold at auction in order for the Holding Corp. and ultimately its shareholders to realize and receive back the valuable equity that has been misappropriated and looted by the Club, the Director Defendants, and the various directors that the Club has installed on the Holding Corp. board who knowingly engaged in wrongful conduct over the years.

28.    Finally, Plaintiffs acting directly as shareholders of the Holding Corp. seek the common-law dissolution of the Holding Corp.

## II.    <u>JURISDICTION AND VENUE</u>

29.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, by virtue of diversity of citizenship. The amount in controversy, exclusive of interest and costs, is in excess of $75,000. Plaintiffs are citizens of the State of Massachusetts and the State of New Jersey. Defendants are citizens of the State of New York or of states other than Massachusetts or New Jersey.

30.    Venue is proper in this District because several Defendants reside in this District and the Holding Corp. maintains its principal place of business in this District.

### III.   THE PARTIES

### A.   PLAINTIFFS

31.   Plaintiffs Meredith Busher and Ellen Busher, as Co-Personal Representatives of the Estate of Eugene L. Busher, are residents of the State of Massachusetts and, by reason of the death of Eugene L. Busher in August 2016, who was the original plaintiff in this litigation when it was filed in June, 2014 and who owned one share of Holding Corp. stock at his death, exercise dominion and control over the Holding Corp. share that is presently in the Estate of Eugene L. Busher.

32.   Nancy Tumposky is a resident of the State of New Jersey and is a granddaughter of Karl Schmieg, one of the original 600 Club members and Holding Corp. shareholders who purchased and held certificate number 304 in the early 1920s. The Holding Corp.'s stock records still list Mr. Schmieg as the owner of the share. Mr. Schmieg was an extraordinarily successful furniture maker, who had a furniture factory on East 72nd Street on the Upper East Side of Manhattan and lived in Westchester County with his family, not far from the Club, until his death in 1949. His work has been exhibited by and is in the collection of the Metropolitan Museum of Art. Suffice it to say that neither Mr. Schmieg, nor his descendants would have been difficult to locate for purposes of sending an annual notice of a Holding Corp. shareholder meeting if the Club, the Director Directors or their predecessors made a minimal effort to locate them. Through a series of wills and trusts Ms. Tumposky owns an interest in the Holding Corp. share evidenced by certificate number 304.

### B.   DEFENDANTS

### (1)   The Director Defendants

33.   The Director Defendants comprise the roster of the Holding Corp.'s board of directors, as elected by its majority and controlling shareholder, the Club, when this Action was commenced. In addition to serving as directors, all the Director Defendants were also officers of

the Holding Corp. when this Action was commenced, which thus has no outside or independent directors. Well before being elected to the Holding Corp. board, all the Director Defendants were longstanding members of the Club.

34.     Defendant Desmond T. Barry, Jr. is a director of the Holding Corp. and its president. He is currently a citizen of Florida. He has been a member of the Club since in or about 1978.  He is not a shareholder of the Holding Corp. Barry is a long-time partner at the law firm of Condon & Forsyth LLP, and specializes in air-crash litigation, representing airlines and aircraft manufacturers. He informally represented the interests of the Club in attempting to dissuade at least one Holding Corp. shareholder from challenging the sweetheart lease deal in favor of the Club.

35.     Defendant Thomas T. Egan is a director and the Vice-President of the Holding Corp. He is a citizen of New York. He has been a member of the Club since in or about 1983. He is not a shareholder of the Holding Corp. Egan has held positions as a managing director of Salomon Smith Barney Inc., and as chairman of the board of trustees of the State University of New York.

36.     Defendant John P. Heanue is a director and the Co-Treasurer of the Holding Corp. He is a citizen of New York. He has been a member of the Club since in or about 1987 and is not a shareholder of the Holding Corp. He is a former managing director with Goldman Sachs & Co.

37.     Defendant William M. Kelly was, until a couple a years ago, a director and the Co-Treasurer of the Holding Corp. He is presently a citizen of Florida. He has been a member of the Club since in or about 1981. He is not a shareholder of the Holding Corp. He was formerly the Chairman and Chief Executive Officer of Blue Tee Corp., a holding company which owns several companies in the steel fabricating business.

38.     Defendant Francis P. Barron is a director and the Secretary of the Holding Corp. He is a citizen of Connecticut. He has been a member of the Club since in or about 1997. He is not a

shareholder of the Holding Corp. Barron is a former partner at Cravath, Swaine & Moore LLP, specializing in securities, antitrust and commercial litigation.

### (2) **Defendant Winged Foot Golf Club**

39.    Defendant Winged Foot Golf Club was formed on August 17, 1921 and is a New York Domestic Not-for-Profit Corporation. The Club is located in Mamaroneck, New York. As the majority and controlling shareholder of the Holding Corp., the Club owes and owed fiduciary duties to the Holding Corp. and its minority shareholders.

### (3) **The Nominal Defendant**

40.    Nominal Defendant Winged Foot Holding Corporation was formed on August 8, 1921 under the laws of the State of New York, as a Domestic Business Corporation with a board of directors comprising five members.  The Company is located in Mamaroneck, N.Y.

## C.    **OTHER PERSONS**

41.    Cyrill Gsell, by reason of an inheritance, is an owner of a share of the Holding Corp., certificate number 925 that belonged to his father, Roland Gsell, who was a member of the Club. Cyrill Gsell lives in Rye Brook, New York, not far from the Club. Share certificate 925, and its present owner, is one of the more than 200 share certificates and owners that the Club and the Holding Corp. consider to be lost or not able to be located for purposes of sending an annual meeting notice of the Holding Corp. shareholder meeting. Cyrill Gsell has never received a notice of an annual shareholder meeting from the Holding Corp., despite the fact that he shares the same, uncommon last name as his father, that he lives relatively close to the Club, and that he is known to members of the Club who some years ago offered to purchase his share for $3,000. The fact that he still does not receive annual notices of the Holding Corp. shareholders meeting can only be

explained by the fact that the Club and the Director Defendants intend to disenfranchise him and others in his position from having any voice whatsoever in the management of the Holding Corp.

42.    Josephine Mandeville, through her position as the executor of the estate of Loretta Mandeville, and due to an inheritance from her husband Owen Mandeville, Jr., owns Holding Corp. share certificate number 1558 which is listed as such on the Holding Corp.'s stock records. Mandeville resides in the Philadelphia, Pennsylvania area. Mandeville's late husband, Owen Mandeville, Jr., was a member of the Club decades ago and after he passed away Mandeville continued the membership until some years ago. As the holder of a Holding Corp. share, Mandeville regularly received notices of annual Holding Corp. shareholder meetings for a period of years. However, several years ago when she moved her residence, she stopped receiving Holding Corp. annual shareholder meeting notices. Moreover, like Gsell, above, Mandeville is not and would not have been difficult to locate for purposes of continuing to send her annual Holding Corp. notices of the annual shareholder meetings. If her name is "googled," near the top of the results is a Bloomberg corporate profile that includes address and telephone information for her personally and her other affiliations such as the Connelly Foundation, a charitable foundation of approximately $300,000,000 of assets, of which she is the Chair and President.  Mandeville is also prominently featured on the Connelly Foundation web site, which also contains easily accessible and available address and telephone information. Inexplicably, earlier this year, after not having received any Holding Corp. notices of the annual shareholder meeting for many years, one such notice suddenly appeared. The likely explanation is that the Club and the Director Defendants have discovered that publicity from the instant litigation has caused significantly increased chatter among Holding Corp. shareholders who have never seen any financial return whatsoever on their equity investment and are evidencing a significantly greater interest in asserting their legal rights to such a return.

## IV.   FIDUCIARY DUTIES OWED BY NEW YORK CORPORATE DIRECTORS AND CONTROLLING AND MAJORITY SHAREHOLDERS

43.    Because the power to manage the affairs of a corporation is vested in the directors and majority shareholders, they are cast in the fiduciary role of "guardians of the corporate welfare." In this position of trust, they have an obligation to all shareholders to adhere to fiduciary standards of conduct and to exercise their responsibilities in good faith when undertaking any corporate action. Actions that may accord with statutory requirements are still subject to the limitation that such conduct may not be for the aggrandizement or undue advantage of the fiduciary to the exclusion or detriment of the stockholders.

44.    The fiduciary must treat all shareholders, majority and minority, fairly. All corporate responsibilities must be discharged in good faith and with "conscientious fairness, morality and honesty in purpose."   Fiduciaries have the obligations of candor and of good and prudent management of the corporation. When a breach of fiduciary duty occurs, that action will be considered unlawful and the aggrieved shareholder may be entitled to equitable relief.

45.    The elements of a cause of action to recover damages for breach of fiduciary duty are (1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct.

46.    The business judgment rule only bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes. Indeed, members of a board of directors of a corporation owe a fiduciary responsibility to the shareholders in general and to individual shareholders in particular to treat all shareholders fairly.

47.     Determinations as to whether the directors' activities were undertaken in good faith for a legitimate corporate purpose and whether other means were available depend not only on an analysis of the objective facts but as well in part on an appraisal of the defendants' motives, involving as it will issues of credibility. Good faith or bad faith as the guide or the test of fiduciary conduct is a state or condition of mind, a fact which can be proved or judged only through evidence.

48.     The Club, as the Holding Corp.'s controlling and majority shareholder owes and owed the Holding Corp. and its shareholders unwavering fiduciary duty obligations.

## V.     FACTUAL ALLEGATIONS

## A.     THE ORIGINAL HOLDING CORP./CLUB STRUCTURE OF ONE SHARE/ONE MEMBER, UPON WHICH THE CLUB AND HOLDING CORP. WERE FORMED, WAS IRREVOCABLY RUPTURED DURING THE GREAT DEPRESSION WHEN OWNERSHIP OF NUMEROUS HOLDING CORP. SHARES SHIFTED TO NON-CLUB MEMBERS

49.     The Holding Corp. was organized in August 1921 pursuant to the Business Corporations Law of the State of New York. After incorporation, the Holding Corp. issued 600 shares. These shares were sold for a total of $623,000, an average of about $1,000 per share. The Holding Corp. used this sum, along with $450,000 that it raised by the issuance of debt, to purchase approximately 280 acres of land in the Town of Mamaroneck in Westchester County. The Holding Corp. constructed two golf courses and club buildings. Shortly after the Holding Corp. was founded, the Club was organized, not as a business corporation, but pursuant to Chapter 40 of the Laws of 1909 of the State of New York relating to Membership Corporations. Pursuant to a lease dated November 1, 1924 (the "Original Lease"), the Holding Corp. leased the land with the two golf courses and other improvements to the Club for twenty-one years, with provision for two (2) twenty-one-year renewals.

50.   The original purchasers of the 600 shares provided the Holding Corp. with the majority of its capital, and there is substantial evidence that the Holding Corp.'s shareholders were motivated to do so by the prospect of receiving a return. Ownership of a share of the Holding Corp. was a condition of membership in the Club, and Club membership was limited to 600 persons. This condition made owning a share highly beneficial, among other reasons, because owning a share was necessary for one to enjoy the Club's facilities and the prestige of membership.

51.   The promotion of the original sale of the Holding Corp. shares included statements that they were an "investment" and were a bargain at their initial sale prices. In fact, through the 1920s, many of the Holding Corp.'s original shareholders, when they resigned from the Club, sold their shares to other individuals—who, of course, were required to own a share to become members of the Club—for substantially more than the price they originally paid.

52.   The Holding Corp. and the Club were incorporated by members of the New York Athletic Club (the "Athletic Club"). As highly sophisticated business and legal professionals, their choice to form the Holding Corp. under the Business Corporations Law is significant evidence that the expectation of the original equity investors was that the Holding Corp. was a for-profit corporation. Moreover, there is substantial authority under New York law that it would have been impermissible in 1921 to incorporate a not-for-profit corporation under the Business Corporations Law. The Business Corporations Law permitted incorporation only for "any lawful business purpose or purposes," and "business purpose" meant a profit purpose. Section 2 of 1909 Business Corporations Law (in effect in 1921).

53.   New York's Business Corporations Law contemplates that the shareholders are its residual claimants. The shareholders are to be the ultimate recipients of the corporation's residuals—whatever wealth is generated by the corporation after giving priority to anyone with

contractual claims against the corporation, such as providers of goods and services for its operations, and any holders of debt. As provided both under the Business Corporations Law in 1921 and under the current New York corporation law that governs the Holding Corp. today, these residuals can be distributed to the shareholders in a number of ways. In the Holding Corp.'s early years, during the 1920s, the Holding Corp. had at least three possible means to provide a return to its shareholders.

54.     The *first approach* would have been for the Holding Corp. to have insisted on receiving a market level of rent for the land and improvements that it leased to the Club, equivalent to what the Holding Corp. would have received in an arm's length bargain. Then, from time to time, the directors could cause the Holding Corp. to distribute pro-rata to its shareholders whatever portion of its net cash flow was deemed appropriate. This first approach would also allow the original purchaser a potential capital gain should he, for reasons of resignation or death, discontinue being a Club member and sell his Holding Corp. share.

55.     The *second approach*—the approach the Holding Corp. followed—was to lease the land and improvements to the Club at a sub-market rent with the knowledge that the holder of each of the 600 shares was also a member of the Club. The return to each shareholder would come in part, then, in the form of being able to enjoy, as a Club member, the leased property and improvements for less in the way of dues than the Club would otherwise have needed to charge if it had been paying a full market rent under the lease. The burden imposed upon the Holding Corp. by accepting a sub-market rent would be shared equally by each of the 600 shareholders.

56.     This second approach also would allow the original purchaser to sell his Holding Corp. share and to realize a potential capital gain; and in the 1920s, as the Holding Corp. followed the second approach, this is exactly what happened. Potential new members needed to acquire one

of the fixed number of outstanding shares. Thus, the growth in the attractiveness of being a Winged Foot Club member led to an increase in the value of each share and an opportunity for discontinued members to realize a capital gain when they sold their shares.

57.    The *third approach* involved the expectation of an important possible additional means to receive a residual. At some point, the leasing arrangement with the Club could end, and, if it did, there could be a sale of the land and improvements and a distribution of the proceeds from the sale after the payment of any indebtedness. At the latest, the Holding Corp. could have insisted on such a result in 1987 at the end of the Original Lease's second twenty-one year renewal term. This result would have occured earlier than 1987 if the Club had not exercised one or both of its rights of renewal or had insisted at renewal time on amendments that the Holding Corp. refused, or if the Club had failed, had defaulted under the terms of the Original Lease, or had chosen to dissolve.

58.    Developments starting in the 1930s, however, made the approach the Holding Corp. followed—that is, the approach based on a sub-market rent combined with each shareholder enjoying membership in a Club that benefits from obtaining its facilities on sub-market terms—an increasingly untenable way of providing a return to the Holding Corp.'s shareholders.

59.    During the Great Depression of the 1930s, the Club began admitting "yearly" and other categories of temporary members who were not required to hold a share and only had to pay dues to enjoy full playing privileges. Each "regular" member, though, was still required to hold a share of the Holding Corp. This bending of the original plan's one share/one member rule continued, despite the return to prosperity, into the first part of the 1940s because of the disruptions to ordinary life caused by World War II. Finally, early in 1949, the Club formally dropped the requirement that even a regular member hold a share of the Holding Corp.

60.     Today, at most only 17 out of the 600 originally issued shares appear to be held by Club members or their heirs. As a result of this nearly complete separation between the ownership of the Holding Corp. shares and Club membership, almost all the benefits that result from sub-market lease terms go to non-shareholders. Moreover, once the one share/one member plan broke down, each extension of the lease on sub-market terms deprived the Holding Corp. of receiving a market-rate rent or, alternatively, of the opportunity to sell the land and improvements and to dissolve the Holding Corp. with what would likely have been a large liquidating distribution. These results are contrary to the fiduciary duty of the Holding Corp.'s directors and its majority shareholder, the Club, to operate the Holding Corp. in a way that seeks to provide the holders of each Holding Corp. share with a return on the investment made by the share's original purchaser.

**(1)     The Initial Planning Period and the Original Solicitation of Stock Purchases**

61.     At a meeting of the members of the Athletic Club in June 1921, Charles C. Nobles, Acting Chairman of the Committee on Golf of the New York Athletic Club, reported on a plan to organize a golf club limited to members of the Athletic Club. The plan included a preliminary budget that projected the cost of acquiring the needed land and implementing the necessary improvements to create a golf course and club facilities. The plan contemplated that stock certificates would be sold and that "the membership and stock certificates would be transferable, subject to the usual transfer fee of approximately $200." A resolution supporting the organization of such a golf club and delegating this organization to a named committee (the "Golf Committee") was adopted unanimously at the conclusion of this meeting.

**(a)     *The filing of the Certificates of Incorporation
of the Holding Corp. and the Club***

62.     The minutes of the August 8, 1921 meeting of the Golf Committee report that the articles of incorporation of the Holding Corp. and the articles of incorporation of the Club had been

drawn up and that the plan was that the Holding Corp. "*would have title and control the property and that the same would be leased by the Winged Foot Golf Club.*" (Emphasis added)

63.     The terms of the Holding Corp.'s articles of incorporation and the corporate law under which it was organized demonstrated that the suppliers of its capital—the initial shareholders—had a legally protected expectation of a financial return. In contrast, the terms of the Club's articles of incorporation and the law under which it was organized demonstrated that the status of being a Club member did not have such a legally protected expectation.

### (b)     The terms of the Holding Corp.'s and the Club's respective articles of incorporation

64.     On August 15, 1921, the Holding Corp.'s Certificate of Incorporation was filed, which stated that it was "forming a corporation pursuant to the Business Corporations Law of the State of New York." The purposes clause of the Certificate listed as the Holding Corp.'s purposes: "To acquire by purchase .., and to hold, own, manage, improve, develop, sell, lease, exchange mortgage, or otherwise dispose of or deal in real estate." There is no mention of a golf club and clearly the Holding Corp. was not confined to developing a golf course that it then forever leased to such a club.

65.     The Certificate authorized the Holding Corp. to issue up to 600 shares "for such consideration as from time to time be fixed by the Board of Directors." The Certificate also granted the Holding Corp. the power "to guarantee the payment of any dividends upon stocks … so far as the same may be permitted in the case of corporations organized under the Business Corporations Law of the State of New York." Thus, the Certificate clearly contemplated the possibility of making pay outs to equity holders during the life of the corporation.

66.     The Certificate of Incorporation indicated the following objectives for which the Holding Corp. was formed:

To acquire by purchase, lease, hire or otherwise, and to hold, own, manage, improve, develop, sell, lease, exchange, mortgage, or otherwise dispose of or deal in, real estate, lands, tenements or hereditaments or any interest therein;

To erect or cause to be erected on any lands owned, held or occupied by the Corporation, buildings or other structures with their appurtenances, and to manage, operate, lease, rebuild, enlarge, alter or improve any buildings or other structures now or hereafter erected on any lands so owned, held or occupied;

To acquire by purchase or lease or otherwise, any personal property of chattels of any class or description necessary, useful or proper in the equipment, furnishing, improvement, development or management of any property, real or personal, at any time owned, held or occupied by the Corporation, and to invest, trade and deal in personal property, and to mortgage, pledge, sell or otherwise dispose of any personal property at any time owned or held by the Corporation;

To do any and all business above mentioned and set forth to the same extent as natural persons might or could do;

To borrow money, to issue bonds, debentures, notes and other obligations, secured and unsecured of the Corporation, from time to time, for moneys borrowed, or in payment of property acquired, or for any of the other objects or purposes of the Corporation, or for any of the objects of its business, and to secure the same by mortgage or mortgages, or deed or deeds of trust, or pledge or other lien upon any or all of the property, rights, privileges or franchises of the Corporation, wheresoever situated, acquired or to be acquired, so far as permitted by law and this Certificate of Incorporation; to sell, pledge or otherwise dispose of any or all such debentures or other bonds, notes and other obligations in such manner and upon such terms as the Board of Directors may deem judicious; and to guarantee the payment of any dividends upon stocks, or the principal or interest upon bonds, or the contracts or other obligations of any corporation or individual, so far as the same may be permitted under the Business Corporations Law of the State of New York;

The foregoing clauses shall be construed both as objects and powers; and it is hereby expressly provided that the foregoing enumeration of specific powers shall not be held to limit or restrict in any manner the powers of the Corporation;

In general, to do any and all things and exercise any and all powers which may now or hereafter be lawful for the Corporation to do or exercise under and in pursuance of the Business Corporations Law of the State of New York, or of any other law that may be now or hereafter applicable to the Corporation.

67.    The Holding Corp.'s broad business objectives, as set forth in its certificate of incorporation, also informed the view of George J. Gillespie, who was a Holding Corp. board member and its President for more than 30 years, that the Holding Corp. could not qualify for tax

24

exempt status as a title-holding corporation under I.R.C. Section 501(c)(2) because, as he advised an Arthur Andersen tax partner, "there is no evidence in our charter or by-laws of the fact that the Corporation was organized exclusively to hold title to property, to collect the income therefrom, and to turn over the entire amount, less expenses to the Club."

68.    The Holding Corp.'s general business objectives also confirm the findings contained in a July 1976 report of Charles Evans, prepared at Gillespie's behest, which was based on Evan's review of the minute books of both the Holding Corp. and the Club from 1921 to 1961. In his report (the "Evans Report"), Evans states "Holding, according to its Certificate of Incorporation, is a real estate corporation."  According to Evans, meeting minutes from "August 25, 1925 and thereafter show that Holding took charge of the construction of the golf courses and handled election of members to the Club and also resignation of members and that Holding's business was exclusively the construction of the golf course and organization of the Club and its financing and operation." Such activities are wholly incompatible with those of a mere title holding company.

*(c)*    *New York Business Corporation Law*

69.    The Holding Corp.'s and the Club's respective articles of incorporation refer to the Holding Corp. being a "business corporation" and to the Club being a "membership corporation." Under New York corporation law in 1921, the distinction between a "business corporation" and a "membership corporation" is between an entity organized for profit that contemplates the distribution thereof to its shareholders and a club where there is no such contemplation.

70.    Section 2 of New York's General Corporation Law of 1909, which was in effect in 1921, distinguishes between a "business corporation," which it includes as a type of "stock corporation," and a "membership corporation," which it includes as a type of "non-stock corporation." Section 3 in turn provides:

A "stock corporation" is a corporation having a capital stock divided into shares, and which is authorized by law to distribute to the holders thereof dividends or shares of the surplus profits of the corporation. A corporation is not a stock corporation because of having issued certificates called certificates of stock, but which are in fact merely certificates of membership, *and which is not authorized by law to distribute to its members any dividends or share of profits arising from the operations of the corporation*. [Emphasis added]

71.     Thus, the terms of the Holding Corp.'s articles of incorporation reflect a choice by its incorporators to incorporate it as a business corporation and contemplate the Holding Corp. generating surplus profits and distributing them to its shareholders. The terms of the Club's articles of incorporation reflect a choice by its incorporators to incorporate it as a membership corporation and do not contemplate the generation of surplus profits and their distribution to its members.

72.     Section 102(a) of the current New York Business Corporation Law states that a "'corporation' or 'domestic corporation' means a corporation *for profit* formed under this chapter, or existing on its effective date and theretofore formed under any other general statute or by any special act of this state for a purpose or purposes for which a corporation may be formed under this chapter, other than a corporation which may be formed under the cooperative corporations law." (Emphasis added.) New York corporate law as specified in the current statute applies to the Holding Corp. just as if the Holding Corp. had been incorporated under it today because the General Corporation Law of 1909, as amended as of the time of the Holding Corp.'s incorporation in 1921, had a "reservation clause" in Section 320, which provided: "The charter of every corporation shall be subject to alteration, suspension and repeal, in the discretion of the legislature." In addition, the New York Constitution provides "Corporations may be formed under general laws . . . All general laws and special acts passed pursuant to this section may be altered from time to time or repealed." In 1921, this was Article VIII, Section 1. In 1938, this section was renumbered and is currently in force as Article X, Section 1.

### (d)   *By-Laws of the Holding Corp. and the Club*

73.    The Holding Corp.'s and the Club's respective by-laws are dated August 29, 1921, the date of the Holding Corp.'s meeting of incorporators and of the Holding Corp.'s and the Club's first board meetings.

74.    The Club's August 29, 1921 by-laws required as a prerequisite to becoming a Club member that "every such person [elected to membership] shall, within thirty (30) days after identification of his election, become the owner of one fully paid share of the capital stock of Winged Foot Holding Corporation, or of a part paid subscription for one share of said stock evidencing the payment of at least $200. thereon." (Art. V, § 2.)" By limiting the number of authorized shares and also requiring candidates to purchase a share of the Holding Corp. to become a Club member, a market (i.e., buyers and sellers) was created for shareholders to convert increases in share value into pecuniary profits. In other words, the organizational structures of both the Holding Corp. and the Club allowed for a market to be created whereby shares could be exchanged, and any increase in perceived value to be a member of the Club could be captured, to a large extent, through share price increases.

75.    The August 29, 1921 Holding Corp. by-laws do not restrict transfers of stock beyond requiring that such transfers "be made only on the books of the Corporation and only by the person named in the certificate or by an attorney thereunto duly authorized and upon surrender and cancellation of the old certificate." (Art. V, § 2.)

### (e)   *Solicitation of the Original Shareholders*

76.    Even before the incorporation of the Holding Corp., the Golf Committee began soliciting the purchase of its shares and did so in a fashion suggesting that there would be a significant return for such purchases.

77.     From the very beginning, the authorized shares of the Holding Corp. were expected to be sold in lots of ever increasing value. This would support the increasing value of the land as improvements were made and structures were built. It also indicates that the value of the Holding Corp.'s shares would increase as time went on and membership grew.

78.     At the initial June 1921 meeting of the Athletic Club members interested in golf, initial share cost expectations were:

| | |
|---|---:|
| 200 members at $600 each | $120,000 |
| 100 members at $750 each | 75,000 |
| 100 members at $1,000 each | 100,000 |
| 50 members at $1,200 each | 60,000 |
| | $355,000 |

79.     The plan adopted at the June 1921 meeting establishing the Golf Committee was that the stock certificates would be transferable.

80.     A letter attached to the minutes of the meeting held on July 7, 1921, announced the formal resolution that the Club be organized and confirmed that the first 200 memberships would be at $600 each and then increased to at least $750.  This letter further touts the value of the Club, even at these prices, by stating:

> As you know membership in other clubs in the Metropolitan District are at a premium some of them being worth from $1,500.00 to $3,000.00, *so it can be safely assumed that within a year after the course is completed the certificates of stock will be worth at least the minimum value or more of the other clubs*. [Emphasis added.]

81.     This represents an increase of anywhere from two and one-half times to five times an initial $600 investment in a very short time and leaves little doubt that initial shareholders were enticed to invest at least partly on anticipated growth in share value.

82.     A later Club announcement discusses the property as being 280 acres of the finest golfing country in Westchester and that two 18-hole courses would be designed by the noted golf course architect A.W. Tillinghast. The announcement goes on to state "[i]f you want to be among the third hundred and enjoy the prestige of a pioneer, as well as the economical feature, the time is to act now. There is no doubt that you will ultimately join, and it will cost you much more if you delay." That document predicts share values of $850 for the third hundred members, $1,100 for the fourth hundred, $1,350 for the fifth hundred, and $1,600 for the sixth hundred, anticipating raising over $600,000 in equity capital.

83.     According to page 21 of "Winged Foot Story," a book written by Douglas LaRue Smith and published in 1984 by Western Publishing Company, Inc., an early 1923 brochure sent to Athletic Club members urged them to act quickly and become one of the 600 Club members as soon as possible by stating:

> We can be filled in a minute by taking in outsiders, and can be oversubscribed by accepting several offers by men within the [Athletic Club] to take over gross lots *as an investment*. [Emphasis added.]

84.     Thus, potential purchasers of Holding Corp. stock were being solicited in part on the basis of its potential to increase in value, as would be typical of the solicitation of potential investors in any equity investment.

**(2)   The Holding Corp.'s and the Club's Operations in the 1920s**

***(a)        The construction period and initial play***

85.     The record contains a pamphlet dated September 8, 1923 with the title "Announcing the Opening of the New Courses of the Winged Foot Golf Club." The pamphlet describes at length the process by which the site was selected and how the golf course and club facility improvements were undertaken. It reveals that the cornerstone of the clubhouse was laid on April 14, 1922, and

that the "informal opening of the courses was arranged for Saturday, June 16, 1923." The pamphlet includes at its end both the articles of incorporation of the Holding Corp. and the articles of incorporation of the Club.

86.     The land and the improvements to construct the two golf courses cost $641,000 and the clubhouse and other buildings cost $493,000, for a total of $1,134,000. The $623,000 of capital contributed by the original purchasers of the 600 shares thus provided almost two-thirds of the funds to acquire and create what was ultimately leased to the Club, with the other third coming from mortgage bonds. This is the land and improvements that are the backbone of what the Club still has to offer its members today.

### (b)     *The Original Lease: general terms*

87.     The Original Lease, by which the Holding Corp. leased to the Club the Holding Corp.'s land with its golf course and club facility improvements, was dated November 1, 1924 and had an initial term of 21 years. The Club was required to keep the golf courses and club facilities "in a first class condition," compliance with which is subject to inspection by the Holding Corp. The lease prohibited any improvements of these items that would "make a substantial change in their present character" unless approved by the Holding Corp. and specified that all improvements belong to the Holding Corp. at the termination of the lease. In all these regards, the lease reads like an ordinary commercial lease between a tenant and a landlord that is contemplating a return of the property at the end of the lease and is concerned with protecting the value of what the landlord will be getting back.

### (c)     *The Original Lease: rent*

88.     As for rent, the lease required the Club to place all of its dues and gross receipts from operations, as determined in true books of account subject to the Holding Corp.'s inspection, into

a general fund. After payment of specified expenses, the remainder of the general fund was to be paid to the Holding Corp. as rent. The Club also was required to pay all real estate taxes, insurance and maintenance.

89.     During the 1920s, revenues net of expenses were high enough for the Holding Corp. to earn significant profits. The consolidated accounts of the Holding Corp. and the Club for their 1925 fiscal year ending October 31 show a profit before depreciation (which appears to be what would be needed to be paid to the Holding Corp. as rent) of almost $28,000 and a profit after deducting for depreciation of about $22,700. This was a very respectable margin on the Club's gross revenues of about $155,000.

90.     The consolidated accounts of the Holding Corp. and the Club for their 1930 fiscal year ending October 31, at which point the lease had been in effect for six years, show that the total surplus had accumulated to the amount of $120,600. This surplus was on the equity of $623,000 that was contributed by the original shareholders.

91.     In any event, once the Club was up and running in the 1920s, there was very close to a one-to-one overlap, if not a 100% complete identity of interest, between the Club's approximately 600 regular members and the 600 individual holders of the Holding Corp.'s 600 shares. Thus, even if Club dues during this period were not set to produce as high a rent as would have resulted from an arm's length deal between the Holding Corp. and the Club, the resulting discount in the dues provided each shareholder with a benefit just equal in value to his pro-rata share of shortfall in rent received by the Holding Corp. Thus, each shareholder still received essentially the same return on the capital provided by the original purchaser as if the Club provided an arm's length, market level of rent, just partly in a different form.

*(d)*     *The Membership Structure in the 1920s*

92.     The Club had "associate members" as well as "regular members."  Associate Members paid higher dues than did the regular members in the Club's early years. For example, the minutes of the December 8, 1926 Holding Corp. board meeting shows that dues for regular members had been $150 per year and for associate members had been $200 per year, an amount increased in each case by $50 for 1927.

93.     In the 1920s, the associates represented but a small fraction of the total membership. The minutes of the Holding Corp.'s December 13, 1927 board meeting shows that there were 558 regular members as of November 1, 1926 and 21 associate members.  They show that as of November 1, 1927, there were 568 regular members and 20 associate members.  The minutes go on to say "with our Regular Membership of 568 and Associates of 20, a total of 588, we have only really 12 vacancies out of our 600, and 3 Regular Members have been elected since the November 1st meeting.."

94.     Meeting minutes during this period indicated that the Club sometimes purchased shares of resigning members. For example, the minutes of the Holding Corp.'s June 6, 1928 board meeting shows 547 regular members and 25 associates and states "We have 22 shares of stock on hand at this time and 31 shares retained by resigned members."  Thus only 5% of the 600 shares were held by non-members, a small backlog in what would have been, because of the small number of holders and the requirement that new members be approved by the Club, a relatively illiquid market.

**(3)  Subsequent Resales of Holding Corp. Shares Were at Higher Prices**

95.     According to a list of Holding Corp. stockholders, the 600th authorized share of Holding Corp. stock was sold by early 1925, and Holding Corp. stock certificate #602 was issued

on January 15, 1925, suggesting that, following commencement of Club operations, starting in early 1925, original Holding Corp. shareholders started selling their shares to new members upon resigning from the Club. For example, the minutes of the Holding Corp. board meeting of September 8, 1925 contains a report of the Membership Committee that records the resignation of J. Harvey McCoy and the election as a regular member of Archibald C. Clark and states "Mr. Poertner submitted the name of Mr. Archibald C. Clark for election, he having bought the stock of Mr. J. Harvey McCloy."

96.     Just before the stock market crash and the Great Depression, which began on October 24, 1929, nearly half (49 percent) of the original Holding Corp. stockholders had already sold their shares.

97.     In the early years of the Club's existence, there were many examples of original shareholders profiting from their investment in the Holding Corp. upon resale of their Holding Corp. shares. Specific instances of such profits include:

(a)     Stock certificate #26, was originally issued to Howard B. Elliott on October 23, 1922. Elliott's share price was $600. Certificate #26 was transferred to John A. Hammell and reissued as certificate # 763. Documents show that this share was transferred to John A. Hammell sometime around January 23, 1928, for $2,100. This would equate to a profit of $1,500 and represents a compound annual growth rate on his investment of about 26.67 percent [(1 + 0.2667)^5.3 years x $600 = $2,100].

(b)     Stock certificate #136 was originally issued to Michael F. Loughman on October 25, 1922. Loughman's price for the share was $600. Minutes of a meeting of the Board of Governors of the Club, held June 9, 1926, reference a suggestion by Williamson, one of the board members, that a "check for $1,600 be made out to Loughman in payment of his share of stock." This would equate

to a profit of $1,000 and represents a compound annual growth rate on his investment of about 30.64 percent $[(1 + 0.3064)^{3.67}$ years x $600 = $1,600].

(c)   Stock certificate #260 was originally purchased by Joseph P. Barry on December 4, 1923. Joseph Barry's share price was $850. The Board of Governor's meeting on January 10, 1927, included a list of nine Club members' resignations received prior to January 1, 1927, whose resignations were now being accepted. Joseph Barry is one of those nine resigning members. Minutes of the February 16, 1927 Board of Governors meeting adopted a resolution "that the nine shares of stock of the Winged Foot Holding Corporation now owned and held by the Winged Foot Golf Club, be offered for sale at a price of Two Thousand One Hundred Dollars. Thomas F. Lennon acquired share certificate #775 as a transfer of Joseph Barry's original share. Paying Joseph Barry $2,100 on his original $850 investment would yield a profit of $1,240 and represents a compound annual growth rate on his investment of 33.57 percent $[(1 + 0.3357)^{3.125}$ years x $850 = $2,100].

(d)   Stock certificate #199 was originally issued to Gray Miller on October 25, 1922. Miller's original share price was $600. Minutes of a meeting of the Board of Governors of the Club, held on June 9, 1926, reference a suggestion by Williamson, one of the board members, that Miller would accept $1,500 in payment of his share of stock. This supports profit of $900 for Miller and represents a compound annual growth rate on his investment of 28.75 percent $[(1 + 0.2875)^{3.625}$ years x $600 = $1,500].

(e)   Stock certificate #30 was originally issued to William Hall on October 23, 1922. Hall paid $600. This share was transferred to Alfred Foster on May 15, 1931, and reissued as certificate #940. Correspondence from Joseph J. McArdle, Treasurer of the Club, dated April 5, 1931, indicates that Alfred Foster has been elected to regular membership and that Foster purchased his certificate

34

for $1,400. This supports a profit for Hall of $800, and represents a compound annual growth rate on his investment of 10.59 percent over 8.42 years [(1 + 0.1059)^8.42 years x $600 = $1,400].

98.     There are many other indications in the record that, even as the Great Depression deepened, resale prices of share were still significantly higher than the price paid by the original purchasers of the 600 shares. For example, in a letter dated January 15, 1931, the Club offered an application for regular membership to G.W. Stockburger, Esq. at "the very low base price of $1,500." The letter puts that price into perspective by explaining that "Winged Foot shares in the past have sold at over $2,000, but hard times have hit several of our friends and they are forced to sacrifice their certificates."

99.     The record indicates that in addition to sales from resigning members to new members, sometimes the Club purchased shares. For example, the minutes of the October 19, 1925 meeting of the Club's board authorized the purchase of a resigning member's stock for $1,500 or less, but rejected the request from the membership committee to the purchase of shares of approximately ten others at a price of $1,600, stating "The sense of the meeting was that the Corporation should not tie up any of its money on the purchase of stock at that price." Purchases also may have sometimes been a way of clearing up member indebtedness to the Club. For example, the April 12, 1926 meeting minutes reports the authorization of the purchase of a resigning member's share "for $1600, less any indebtedness to the Club."

100.   On February 2, 1932, the minutes of the Annual Meeting of the Club report:

[T]he present asked price for stock is $1350, first cost. *That price may shift b y mutual agreement between buyer and seller.* [Emphasis added.]

101.   This statement shows, unmistakably, that there was a market in shares between resigning members and new members, and that prices for Holding Corp. shares were determined by "willing-buyer-willing-seller" market forces, one of the most basic concepts of fair market value,

and supported share price increases. Also, in those same February 2, 1932 minutes, the "Chair remarked that the most conservative appraisal gave a value for a share of stock of $3,500."

102.   Holding Corp. shares that sold at prices in excess of initial share costs represented profits to the selling shareholder.

103.   In a report on the Structure of the Club, believed to be written around 1947, the author made the following statement:

> Stockholding members who may have expended considerable amounts in years since the Club was founded in the acquisition of their shares should bear in mind that, except for a transfer fee of $200 per share (somewhat akin to an initiation fee), the money they paid went to the previous owners of the shares and did not benefit the Club in any way. If a new member paid $1,320, $1,000 was paid to the previous owner, $120.00 to the U.S. Gov't. for Tax and $200.00 to the Club. It is not fair to meet the current request for investment of money in the Club by saying "I have already invested $1,320". Furthermore, the value, whatever it may be, of that which he acquired by the expenditure of the $1,320, *i.e.*, the share of stock, continues unaffected by the current refinancing program.

### (4)   The Demise of the One Share/One Member Structure

104.   The events of the Great Depression and World War II created serious problems for the Club in retaining a sufficient number of dues paying members to cover the costs of the Club's operations and its payment of the taxes, insurance and interest payments owed by the Holding Corp. For example, at a Club board meeting on November 22, 1934, a member, J.J. McArdle, stated: "for the season of 1936 the Club must do everything possible to balance the budget. To do this, we must have a sustaining membership of at least 450 members paying dues of $200.00 each." The campaign to do this included retaining the services of a W.J. McCarthy, who would receive a free share of the Holding Corp. and his $200 Club dues paid if he was able to meet the goal. This was just one of many instances in the record of references to the need to recruit dues paying members, and to campaigns to accomplish this goal, throughout the 1930s and the first part of the 1940s.

105.  The requirement that a new member acquire a share of the Holding Corp. obviously posed an obstacle to recruiting new dues paying members. As a result, the Club increasingly began to rely on types of membership that waived this requirement and increasingly filled its dues paying membership with non-shareholder members.

106.  In the later 1920s, the Club's membership of full members was close to 600 and consisted almost entirely of regular, stockholding members, with just a handful of associate members. The associate members had full playing privileges without being required to hold a share of Holding, but they were required to pay materially higher dues. For example, there were 558 regular and 21 associate members in November 1926 and 568 regular and 20 associate members in November 1927.

107.  As the Great Depression deepened, the Club's financial situation deteriorated further. By the end of 1931, the Club was down to 470 regular members and 34 associate members. By the end of 1933, the Club was down further, to only 289 regular members. Thus the remaining 311 shareholders were no longer members and hence not paying dues.

108.  In response to this negative financial trend, in January 1934, the Club created a new category of members—yearly members—who had full playing privileges and paid the same dues as regular members, but who were not required to be shareholders. As Gillespie said in a memorandum looking back at this period that he wrote as President of the Holding Corp. in 2008, "After a few years [after the Stock Market Crash of 1929], as the Great Depression deepened, the Club abandoned the requirement that new members acquire a share from a resigning member or member's estate."

109.  By September 27, 1934, there were 55 such yearly members in addition to 331 regular members. By July 14, 1935, there were 96 yearly members, 15 associate members (who by this

point appear also to be paying the same dues as regular members) and 302 regular members. By December 14, 1937, there were 200 non-shareholding, full-dues-paying members and 333 shareholding regular members.

110.   By December 1943, the number of regular shareholding members had become a minority of all full dues paying members, with 170 regular members and 180 yearly members. By December 1948, the last time the board minutes provide a breakdown, yearly members outnumbered regular members by 252 to 133, a ratio of almost two-to-one.

**(5)   The Continued Market in Holding Corp. Shares**

111.   Throughout the 1930s and the first part of the 1940s, despite the rise in non-shareholding membership in the Club, there continued to be a market in Holding Corp. shares whereby new regular members acquired their shares from resigning or the estates of deceased regular members at prices determined by the buyer and seller.  For example, at the Annual Meeting of the Club in February 1934, the secretary of the membership committee stated "the present asked price for stock is $1350, first cost. That price may shift by mutual agreement between the buyer and seller." At a Club board meeting a year and a half earlier, the chairman of the membership committee "reported that stock in the Winged Foot Holding Corporation had jumped from $800 to $1000 a share." Starting in 1936, the Club board minutes regularly report from which resigning or deceased regular member a yearly member changing to become a regular member acquired his share.

112.   Club and Holding Corp. board minutes during this period indicated that sometimes these sales involved a transaction where the resigned member or the estate of the deceased member turned over the share directly to the person becoming the new regular member. Other times, the Club records refer to "certificates held in escrow for Resigned Members pending sale," with the

38

names of the resigned members whose shares are being so held individually listed.  The person

whose certificate was held in escrow then received the proceeds when the share was subsequently

sold to a person becoming a new regular member.

113.  In a 2008 memorandum, Gillespie, then President of the Holding Corp., while

speaking of the 52 shares still held in escrow by the Club at that time, described the escrow

arrangement as follows:

> The deposited shares, or some of them, have notations of the price the resigning
> member desired to receive for his share.

Again, this shows that that there was a person-to-person market with the price established by the

buyer and seller during this period of time. As to why there were 52 shares still in the safe in 2008,

Gillespie adds:

> After a few years, as the Great Depression deepened, the Club abandoned the
> requirement that new members acquire a share from a resigning member or
> member's estate, and the 52 shares simply languished in the firm's safe, though
> remaining in the respective ownership of the departing members and then their
> estates.

114.  The same 1930s meeting minutes show that other resigned members and the estates

of deceased members continued to hold their respective certificates themselves.

115.  From time to time, it appears that the Club or the Holding Corp. also purchased a few

shares if they could do so below a particular price.  For example, minutes of the September 27,

1934 Club Board meeting stated:  "On motion regularly made, seconded and carried, the Treasurer

was directed to purchase up to five shares of Winged Foot Holding Corporation stock at the best

price he can obtain under $800."

116.  Shares purchased by the Club in this period were presumably resold relatively quickly

to persons becoming new members, as indicated by the fact that the occasional tallies in the record

of shareholdings during this period do not show that any of the 600 shares were being held by the

Club or by the Holding Corp. in the form of treasury shares. The Stock Certificate Record as of September 29, 1931, attached to the Minutes of September 30, 1931 Club Board meeting, accounts for all 600 shares as belonging in one of three categories: "Certificates held by Regular Members," "Certificates held in Escrow for Resigned Members Pending Sale," and "Certificates held by Resigned Members or the Estates of Deceased Members."

### (6)  The Reasons that Holding Corp. Shares Continued to Have Value

117.   There are two reasons why people continued to be willing to pay a significant sum to acquire a Holding Corp. share during this period despite the availability of non-shareowner memberships having full playing privileges and the same level of dues as paid by regular members. One is the underlying value of the assets owned by the Holding Corp. The second is the possibility that yearly memberships would gradually be eliminated if the number of regular memberships grew and ultimately reached 600. The existence of both reasons is well documented in the record.

#### (a)   *Value from underlying assets*

118.   The remarks of the Club Treasurer, J.J. McArdle, at the 1933 Annual Meeting, acknowledge that share value derives in part from the value of the underlying assets:

> Now, I have prepared here a consolidated balance sheet of the Winged Foot Holding Corporation and the Winged Foot Golf Club. Of course, you understand that this is a combination of the two. *Primarily, we are meeting here as stockholders of a real estate corporation.* From my point of view, they own 280 acres of land. They have a golf club and one tenant, the Golf Club; if the Golf Club does not make money, no rent is paid.  [Emphasis added.]

119.   In similar remarks at the January 24, 1934 Club board meeting, McArdle referred to a "Group A," the 600 shares held by members or ex-members of the Club, and a "Group B," the 289 shareholders who remained active regular Club members. He complains:

> Of Group A - the Landlord - 311 shareholders had ceased to contribute to Group B - the tenant. This has had the effect of reducing the income of Group B, so that they have to bear the burden of expense of operation, while the 311 inactive shareholders,

who are not contributing, *have the same equity in the property* as those upon whom the burden falls. [Emphasis added.]

120.   While McArdle's complaint ignores the fact that the active regular members, in return for their payments of dues, are continuing to enjoy the benefit of using the services of the Club, he recognizes that the inactive shareholders have the same equity in the property as do the regular Club members. His complaint could only be of concern if he viewed this equity in the property as having value at the time. He could believe that this equity had value at the time only if he believed that if the Holding Corp. had been voluntarily wound up, or dissolved as a result of failing to meet the debt service on its bonds, the property with its improvements could have been sold for more than the claims of the bondholders, with each shareholder receiving his pro-rata share of the excess.

121.   At the same meeting, McArdle argued in favor of maintaining the initiation fee for regular members, pointing out that while the dues were the same for regular members as for yearly and associate members, there is the increase in privileges from being a regular member and there is "[the new regular member's] subsequent ownership in the property." (Emphasis added.)

122.   There are also statements of Club officials which relate to a comparison between the prices at which Holding Corp.'s shares were available in the market and some measure of value, which would appear to be related to the value of the Holding Corp.'s underlying assets. For example, the minutes of the Club's February 2, 1932 Annual Meeting report that "the Chair remarked that the most conservative appraisal gave a value for a share of stock of $3500" and that given this, with a price for the shares (at the time $1350) lower than what some of the original purchasers paid, new members "could easily be secured." Similarly, at the Club's December 10, 1936 Annual Meeting, the President, Fred K. Williamson, stated that he would not try to value the land and improvements, but that they are carried on the books of the Holding Corp. on a cost basis and that the stock has:

in my opinion, a true book value of $1000 per share for the stock. I think, if the members could see their way clear to advise their friends that *this stock is cheap*, we would have them sewed up a little closer than they are at present. [Emphasis added.]

123.  At a meeting on March 1, 1945, the Board of Governors of the Club appointed a Committee on Treasury Stock, which delivered a report to that board (the "Stock Committee Report") at the board's April 8, 1945 meeting. In recommending the price at which shares held by the Club (39 at the time) should be sold, the value of the underlying assets was clearly an important factor:

> The book value, cost less depreciation, of fixed assets is $979,000. The 280 acres, viewed purely as undeveloped real estate, forgetting the buildings entirely, should be worth $3,000. per acre in any normal real estate market, or $840,000. The assessed value is $750,000. This gives us three different prices for the stock: (a) book value, $950.; (b) what we may term "scrap" value, $720.; and (c) assessed value, $590. It is the unanimous opinion of this Committee that the Club should not sell the Treasury shares for less than $500 and that that figure be quoted to any inquiring yearly member.

124.  Later in the Report, the Committee again exhibits the same point of view:

> If a foresighted yearly member can now pick up a share at private sale for, say, $300, let him go to it, but the Club, in fixing a price which it is fair to charge the yearly member, when the time arrives, for continuing in the Club, should have very much in mind the *fundamental value of the shares…* [Emphasis added.]

### *(b)* *The possible elimination of yearly memberships*

125.  The Holding Corp. shares also had value because of the possibility that yearly memberships, which needed to be renewed each year, would be eliminated. In that event, owning a share would have been the only way of enjoying the facilities of the Club. Given the goal, maintained from the beginning, of the Club to cap full membership at 600, yearly memberships (and the financial need for them) could gradually disappear if the number of regular memberships started growing again and ultimately reached 600. At that point, the one share/one member plan would be resurrected, and each shareholder could receive part of his pro rata return in the form of the benefits of being a club member.

126.   As noted in ¶ 104, *supra*, the desire of Club officials to return to having 600 regular members remained strong well into the 1930s and beyond. For example, in minutes of the Club board meeting of November 22, 1934, Club Treasurer McArdle stated "for the season of 1936 the Club must do everything possible to balance the budget. To do this, we must have a sustaining membership of at least 450 members paying dues of $200.00 each."  The campaign to do this included retaining the services of W.J. McCarthy, who would receive a free share of Holdings and his $200 dues paid if he was able to meet the goal.  This was just one of many instances in the record of references of the need to recruit dues paying members throughout the 1930s and the first part of the 1940s.

127.  In a December 10, 1936 letter to Club members from its President, Fred E. Williamson, that accompanied the 1936 fiscal year Consolidated Financials of Holding Corp. and the Club, Williamson said:

> our main problem is to fill our Club with stockholding members. We have made splendid progress in this direction the past year and, with the cooperative effort of all, we are confident that our Club can soon be restored to the limit of six hundred stockholding members.

128.  In a similar December 6, 1937 letter to Club members accompanying the 1937 financials, Williamson repeated the refrain, saying "it is most necessary that we continue our efforts to restore our membership to the limit of six hundred active stockholding members." In 1944 there was discussion among Board members to charge higher dues to yearly members in order to encourage them to buy stock and become regular members.

129.   The idea of returning to a membership primarily based on stockholders in the Holding Corp. still had currency among at least some leaders of the Club as late as 1945. The Stock Committee Report, (¶ 123, supra), suggested increasing the dues of yearly members to $300 or $350 while keeping the dues of regular members at $250, taking in no new yearly members, and,

to create a supply of Holding Corp. shares that could be sold at $500 to permit the conversion of current yearly members into regular members, acquiring Holding Corp. shares held by non-members for $500 or less, and considering the feasibility of doubling the authorized number of shares that could be sold at $500 to converting members. These recommendations from the Committee were never adopted, however.

### (7) The Idea of the Dissolution of the Holding Corp. or its Merger into the Club

130.   The minutes of the December 9, 1930 Annual Meeting of the Holding Corp. reported that a properly noticed resolution was introduced proposing "the Dissolution of the Winged Foot Holding Corporation and the transfer of its assets to the Winged Foot Golf Club." While the minutes do not describe what kind of consideration would be paid by the Club to the Holding Corp. for these assets, it is something that must have been a concern given that it is very likely that there were a number of non-member shareholders by this time. The minutes rather opaquely state "the majority of Stock-Holders discussing the Resolution opposed [the resolution] on the ground that it was not sufficiently definite as to how we could control the future action of minority Stock-Holders who were not present at the Meeting." Instead, a resolution passed calling for the establishment of a committee of five shareholders who were not members of the Holding Corp.'s board to further consider the matter. More than a year later, the minutes of the Club's February 2, 1932 Annual Meeting reported that a Mr. Kadel, Chairman of the Law Committee, was "convinced that the Winged Foot Golf Club and Winged Foot Holding Corporation will be merged" but that "the consolidation might be postponed until summer." Obviously, however, the merger never happened. Rather this was the first of many instances where the problem of what to do about the non-member shareholders was recognized but was ultimately "kicked down the road."

B.      **THE FUNDAMENTAL CHANGES IN THE LATER 1940S**

131.   Three interrelated fundamental changes in the structure of the relationship between the Holding Corp. and the Club occurred in the later years of the 1940s: (1) the Holding Corp. agreed to change the terms of its lease with the Club; (2) the Holding Corp. refinanced its outstanding Mortgage bonds by requiring every existing and new member to acquire a $1,000 bond or debenture; and (3) the Club amended its by-laws to eliminate the requirement that a regular member needed to own a share of Holding Corp. stock and converted all the yearly members into regular members.

(1)  **The Lease Extension and Modification**

132.   Paragraph 21 of the Original Lease provided that the Holding Corp. "will grant and execute unto the [Club] at [the Club's] option, expressed in writing not less than one year prior to the expiration of said term, a renewal of this lease for a term of twenty-one years next ensuing." The Original Lease expired on October 31, 1945 and so the last day that the Club could give notice to renew would have been October 31, 1944. The Club missed this deadline, but, more than six months later, the board of the Club, on May 4, 1945, did request the 21-year extension of the lease.

133.   There is nothing in the record that indicated that a board meeting of the Holding Corp. ever considered whether it was in the Holding Corp.'s best interests to waive the missed deadline. Nevertheless, the Holding Corp. and the Club did in fact enter into an agreement, dated as of May 1, 1945, to waive the deadline and to allow the Club to renew the lease from November 1, 1945 to October 31, 1966. At this time there were only about 150 regular members. The January 7, 1945 board minutes report 142 regular members;  and at the August 5, 1945 meeting (the next board minutes in the record to report on the composition of the membership), 154 regular members are reported.

45

134.  In other words, around three-fourths of the 600 shareholders of the Holding Corp. were not Club members, these non-club shareholders were likely not given notice of the meeting and likely never had an opportunity to be heard. Accordingly, the Club and the Holding Corp. directors at the time violated the Holding Corp.'s Certificate of Incorporation and By-laws and the New York BCL, and also caused harm to the Holding Corp. if the extension of the lease was not in the Holding Corp.'s best interests.

135.  At the board meeting for both the Club and the Holding Corp. on June 8, 1947, just seven months into the Original Lease's second twenty-one year lease term, the boards of the Club and the Holding Corp. authorized an amendment to its terms to substitute a fixed payment of $30,000 per year for rent, instead of the rent being the net income of the Club, with the Club continuing to be responsible for real estate taxes, maintenance and insurance, leaving the Holding Corp. responsible for the debt service on the mortgage debt with potentially less revenue to meet its obligations.

136.  The meeting minutes indicate that the Original Lease "contemplated that the net income from the operations of the Golf Club would be paid to the Holding Corporation," and that, by contrast, the purpose of substituting a fixed payment of $30,000 per year was "in order to enable the Golf Club to conserve and accumulate all of the available cash which it can earn from its operations or obtain as a result thereof."

137.  The Club and the Holding Corp. entered into an agreement dated as of July 21, 1947 incorporating these new terms. One recital preceding the authorization stated, "it was always contemplated that such arrangement [the two-entity approach with the Holding Corp. as the landlord] would be at all times for the benefit of the Golf Club," but it did not cite any supporting documentation for this proposition, which was contrary to what would have been expected by the

original shareholders who provided the Holding Corp. with its capital and presumably expected a return in exchange, and did not address whether such an "arrangement" would have run afoul of the New York Business Corporations law.

138.  Another recital suggested that the arrangement was necessary because of a possible foreclosure of the mortgage "with a possible extinguishment of any equity which the Golf Club or the Holding Corp. may have in the property." It does not indicate, however, that the board of the Holding Corp. obtained an appraisal of the property to see how the value of the property compared to the amount of the debt:  if the value was greater than the debt, foreclosure would not extinguish the Holding Corp.'s equity because, upon sale of the property, the Holding Corp. would receive the difference in cash and only the Club would lose. At the time, only 164 out of the Holding Corp.'s 600 outstanding shares were held by Club members, and it is unlikely that the Club could have marshalled the required number of Holding Corp. shareholders to approve the Club's disposition of the Holding Corp.'s Property.

139.  Moreover, the newly determined annual net rent of $30,000 was completely out of line with any normal return to be expected on the value of the property as of 1947.

**(2)  Refinancing of the Debt**

140.  By early 1948, the Club faced the problem that it had about $380,000 in mortgage certificates outstanding with a maturity date of June 1, 1948 and about $57,000 in interest due and unpaid. Much of this debt was no longer in the hands of Club members and it appeared that no extension could be negotiated. Unless a refinancing was arranged, the mortgage would be foreclosed upon. While, as noted above, the holder of each share of Holding Corp. would receive a pro rata share of the proceeds of the sale of the assets to the extent, if any, that these proceeds

exceeded the principal and interest owed on the mortgage debt, the Club would be left with nothing: no golf courses and no club facilities.

141.   The minutes of the Club board meeting of February 15, 1948 reveal a plan, adopted by the Club board at the February 29, 1948 meeting, to require each yearly and regular member of the Club, and all new members as they join, to purchase a $1,000 bond. The bonds were obligations of the Club but secured by the property of the Holding Corp. through an arrangement by which the Club purchased the old Mortgage Certificates that were becoming due. The issuance of the bonds was approved at March 28, 1948 board meeting of the Club, and memorialized in a Collateral Trust Agreement dated as of May 1, 1948 between the Club and the Bronx County Trust Company, as Trustee.

142.   The refinancing scheme was a success, with the Club having a sufficient number of members being willing to meet the bond purchase requirement that the needed funds were raised. There were by this point, however, only 133 regular Club members left, with the other 467 shares (less any owned by the Club) in the hands of non-members. There were 252 yearly members. Essentially the original requirement that every member have a share of Holding Corp. had been replaced by a requirement that every member hold a $1000 bond.

### (3)   The Formal End of the Requirement that Regular Members Hold One Share and the Problems This Posed for the Club

143.   The minutes of the February 13, 1949 board meeting of the Club show that a resolution was passed eliminating the requirement of owning a share of the Holding Corp. stock to be a regular member of the Club and authorizing the conversion of all yearly members into regular members. The by-laws were amended to this effect, and instead required ownership of a $1,000 Club bond.

144.   This change meant that the shares of Holding Corp. had no value anymore as the way of meeting a requirement to be a member of the Club. Their value, therefore, had to come from the Holding Corp.'s ownership of the land and the golf courses and club facility improvements.

145.   Club officials were obviously aware that the existence of the shares, now largely in the hands of non-members, posed potential problems for the Club. For example, a document entitled "Winged Foot Golf Club Structure" (the "Structure Document"), which appears to be referred to in the minutes of the January 25, 1947 Adjourned Annual Meeting for the Club and for the Holding Corp. (that the President mentions was sent out relating to the bond refinancing plan), points out that most Holding Corp. shares were no longer held by Club members and clearly implied a recognition that when the lease expired, the Holding Corp. would obtain possession of the land and the golf courses and club facility improvements, whose disposition would be available for the benefit of its shareholders:

> This [the stock situation] is a situation which should be corrected, and must be corrected before any statement can be made that the Club owns the property, but it is not a pressing situation (as is the maturing mortgage indebtedness) in view of the lease of the property held by the Club, extending to 1966. Our use and enjoyment of the property is currently threatened by the mortgage situation and is not threatened by the stock situation.

146.   Similarly, the minutes of the Club and the Holding Corp. held on January 9, 1949 states that the President reported "With the bond obligations out of the way we are studying the stock situation to find some solution to it."

147. In a February 22, 1950 memorandum to the Club board, the Club President, Chambers, called for separation of the financials of the Club and the Holding Corp., one reason being that a Club member might be "*misled by the consolidation into thinking that the Club members alone own the surplus shown ... This would not be true legally.*" (Emphasis added.)

49

**(4)  The Club Improperly Amended Its By-Laws to Give
Itself an Option to Purchase Holding Corp. Shares**

148.   The record for this period shows a renewed concern about the shares owned by non-

Club members. At about the same time as the elimination of the requirement of share ownership

for regular membership, the Club board amended the by-laws of the Club to read:

> The Club shall have the option to acquire any share of stock of Winged Foot Holding
> Corporation owned by a deceased or resigned member at the prevailing price then
> fixed by the Board as the reasonable value thereof, or at the amount paid by the
> member if that be less.

149.   The amendment to the Club's by-laws that occurred after the issuance and original

sale of the shares by the Holding Corp. did not, however, give the Club the legal right to call the

shares on the terms specified in such amendment. The concept that the Club could unilaterally,

through adoption of a by-law, create a call option on a Holding Corp. share at a price that would

deprive the Holding Corp. shareholder of the expected return that prompted the original purchaser's

willingness to provide the Holding Corp.'s capital is contrary to the basic principles of

organizational law.

150.   The Club's original by-laws contained no provision relating to the option to purchase

shares.   The only restriction on the rights of the holder of a share of the Holding Corp. stock

concerning legal ownership that does go back to the time that the shares were originally issued and

sold, appears in the legend on the stock certificate, which states that the stock

> is transferable on the books of the Corporation kept for that purpose, after such
> transfer shall have been authorized by the affirmative vote of at least two-thirds of
> the Board of Directors of said Corporation.

The restrictive legend, however, is itself void as against public policy under New York law. It is

well-established that neither restrictions printed on a stock certificate, nor restrictions contained in

corporate bylaws, have any effect on the validity of a stock transfer. *See, e.g.*, *Rafe v. Hinden*, 29

A.D.2d 481 (2d Dep't), *aff'd*, 23 N.Y.2d 759 (1968); *Colucci v. Canastra*, 130 A.D.3d 1268, 14 N.Y.S.3d 204, 2015 N.Y. Slip Op. 06182 (3d Dep't 2015).   This was apparently the conclusion reached by the Holding Corp. board in 1973 and 1974, when it approved share transfers to Anthony and Frank Gagliardi after concluding it "lack[ed] authority" to restrict them.

151.   A purported option of some sort was first added in 1927 by a by-law amendment that has been described as stating: "no resignation shall be accepted until … the said member has surrendered or offered to surrender his certificates of [Holding Corp.] stock … for redemption by the board at the prevailing price then fixed by the Board as the reasonable value thereof."  The 1949 amendment not only included the concept of the price being set "at the prevailing price then fixed by the Board as the reasonable value thereof," but added for the first time as well the new limitation "which shall in no event be more than the amount paid therefor by the member."

152.   There was no effort by the Club at the time, and there has been no effort by the Club since, to determine the "reasonable value" of the shares, despite the Club being advised that it should obtain an independent appraisal of the value of the shares.

153.   The minutes of the February 5, 1950 Club board meeting reported:

The President stated the Club had acquired by purchase over the years, from resigned or deceased members 63 shares of the Holding Corporation stock (out of a total of 600 shares outstanding) at an average per share cost of about $142; and that in the last two years the Club had been offering $50 per share to inquires as to a possible market for the shares, *without representation of any  kind as to the value*  of the shares, and *without engaging in any campaign of any kind*  to get the shares in. He recommended continuation of this practice until further order of this Board. [Emphasis added.]

154.   Thereafter, the board, "[a]fter considerable discussion," adopted the following resolution:

RESOLVED, that the officers of the Club be authorized, until action of this Board to the contrary, to buy in shares of the Holding Corporation, as opportunity offers, at not exceeding $50 per share.

155.  In a memorandum purporting to address the financial structure of the Club and the Holding Corp. written in May 1952, R.N. Chambers, President of both the Club and the Holding Corp., stated:  "It is the present policy of the Club to offer $50 per share to any inquiring shareholder desiring to dispose of his share, *disclaiming any representation as to value*." (Emphasis added.) Chambers also says that the stock's "possible value in 1987 at the expiration of the lease, assuming extension, is anybody's guess," thus also implying a recognition that when the lease expired, the Holding Corp. might obtain possession of the land and the golf course and club facility improvements for the benefit of its shareholders.

C.    **THE SEPTEMBER 15. 1961 KELLEY DRYE LEGAL MEMO**

156.  In 1961, the Club was facing the question of the lease renewal in a few years and was considering the construction of a swimming pool and bowling alley. Apparently because of these considerations, it sought the opinion of Kelley Drye Newhall & Maginnes, a well-known New York law firm, concerning its relationship with the Holding Corp. Kelley Drye provided its opinion to the Club in a letter dated September 15, 1961 (in the "Kelley Drye Legal Memo"). The Kelley Drye Legal Memo stated that, "[a]s requested, we have given particular attention to the validity and status of the lease from Winged Foot Holding Corporation (the 'Corporation') to Winged Foot Golf Club, Inc. (the 'Club')."

157.  At the time of the September 15, 1961 Kelley Drye Legal Memo, only 89 of the 600 outstanding shares were held by Club members, and 170 of the original 600 shares were owned by the Club. The other shares were "held in safekeeping by the Club for former members" (61), or "held by others" (280), meaning that a majority of shares (341) were owned by non-Club members.

158.  The letter reviewed in detail a history of the two entities, noting the lack of attention that had been paid to corporate formalities. It particularly noted, in connection with the Original

52

Lease, the agreement in 1945 to waive the Club's failure to give timely notice of renewal, and the 1947 amendment setting the annual net rent at $30,000, that in each case the Holding Corp. board approval was by the votes of board members who were not independent of the Club, which was the other party to the transaction.

159.   The Kelley Drye Legal Memo observed that: "*The corporate proceedings of the Corporation have been handled with extreme inform ality, and in disregard of its Certificate of Incorporation and By-Laws.*" (Emphasis added.)

160.   "With respect to the validity of the Lease," the Kelley Drye Legal Memo stated, "it is evident that, if the Corporation should be treated as an ordinary business corporation organized for profit, a serious question would exist not only as to the validity of the original Lease, but also, and more particularly, as to the validity of the extension of the Lease in 1945 after the Club had failed to give the required one-year written notice of renewal, and the substitution in 1947 of a flat rental of $30,000 per annum in lieu of the previous provision which required the Club to pay over its entire net income as rental."

161.   The Kelley Drye Legal Memo also stated that the annual net rent of $30,000 granted by the Holding Corp. in 1947 "was in all likelihood completely out of line with any normal return to be expected on the value of the properties as of that date, and the change has enabled the Club to accumulate cash and buy property for its own account."

162.   "In addition," the Kelley Drye Legal Memo advised that, "all of these transactions were authorized (if at all) by a board of directors none of whom, being members of the Club, could be considered as disinterested directors – and who, furthermore, had not been elected in accordance with the Certificate of Incorporation or the By-Laws"; and warned, with respect to this litany of transactions, that "*in the case of an ordinary bu siness corporation organized for profit, there is*

*little doubt that such transactions would  be set aside at the suit of a stockholder* ."     (Emphasis added.)

163.   The Kelley Drye Legal Memo also stated that in the event of a stockholders' suit, the Club "would have an excellent chance of sustaining a defense based upon the fact that [the Holding Corp.] was never intended to be operated for profit as a normal business corporation, but was formed simply as an adjunct of the Club." In saying this, however, Kelley Drye does not address that original purchasers of the Holding Corp.'s stock provided it with capital based on an expectation of a return that, as the one share/one member plan broke down, would not be legally protected unless the Holding Corp.'s directors dealt with the Club on an arm's length basis as directors of a profit oriented company. It also does not address the many places in the record that suggest that Club officials believed that the shares did have value that was related to the underlying value of the Holding Corp.'s assets.

164.   In any event, the Kelley Drye Legal Memo goes on to advise that the matter of the enforceability of the lease is "not free from doubt" and recommended that the Club take certain remedial steps to solve the shareholder problem. Specifically, it recommended two measures.

165.   First, the Kelley Drye Legal Memo stated:

[We] think it is most important that the Club undertake a sustained and determined effort to acquire all of the outstanding shares of the Corporation which are not held by Club members; that it institute and maintain a firm policy of either acquiring shares held by Club members who die or resign, or seeing to it that such shares are acquired by other Club members; and that the Club should plan ultimately to acquire also such member-owned shares with a view toward dissolving the Corporation and taking over direct ownership of its assets.

166.   Second, the Kelley Drye Legal Memo recommended:

In connection with a program for acquisition of the outstanding shares, the Club may wish to consider obtaining an independent appraisal of the value of the stock of the Corporation (based on the present value of the Corporation's assets, subject to the $387,500 mortgage and also subject to the Lease until November 1, 1987) …

167.   Kelley Drye advised that these steps were necessary for various reasons, among them being to "forestall the possibility of a stockholders' suit … and to eliminate the possible question of liability of the present Governors of the Club acting as *de facto* directors of the Corporation, but also to put the Club in a position where there can be no question as to the propriety of the execution of a new lease between the Club and the Corporation."  While the Club undertook a sustained and determined effort to acquire Holding Corp. shares, it ignored the Kelley Drye Legal Memo's advice to obtain an independent appraisal of the value of the Holding Corp. stock.

168.   The Kelley Drye Legal Memo specifically warned the Club and its agents not to commit securities fraud: "In carrying out such a program for acquisition of outstanding shares, both the Club and persons acting on its behalf should be careful not to make any untrue statement of a material fact bearing on the value of the shares, and not to fail to state any material fact which is necessary to make any statements that are made not misleading."  As discussed below, the Club, its agents and the Director Defendants ignored this aspect of Kelley Drye's advice as well.

169.   The Kelley Drye Legal Memo also puts into sharp focus the question of the validity of the option to purchase provision inserted by the Club into its By-Laws, the same provision that the Club had been purporting to exercise in purchasing shares since the late-1940s. The firm states, "the option provision in the Club's By-Laws … in the absence of a 'prevailing price' fixed as the 'reasonable value' of the shares at the time of the member's death or resignation, is perhaps questionable" and, in any event, "would probably not be valid against subsequent purchasers for value without notice."  As discussed below, even after receiving this advice, the Club continued to assert its call option, and systematically misled shareholders and fraudulently induced them to sell their shares for decades.

170.   The Kelley Drye Legal Memo also explained the need to obtain shareholder approval for any extension of the lease: "Section 909 of the New York Business Corporations Law … will require authorization by two-thirds of the stockholders, at a meeting, for a 'sale, lease, exchange or other disposition of all or substantially all of the assets of a corporation, if not made in the usual or regular course of the business actually conducted by such corporation.'  If this section should apply to the execution of a new lease in 1987, dissenting shareholders would have appraisal rights under Section 910 of that Law."  Neither the Club nor its agents, including the Director Defendants, ever sought to comply with Section 909. In his previously mentioned discussion with Arthur Andersen tax partner, Joseph DioGuardi, Gillespie cautions "I seriously doubt whether at this time the Club would wish to consider conferring dissenters' rights on outside stockholders."

171.   The Kelley Drye Legal Memo further recommended that two-thirds shareholder approval is necessary to ratify prior ultra vires corporate actions, and that as soon as the Club has acquired sufficient shares, it should consider convening a stockholders' meeting in order to ratify the 1945 lease extension and 1947 lease amendment, among other improper prior transactions. The Club has not yet acquired a sufficient number of Holding Corp. shares to assure a two-thirds vote and, needless to say, none of the past ultra vires actions taken by the Club or its agents as of the date of the Kelley Drye Legal Memo were ever ratified.

**D.     THE IMPLEMENTATION OF THE CLUB'S SCHEME TO CONTROL HOLDING CORP. FROM THE 1960S TO 2008**

172.   Following receipt of the Kelley Drye Legal Memo, other than doubling down on the Club's existing campaign to acquire Holding Corp. shares, the Club and its agents ignored each of Kelley Drye's other recommendations. Despite the numerous red flags contained in the Kelley Drye Legal Memo, the Club was yet again not compelled by concerns about the shareholder problem to implement a lawful solution. With no reforms in place, the Club redoubled its efforts to acquire

Holding Corp. shares, and, in 1966, exercised its option to renew the Original Lease, subject to its 1947 amendments, and thus extended its term to 1987.

### (1)  The Holding Corp.'s Board Decision to Grant the Club an Option to Extend the Lease from 1987 to 2008

173.  A January 7, 1973 report to Club members by President Edward B. Vaughan, published in anticipation of the annual meeting of the same day, revealed that the Club was undertaking some expensive capital improvements to the golf course in the form of automatic watering systems. The fact that these improvements were expected to last more than the remaining 15 years on the lease was a cause for concern. Again, this concern reflected that the Holding Corp., and derivatively its shareholders, had a valuable interest in the 280-acre Westchester property and its improvements, and that Holding Corp. could obtain possession of them at the expiration of the lease in 1987.

174.  A committee was formed of some persons who were both Club members and prominent New York lawyers. The committee recommended that "in return for authorizing substantial Capital Expenditures to the course and clubhouse, the Winged Foot Golf Club should request an option to renew its lease with the Winged Foot Holding Corporation." The Holding Corp. board subsequently approved granting the Club this proposed option to extend the lease from 1987 to 2008, for another 21 years.

175.  The Holding Corp.'s board decision to grant the Club an option to extend the lease from 1987 to 2008 illustrated and demonstrated the failure of Defendants and their predecessors to protect the interests of the Holding Corp.'s shareholders. Not only were the Holding Corp. board members who approved granting the Club this option not independent of the Club, they made no attempt to calculate what the market rent for a lease running from 1987 to 2008 should be. On the face of it, the prospect of receiving a 38-year old sprinkler system in 2008 and rent of $30,000 per

year during the term of the extended lease is hardly adequate consideration in return for delaying by 21 years the possession of 280 acres of improved land in Westchester County.

**(2)   The Separation of the Holding Corp. and Club Boards**

176.   The same committee that recommended that the Club secure a further option to renew the lease from the Holding Corp. also recommended that the boards of the two entities be composed of different persons and that the same rule apply to the officers of the Holding Corp. and the Club as well. This recommendation, which was implemented in 1974, reflected a clear recognition that the Holding Corp. and the Club were separate and that in order to protect the interests of the Holding Corp.'s shareholders, it was necessary to have procedures that required an assessment by persons independent of the Club of the value to the Holding Corp. of any transactions between the Club and the Holding Corp.

177.   Unfortunately, the persons selected for the Holding Corp. directors and officers were members of the Club, and therefore could not provide this independent assessment. Highlighting this lack of independence was the President and Chairman of the Board of Directors of the Holding Corp., Gillespie, who had been, until shortly before the board and management separation, also President of the Club.

**(3)   During the 1960s and 1970s, via both Informal and Organized Stock Solicitations, the Club Gradually Built Up a Majority Ownership of Holding Corp. Stock**

178.   As noted, as of September 1961, the date of the Kelley Drye Legal Memo, the Club owned 170 shares. By 1967, the Club had accumulated 39 additional Holding Corp. shares, for a total of 209 Holding Corp. shares.

179.   In early 1967, still vexed by its failure to achieve at least majority ownership of the Holding Corp.'s shares, the Club's Governors appointed a committee "to investigate [the] stockholders situation and other problems concerning" the Holding Corp.

180.   The Governors decided in February 1967 to "devise ways and means of acquiring for Winged Foot Golf Club, voting control of the majority of Stock of the Winged Foot Holding Corporation."  The "ways and means" devised by the Club would include both a solicitation of voting proxies from member-shareholders, coupled with an "[a]pproach [to] all known ex-members with a proposal to purchase their stock."

181.   In preparation for the 1967 solicitation, the Board of Governors adopted a resolution in March 1967 stating both that the Club "[h]enceforth… will exercise its option to purchase shares" whenever available, and that it "will not permit transfer of shares between individuals whether they be members or non-members." Neither part of the Board's resolution had any legal foundation.

182.   Nonetheless, in March 1967, the Club's Board of Governors formally "recommended pursuit of the campaign to gather all shares outstanding now in the hands of resigned or deceased members," and directed that "an appropriate letter" and a list of addressees be drawn up for board approval.

183.   The resulting "stock solicitation" letters, as they were called, were mailed out between April and May of 1967. In the letters, the Club offered $250 per share, and represented falsely that the Holding Corp. "was created for the purpose of holding title to the property of the golf course." Seeking to enforce its illegitimate share purchase option, the Club represented to recipients that it was a "condition of membership in the Golf Club … that a resigning member surrender his stock certificate to the Club."  The Club represented to shareholders that "there has been no market for the stock" as the Club had eliminated stock ownership as a requirement for Club membership years

earlier.  Without achieving a majority ownership of Holding Corp. shares, the Club later stated that the "stock solicitation" campaign had gone "as well as could be expected."

184.   The following year, in February 1968, the Board of Governors undertook to study the "[m]ethods used by other clubs to gain stock control."  But then in May, the Club instead decided "to follow the current procedure of purchasing such shares of stock of [the Holding Corp.] as we could for the present rather than resort to other means."

185.   In January 1973, the Club's Board of Governors, with Gillespie still in the role of Club President, appointed a new committee "for recovery of stock certificates of Winged Foot Holding Corporation." The committee held at least one meeting, "on the subject of Ways and Means [of] acquiring additional shares of Holding Corporation stock."

186.   Early in the following year, in 1974, Gillespie resigned as President of the Club and from its Board of Governors, becoming the Holding Corp.'s [first] President and joining the newly separated Holding Corp. Board, whereupon another organized campaign of solicitations on behalf of the Club was soon organized.

187.   As discussed below, Gillespie worked over many years to convince the Holding Corp. shareholders to sell their shares, and did so despite knowing and admitting that the share transfer restrictions based on the Club's asserted option to purchase were unenforceable. In July 1978, after a series of meetings and discussions, Gillespie circulated a list of 73 shareholders to 9 individuals (all current or former Club Governors, including Gillespie himself) who had each agreed to contact an assigned group of the shareholders to solicit sale of their stock to the Club.  This campaign of solicitation was to be coordinated with a forthcoming letter to shareholders from the President of the Club, to inform them that the Club had raised its offer price for shares to $1,000.

188.  Gillespie circulated suggested language to be used in the 1978 solicitation.  After stating that the Club's "founding members decided to form a Holding Corporation to hold title to the land … to limit their personal liability during the construction of the facilities," the suggested language asserted that the newly authorized $1,000 price was the same as "the average original issue price of the Holding Corporation stock." The suggested language continued:

> [I]t should be noted that the Golf Club continues to operate under the original lease between the Holding Corporation and the Club, and that, assuming the Club exercises its option to renew that lease, it will run at least until the first decade of the next century. Rental payments have been relatively minimal and have been used in major part to pay mortgage interest and other expenses. Under all the circumstances, the likelihood that the Holding Corporation will pay a dividend (one has never been paid) can be considered as remote.

189.  Apart from these organized solicitation efforts, the Club and Holding Corp. constantly and actively solicited share sales to the Club on an ad hoc basis whenever contact was made with individual shareholders for any reason over this period. Thus, the Holding Corp. routinely answered any shareholder who merely sought to transfer an inherited share into a new name by referring the shareholder to the Club's offer to buy the share. Any shareholder who inquired about the value of a share for estate or other purposes was similarly and misleadingly answered by reference to the Club's offer, and quotation of its then-prevailing offer price.

190.  Shareholders who made detailed or persistent inquiries were provided additional, materially false and misleading information of the exact same type used in the Club's organized share solicitations, designed to induce the shareholders to sell to the Club for a "nominal" price. On the one hand, the Holding Corp. emphasized purported facts that suggested its stock had minimal value—e.g., stating that the Holding Corp.'s sole purpose was to support the non-profit Club, that its lease was never intended to generate a profit and was intended to be permanent, and that it never

had and never would pay dividends. On the other hand, the Holding Corp. told shareholders that no market except the Club existed for their stock, because transfer to outsiders was prohibited.

191.   No information was ever provided to shareholders about the true value of the Holding Corp. property, the lack of enforceability of the purported transfer restrictions on Holding Corp. stock, or the conflicted interests of the Holding Corp. representatives who conveyed the offer, who were Club members assisting the Club's ongoing efforts to gain control.

192.   In 1983, the Club finally reached majority ownership of Holding, with 302 shares. The Club's share solicitations continued apace, however, as the Club steadily built up its ownership of Holding Corp. shares.

**(4)   Complicating the Club's Efforts to Gain Control of the Holding Corp., some Well-Informed Club and Holding Corp. Insiders Continued to Seek Shares for Themselves or Family Members, while Others Objected in Principle to the Club's Domination over the Holding Corp.**

193.   Even after share ownership ceased to be a requirement for membership, well-connected insiders with knowledge and experience of the entities' governance continued from time to time to seek to acquire shares for themselves or their family members—and in at least a few cases, acquired more than one share.

194.   In 1958, for example, the Holding Corp. Board approved without comment the transfer of a share from the estate of a deceased member to Lee Gagliardi, a governor and the Holding Corp. director and later the Club President to whom the Kelley Drye Legal Memo was addressed. In 1959, another member of the Gagliardi family—Frank Gagliardi, a member of the Club and active in its governance since the 1930s—went a step further, requesting approval to transfer a share of stock to his son, Anthony, even though (as the joint Holding Corp. and Club board meeting noted) the latter "is not presently a member of the Winged Foot Golf Club." Moreover, "[t]he Secretary explained that the Club had been negotiating for the purchase of this

share of stock from Mrs. Von Bommel, widow of a deceased member, and he was surprised that Mr. Gagliardi should have acquired it." The joint board resolved to defer approval of the requested transfer "pending further explanation from Mr. Gagliardi", and a few months later, the stock was instead acquired by the Club.

195.   In 1966, Frank Gagliardi—who was in fact already the owner of one share of Holding Corp. stock acquired in 1930—requested the transfer not to his son, but directly to himself of another share of stock. The Holding Corp.'s board denied approval without comment. In 1973, however, his son Anthony finally succeeded in acquiring a share, from the estate of Roy LaMarche. The Holding Corp. board approved the share transfer after stating:

> The question as to the amendment of the by-laws respecting the transfer of shares of stock was discussed and it was the consensus of the meeting *that the directors lacked the authority to amend the by-laws in   a manner that would impose any new or additional restriction upon the transfer of stock*. [Emphasis added.]

196.   The Holding Corp. Board in 1974 (in its first meeting presided over by newly appointed President Gillespie) apparently felt similarly constrained to finally permit Frank Gagliardi to transfer a second share of stock into his name, again without comment. Later that same year, however, when Gus Ensinger (another long-time Governor and Holding Corp. director) purchased a share of stock for himself from a deceased member's estate and requested its transfer into his own name, the Holding Corp. board instead transferred the share to the Club and reimbursed Ensinger his $250 purchase price.

197.   The Holding Corp.'s board's refusal to allow Ensinger to purchase a share for himself drew a rebuke from long-time member George Schaefer, who in the 1975 annual meeting protested both the ownership and voting of the Holding Corp. shares by the Club, which he called "irregular and self-serving." Regarding the Holding Corp.'s refusal to issue a share to Ensinger, Schaefer objected:

By that action[,] they have automatically frozen the price at $250. For instance, if a member wished to buy a share from another stockholder for more than $250, he knows that it cannot be processed in his name and that it will be transferred instead to the Golf Club.

198.   In contrast to this artificially low, "frozen" share price, Schaefer called attention to

the real sums at stake, particularly if the property were ever liquidated. Schaefer observed:

The founders of the Holding Company made an investment of $623,000 in stock and $387,500 in bonds, or approximately $1,000,000. As matters stand now, the Club, by its investment of approximately $50,000, would have a 50% interest in assets worth many millions of dollars. The deed to the property is, of course, in the name of the Holding Corporation. If part or all of the property or assets are disposed of, let's say in the far distant future, what becomes of the monies received? Will this money be distributed among the remaining individual stockholders and the "Johnny Come Latelies", or will some of those in charge find methods or reasons to participate in the 'pot'?

199.   In the 1975 annual meeting, Schaefer rightly challenged the refusal to transfer a share

to Ensinger, asking "[u]nder what authority, by-law or otherwise was such action taken."

**(5)   Gillespie Admitted that the Share Transfer Restrictions Were**
**Illegal and that the Holding Corp. Was Not Merely a Title-Holding**
**Company Set Up to Serve the Interests of the Club**

200.   Walter Kolb, another former governor and director, also wrote to Gillespie, seeking

an explanation concerning Club policies with regard to the transfer of the Holding Corp. shares,

and inconsistencies in the Holding Corp.'s treatment of proposed share transfers. In response,

Gillespie wrote Kolb a letter on March 14, 1975 in which Gillespie represented that "over the years

policies and practices have varied widely" as to these matters.  He indicated that then current policy

was "at least initially" to disapprove of transfers other than to a close relative. He added, however,

that:

as a legal matter, I do not think that the Board of Directors of the Holding Corporation may properly withhold approval of any transfer of a share if the transfer papers are in good order. Neither our charter nor our By-laws give us the authority to pick and choose. I believe that counsel for the Club who have focused on this question over the years would all agree with this statement.

In the same letter, Gillespie expressed the opinion that if the Club were to suggest that it would be desirable for the share of a non-member to be sold to the Club, it is the "privilege" of the person "to decline to sell the share to the Club." Gillespie thus effectively admitted that Club did not possess a valid call option on the outstanding shares of Holding Corp. stock.

201.  In the same letter, Gillespie flatly admitted that the share transfer restrictions were illegal, and would not be upheld if challenged in court:

> In past years, the Holding Corporation on occasion refused to transfer those shares and some of the legatees wrote quite bitter letters and even retained counsel in order to press their position on the matter. Ultimately, in every case, the proposed transferee simply gave up and took back his share because, obviously, one does not litigate a matter involving a share nominally worth $250 unless as a very deep matter of principle where the expenditure of funds for lawyer's fees is not important. Someone who is in that position may come along one day but, so far, we have been lucky. *If such a litigation were brought, my view is that Winged Foot would not only lose the case, but would al so lose many future opport unities to pick up shares .* [Emphasis added.]

202.  As a practical matter, therefore, it was only the artificially low share price purportedly set by the Club's call (the "frozen" price, to use Schaefer's term) that protected the Holding Corp. from litigation which, in Gillespie's view, Winged Foot would surely lose.

203.  Toward the end of his letter, Gillespie concluded that while the then-current policy meant that the board should normally "disapprove any transfer in cases where the proposed transferee purchased the share," he thought "also that maybe circumstances might dictate exceptions to [this] rule, although each should be given grudgingly."

204.  Such circumstances, in which there was a grudging approval of share transfers occurred when the share transfer restriction policy was pointedly challenged, as it apparently had been by members of the Gagliardi family in 1966, 1973 and 1974.  Another example occurred in 1982, when Charles Evans, the former, long-time secretary of the Club and the Holding Corp., sought to transfer his share to a then current member of the Club. The Holding Corp. approved the

transfer subject to a written agreement by the transferee that the Club would have the right to purchase the share upon her death or resignation from the Club—which it eventually did in 1988.

205.   Gillespie himself purchased a share in 1962, which he retained throughout the period that he was actively pressuring others to sell their shares to the Club.   He later also inherited his father's Holding Corp. share, making him one of only a few shareholders other than the Club to hold multiple shares of Holding Corp. stock, both of which he retained and voted.

### (6)   Gillespie's Memo Acknowledging that the Holding Corp. is Not a mere Alter Ego of the Club

206.   In his capacity as President and a board member of the Holding Corp., from 1974 to 2008, Gillespie authored several other documents concerning the nature of the Holding Corp. and the relationship between the Holding Corp. and the Club. For example, in response to a May 23, 1975 letter from Joseph DioGuardi, who was a partner at Arthur Andersen and was suggesting certain actions to help the Holding Corp. avoid federal taxes, Gillespie wrote a letter of June 10, 1975 containing a number of critical admissions. With regard to whether the Holding Corp. could avoid federal corporate income taxes by being able to take advantage of the exemption under Section 501(c)(2) of the tax code available to certain non-profit entities, Gillespie expressed doubt, saying:

> There is no evidence in our charter or by-laws of the fact that the Corporation was organized exclusively to hold title to property, to collect the income therefrom, and to turn over the entire amount, less expenses, to the Golf Club.

207.   As to the possibility of merging the Holding Corp. into the Club, Gillespie states that "I seriously doubt whether at this time the Club would wish to consider conferring dissenter's rights on outside shareholders." Dissenters' rights would only have been of concern if there was the prospect that a court, in a dissenter's action, would have found that the shares had value. Indeed, Gillespie says "Only when the Club has a much higher percentage of outstanding shares will the

long-term solution of some sort of amalgamation of the two entities become less than prohibitively expensive to the Club."

208.   Gillespie also rejected the idea that "the Holding Corporation is 'merely the alter ego or captive' of the Club," thereby again implicitly acknowledging that the Holding Corp. must have some separate purpose than simply serving the Club, which must be to serve its own shareholders.

**(7)** **Gillespie's 2008 Retirement Memo**

209.   In February 2008, Gillespie, who was retiring as President of the Holding Corp. after over 30 years, wrote a memorandum to W.B. O'Keefe, which was intended to provide O'Keefe with some needed background.

210.   One topic addressed by Gillespie was then current figures concerning who held the 600 Holding Corp. shares. The Club held 335 shares and Club members held 17 shares. Thus over 40% of the Holding Corp.'s outstanding shares – 248 – remained in the hands of persons with no relation to the Club.

211.   Of the 248 shares held by persons unrelated to the Club, the certificates for 52 were being held in escrow in the Club's safe. Gillespie describes their status as follows:

> The deposited shares, or some of them, have notations of the price the resigning member desired to receive for his share. After a few years, as the Great Depression deepened, the Club abandoned the requirement that new members acquire a share from a resigning member or member's estate, and the 52 shares simply languished in the firm's safe, though remaining in the respective ownership of the departing members and then their estates.

212.   A second topic addressed in Gillespie's 2008 memorandum to O'Keefe related to the renewals of the lease. In this connection, Gillespie stated:

> [I]n the early 70s the impending lease expiration became a matter of concern. Thus, the separation of the two boards which led in due course to negotiations resulting in the grant of a third renewal option exercisable by the Club to extend the lease for a third 21 year renewal in 1987. As the years went by, that renewal option was exercised resulting in an extension of the lease on the terms agreed upon in the mid-

40s to 2008. A second negotiation occurred in the mid-80s, resulting in the grant of a fourth renewal option, exercisable by the Club, to extend the least to 2019. That renewal option was exercises. And, again, in the 90s a third negotiation took place with the result that a fifth renewal option was granted by WFHC to the Club. In due course, the Club exercised that renewal option, with the result that the lease now by its terms extends to 2050.

213.   A lease extension allowing the Club possession of 280 acres of land in Westchester County, improved to be one of the country's top golf venues, for an additional two decades is obviously a transaction involving something of substantial value. It is unclear what the nature and extent of the "negotiations" concerning each of these lease extensions was. The record contains no evidence concerning how the Holding Corp.'s directors and officers could have exercised independent judgment concerning whether the extensions of the lease were in the best interests of the Holding Corp. and its shareholders given that the Holding Corp. directors were all members of the Club. And it contains no evidence that they sought expert outside advice as to what a market rent would be for the periods involved in these lease extensions or what the value of the property would be in the hands of the Holding Corp. if they did not extend the lease. There is no evidence that they even sought to calculate these values on their own.

214.   In this connection, the only consideration that Holding Corp. received for the 2001 option to extend the lease until 2050 was a promise by the Club to undertake improvements in the form of employee housing at a cost in 2001 of $550,000. The minutes of the Holding Corp. board meeting approving the grant of the option contains no description of how the board decided that the receipt in 2050 of a 50-year-old building originally costing $550,000 plus a yearly rent of $30,000 was adequate compensation for the use for an additional twenty-one years of 280 acres in Westchester County with golf courses and facility improvements.

215.   Finally, Gillespie reports on a recent conversation with a shareholder who was the grandson of a long-deceased member and had received his share via inheritance. This shareholder

had been offered by a Mr. Kupersmith "a large dollar amount for his share of stock (I recall the

figure of $350,000)." Gillespie goes on to say

> With ownership of a share, Kupersmith would request a transfer to his name. The
> WFHC Board would presumably refuse citing our policy. Litigation might the result
> on a number of issues.

### (8) The Holding Corp.'s New 2008 Board and the Changing of the Guard

216.   In 2008, the entire Board of the Holding Corp., which had an average age close to 80,

stepped down as did Gillespie in his capacity as the Holding Corp.'s President. As Gillespie reports

in his 2008 memorandum, these persons asked the Club's board to come up with a slate of Club

members to recommend for election at the Holding Corp.'s next annual meeting. The Club was the

majority shareholder of the Holding Corp. and so the slate it chose would surely be elected.

217.   All of the Holding Corp. Director Defendants were Club members and hence could

not have exercised independent judgment concerning the value to the Holding Corp., and

derivatively its shareholders, from entering into a major transaction with the Club.

218.   As one of his last acts as the Holding Corp.'s President, Gillespie provided each of

the new directors with a binder that contained a number of important documents, including copies

of the Kelley Drye Legal Memo and one or more other legal memos concerning the relationship

between the Holding Corp. and the Club, the Holding Corp.'s Certificate of Incorporation and

bylaws, the   1952 document entitled "Structure and Funded Indebtedness" of the Club,

correspondence concerning Holding Corp. shareholders, and copies of judicial opinions in cases

involving disputes between shareholders and companies that owned the real property occupied by

golf courses managed by clubs.

## VI.    BREACHES OF FIDUCIARY DUTY BY THE HOLDING CORP. BOARD

219.   The Directors of the Holding Corp. owes a fiduciary duty to act in the best interest of the Holding Corp. and its shareholders, including the duty to:

(a)    manage, conduct, supervise, and direct the business and affairs of the Holding Corp. in accordance with laws, rules and regulations, and the certificate of incorporation and by-laws of the Holding Corp.;

(b)    neither violate nor knowingly or recklessly permit any director of the Holding Corp. to violate applicable laws, rules and regulations;

(c)    ensure the prudence, honesty and soundness of policies and practices undertaken or proposed to be undertaken by the Holding Corp.;

(d)    exercise appropriate control and supervision over statements to Holding Corp. shareholders, making full and accurate disclosure of all material facts, concerning, *inter alia*, each of the subjects set forth above; and

(e)    remain informed as to the nature of the Holding Corp., and upon receiving notice or information of imprudent or unsound practices make reasonable investigation in connection therewith and take steps to correct that condition or practice.

220.   The Director Defendants have abrogated each of these duties, and have treated the Holding Corp. as simply an appendage of the Club. As the foregoing shows, the view that the Holding Corp. was merely established for the benefit of the Club has no basis in reality. It is, in short, a post hoc rationalization for breaches of fiduciary duty, waste and looting that cannot withstand scrutiny. It is a myth that the Directors Defendants certainly knew was contradicted by numerous facts concerning the Holding Corp.

221.  At the most elemental level, in perpetuating the myth that the Holding Corp. was established for the benefit of the Club, the Director Defendants ignored that the Club, as originally constituted, was comprised only of members who owned shares of the Holding Corp. Thus, when the original one-share/one-member structure prevailed, any benefit conferred upon the Club by the Holding Corp. was a benefit conferred **not just upon the Club qua Club, but upon the Holding Corp.'s shareholders—who were the only Club members**. Defendants' eliding of this fact—that the Club originally was comprised **only** of the Holding Corp. shareholders—is crucial to the creation myth, i.e., that the Holding Corp. was set up to benefit only the Club, and informs each of the fiduciary breaches Defendants have committed in the name of the Club.

A.  **THE DIRECTOR DEFENDANTS' INCORRECT**
   **UNDERSTANDING OF THE HOLDING CORP.'S PURPOSE**

222.  Each Director Defendant testified that the Holding Corp. existed merely for the benefit of the Club and that it was formed as a separate entity when the Club itself was formed because New York law at the time made it necessary in order to protect individual members from liability.

223.  The overall attitude of Barry, the President of the Holding Corp. and a board member concerning how the Holding Corp. should be governed is demonstrated by an April 14, 2009 letter that he wrote Christopher McLoughlin:

> While the improvements to the property made by the club may be held by the Holding Corporation, the Corporation does not, and is not intended to, make a profit. Instead, the goal of Holding Corporation is, as it always has been, to facilitate the continued operation of Winged Foot Golf Club in perpetuity solely for the benefit of its membership.

224.  Barry said that the Holding Corp. operated for the "sole purpose of creating, establishing and maintaining the golf club" and that there were two companies in the first place

because of "idiosyncrasies" of NY law at the time. (Barry Tr., at 204.) The Holding Corp. was not, he said, intended to make money. (*Ibid* at 83.)

225.   To Barron, the Holding Corp. was established for the "dual purpose" of "set[ting] up a golf club" in a way that did not "put [Club member] assets at risk." (Barron Tr., at 7; 65 ("Winged Foot Holding Corporation was set up . . . to allow the members to play golf").

226.   Heanue believed that the Club and the Holding Corp. should "operate[ ] as a single entity" and that as long as the Holding Corp. had enough to maintain the Club's golf courses and other facilities he was doing his job as a Director of the Holding Corp. (Heanue Tr., at 153; *see, also, ibid* at 161 ("The whole purpose was to play golf").)

227.   Kelly testified that the sole purpose of the Holding Corp. was "to shield [Club] members from liability," (Kelly Tr., at 42), and that the Holding Corp. was "established for the benefit of the members" of the Club so that it was Club members who "I viewed my responsibility to" as a Holding Corp. Director. (Kelly Tr., at 28. *See, also*, Kelly Tr., at 42 ("I viewed my role as a fiduciary responsibility to the holding company and the members of the golf club.").)

228.   Egan similarly did not view the Club and the Holding Corp. as "standalone" entities. Instead they are "interconnected" and were created together. (Egan Tr., at 114-115. *See also ibid* at 116 ("They couldn't exist without each other.").) To him, because the Club needs land for its courses, etc., and the Club's "objective" is to have golf courses, the Holding Corp. is just an "instrument" of the Club. (Egan Tr., at 118.) And Egan too was told after he reviewed the certificates of incorporation for the Club and for the Holding Corp. that that the two entities were formed to protect members of the Club from personal liability. (Egan Tr., at 119.)

**B.   THE DIRECTOR DEFENDANTS' FAILURE TO**
**INVESTIGATE THE HOLDING CORP.'S PURPOSE**

229.   At about the time that each Director Defendant joined the Holding Corp.'s Board, he received a binder containing a number of documents. The first binders were prepared, it appears, by Gillespie and then later and slightly modified ones by Barry. Although the record is not clear concerning precisely what was contained in these binders, and the extent to which they changed over time, it appears at the least that each contained a copy of the Holding Corp.'s Certificate of Incorporation and bylaws, a 1952 document entitled "Structure and Funded Indebtedness" of the Club, correspondence concerning the Holding Corp.'s shareholders, legal opinions concerning the structure of and relationship between the Holding Corp. and the Club and issues that arose with respect to that, and copies of judicial opinions in cases involving disputes between shareholders and companies that owned the real property occupied by golf courses managed by clubs.

230.   Each Director Defendant understood that the documents in the binder related to the history of the Holding Corp. and would be valuable in understanding that history. (See Barron Tr., at 49; Egan Tr., at 51-52).

231.   Several Directors also received information orally from Gillespie or perhaps others, and all of the Director Defendants had access to the full historical record contained in the Holding Corp. and Club meeting minutes, correspondence and other documents. (*See* Barry Tr., at 55-56, 205; Kelly Tr., at 40; Egan Tr., at 119.)

**(1)   The Holding Corp.'s Certificate of Incorporation**

232.   The binder contained a copy of the Holding Corp.'s Certificate of Incorporation. As shown above, nothing in the Certificate supports the view that the Holding Corp. was merely an appendage of the Club. There is no mention in the Certificate of the Club and clearly the Holding Corp. is not confined to developing a golf course that it then forever leases to the Club. The

Certificate clearly states that the Holding Corp. is a New York business corporation, and expressly authorizes the Holding Corp. to issues shares and grants the Holding Corp. the power to pay dividends to its shareholders. Thus, the Certificate indicates that Holding Corp. is a "business corporation," and therefore necessarily for profit, and expressly contemplates the possibility of making pay outs to equity holders during the life of the corporation.

233.   Barry said that while he recalled seeing the Certificate of Incorporation in the binder, it did not "require[ ] a close and careful reading." (Barry Tr., at 227-228.)

234.   Barron said he may have read the Certificate, but dismissed its importance by saying, "[i]t wouldn't have been particularly relevant to me" because it was nothing but an ancient "vestige" which "was no longer relevant to what should be done going forward." (Barron Tr., at 168-169.)

235.   Heanue dismissed the Certificate as "boilerplate." (Heanue Tr., at 244.)

236.   Egan said he independently reviewed the Certificate but was assured by someone, he does not recall whom, that the Holding Corp. was just a means to protect Club members for potential liability and so accepted that that there was a symbiotic – our word, not his – relationship between the two. (Egan Tr., at 119.)

237.   For his part, Kelly did not recall seeing the Certificate. (Kelly Tr., at 207.)

238.   None of the Director Defendants, in sum, afforded any significance to the Certificate's terms, which plainly reflected a choice by its incorporators to incorporate the Holding Corp. as a business corporation to allow for generating surplus profits and distributing them to its shareholders.

239.   As to the purported concern that two entities were established, rather than just a club, because, in 1921, there existed a concern that under then current law each member of a membership corporation might be individually liable for all of its liabilities if the membership corporation were

unable to meet them—there is no evidence in the early record suggesting the existence of this concern. The notion of a concern about limited liability appears to surface for the first time in connection with the Club changing the terms of the lease to provide for a fixed $30,000 annual rent, and appears a thinly disguised, post hoc justification for the Club's oppressive dealings with the Holding Corp. in connection with the lease amendment and, indeed, thereafter. In any event, if concern about limited liability formed any part of the founders' objectives—to the extent there was any legal basis for such concern, which is questionable—it could only have been achieved by the Holding Corp. not being treated as the alter ego and mere appendage of the Club. The Club, to accomplish a limited liability objective, would necessarily have dealt with the Holding Corp. on an arm's length basis, not as the Club's mere agent solely serving the purposes of the Club. The Director Defendants' purported reliance on a limited liability concern, then, is not only ill-informed, but to be true would have required the Holding Corp. to have from inception its own purposes distinct from those of the Club, which would be to try to generate wealth so as to generate a return for its shareholders.

## C.   IGNORING RED FLAGS

240.   The Binder contained numerous documents that further belie the notion that Holding Corp. existed solely to serve the Club.

### (1)   The Kelley Drye Memos

241.   Included in the binders were the 1961 Kelley Drye Legal Memo, as well as a more recent 2008 Memo from Kelley Drye. The contents of the Kelley Drye Legal Memo are detailed above (¶¶ 156-172, supra.), and the 2008 Memo, withheld on the basis of privilege, appears to relate to the same subject matter as the Kelley Drye Legal Memo. The Kelley Drye Legal Memo, of course, called into question the entire structure of the Holding Corp. and its relationship with the

Club, and made several recommendations about what should be done to address the Club's interests given the existence of the Holding Corp. and its shareholders, as discussed above.

242.   Barron was particularly dismissive of the Kelley Drye Legal Memo. Referring to a sentence in the 1961 Memo that observed that the Holding Corp. had exercised "extreme informality," a sentiment with which he actually agreed, Barron said:

> when I read this, this is probably one of the things that I read in this memo that suggested to me these guys are treating this like a law school exam and getting all tangled up in legalities that bear no relationship whatsoever to the purpose of why there is a Winged Foot Holding Corporation.

(Barron Tr., at 239-40.) Thus, Barron was directly confronted in the Kelley Drye Legal Memo with the inconvenient "legalities" that the Holding Corp. presented, and, as he admitted, he simply ignored them.

243.   Barry recalled that the 1961 Kelley Drye Legal Memo was in the binder he received. (Barry Tr., at 125.) But he thought it a "good memo, positive," (*ibid* at 136), by which he meant "it raised certain issues, but overall it didn't give me concern," (*ibid* at 137). He thought it significant enough, however, to include it in the binders he prepared for later Holding Corp. Directors. He also did not know whether the Club or the Holding Corp. had sought professional opinions with regard to the matters addressed by the Kelley Drye Legal Memo. (Barry. Tr., at 241-242.)

244.   Kelly did not recall that the 2008 Memo was in his binder, but did recall receiving and reading the 1961 Kelley Drye Legal Memo, (Kelly Tr., at 186-187; 194). He recalled that the Kelley Drye Legal Memo identified numerous business risks to which the Holding Corp. and the Club were exposed, including with respect to the Lease, and that it made recommendations concerning how those risks could be lessened or "minimized." But he did nothing to investigate further the issues raised in the Kelley Drye Legal Memo. (*Ibid*, at 394 ("pointed out a number of things that the Club needed to consider") to 401.) "It didn't seem to be anything wrong with the

way the Holding Corp. was being governed when I was on, so I had no concern about it." (*Ibid*, at 397.)

245.   Heanue received the Kelley Drye Legal Memo, but said he did not recall seeing it. He testified, however, that if he had seen it he would likely have read it. After reading parts of it at his deposition, Heanue stated that he would have recognized that there were a number of risks the Kelley Drye Legal Memo was "trying to bring to the forefront here" and that he "would have had to evaluate all of these things," in understanding the Holding Corp. and its relationship with the Club. But he maintained that he did not recall receiving the Kelley Drye Legal Memo. (Heanue Tr., at 228-236.)

246.   For his part, Egan recalled that both Kelley Drye memos were in the binder he received and recalled some of the particulars of the 2008 Memo. The 2008 Memo, he recalled, set out a "dense legal argument" about the ins-and-outs of the Club buying the Holding Corp. shares it did not own. (Egan Tr., at 53-54.)

247.   In sum, none of the Director Defendants who recalled seeing at least one of the Kelley Drye memos in the binder he received gave it much thought or were led to investigate further the nature of the Holding Corp. or its relationship to the Club, or to reevaluate any of the implications for the scope and discharge of his fiduciary duties owed to the Holding Corp. and its shareholders.

248.   The 1961 Kelley Drye Legal Memo and 2008 Memo, as detailed above, were red flags that identified significant concerns about how the Holding Corp. functioned and steps that should be taken to attempt to address those concerns. The 1961 Kelley Drye Legal Memo advised that if the Corporation should be treated as an "ordinary business corporation organized for profit," that "serious questions would exist … as to the validity of the lease," and a litany of other transactions; and further warned that the Club's option to purchase—the very means by which the Club had come

to dominate the Holding Corp.—was invalid. Yet, none of the Director Defendants took any steps to investigate any of the issues or concerns raised by Kelley Drye. On this basis alone, the Director Defendants breached their fiduciary duties to be fully informed concerning their obligations as members of the Holding Corp. Board. While they varied in explaining their lack of inquiry and action, each flagrantly breached his fiduciary duty as a director of the Holding Corp.

**(2)  The Correspondence**

249.  Gillespie included several pieces of correspondence in the binders, as well. These letters identified issues that had been raised with regard to how the Holding Corp. and the Club were set up and how they operated over the years. They included responses that set forth historical details on those topics. They recognized that the manner in which the Holding Corp. and the Club had operated were inconsistent with the notion that there was simply an identity of interests between non-member Holding Corp. shareholders and members of the Club, and confirmed the divergence of those interests.

250.  Although they were included in the binders, none of the Directors considered them as providing anything but background information and in particular none deemed the correspondence and the information that they contained enough to call into question their belief in the purpose of the Holding Corp. For example, in discussing Gillespie's May 23, 1975 letter to Joe DioGuardi, an Arthur Andersen partner at the time, (described at ¶¶ 206-208, *supra*), Barron dismissed as absurd Gillespie's statements that there was no evidence in the Holding Corp.'s charter or by-laws that it was set up merely to serve the Club, or that consideration of a merger of the entities would risk conferring dissenter's rights, i.e., appraisal rights, simply because such considerations were not consistent with his own understanding of the Holding Corp.'s original purpose.  In this regard, Barron admitted that he and others had "dispensed with" such formalities, stating "there isn't any,

as I understand it, nobody has come across a way to do that that accepts the sort of premise that the legal formalities are meaningful, notwithstanding the fact that they are, you know, inconsistent with the original purpose of the corporation." (Barron Tr., at 343.)

251.  Regarding the concerns Gillespie expressed in his March 14, 1975 letter to Walter Kolb, who served as both a Holding Corp. director and a Club governor, (¶¶ 200-203, *supra*), about the illegality of the Holding Corp.'s restraining the ability of a shareholder to freely transfer a share she owned, Heanue did not recall seeing it before he was deposed, but stated "[i]t would have gotten my attention." (Heanue Tr., at 296.) At the same time, he dismissed Gillespie's observation as being in a "casual conversation" that did not rise to the level of an actual opinion and said that he was confident that the two lawyers on the Holding Corp. Board, Barron and Barry, "probably investigated this matter" when in 2008 the Holding Corp. Board, itself, formally asserted restrictions on share transferability. (Heanue Tr., at 296-297.)

252.  As to the concerns Gillespie expressed in his 1975 letter to Kolb, Barron simply thought Gillespie was wrong. (Barron Tr., at 144-146.)   Barry, though, said that Gillespie's observation was never brought to his attention, (Barry Tr., at 418), but upon reading it he did not agree, (*ibid*, at 418). Tellingly,  Barry explained how it could have been done but how, as we have seen, it was not done (since the Holding Corp. is not a not-for-profit and did not impose the type of share-transfer restrictions Barry describes):

> I don't believe, Mr. Halebian, that it's illegal to restrict transfers of shares in a private club that's being operated on a not-for-profit basis.

> You know, Holding Company was incorporated and established to maintain the golf club. I belong to a golf club in England that has shares and it's a condition of membership and the shares are fully restricted. You can't sell it to anybody else. You can't – the club can only tell you who you can give your share to and – and only if that person is going to take your place as a member of the club.

(Barry Tr., at 419.)

79

(3) **The Other Litigations**

253.   Gillespie believed that to understand the Club and the Holding Corp., it was important that Holding Corp. directors understand various legal issues that had come up with the Holding Corp. itself and in similar situations. Accordingly, a number of judicial opinions were included in the binder.

254.   For example, Barron was aware of a case involving the Deepdale Golf Club on Long Island, which was the subject of litigation in the Southern District of New York that was settled in 2007, *Patrick v. Allen, et al*, 04 CIV. 00657 (WHP) (SDNY). The Deepdale litigation is strikingly similar to the instant litigation in that equity shareholders of Real Property Owners, Inc., ("RPO") the holding corporation that owned the property on which the Deepdale Golf Club was located asserted that the directors of RPO breached their fiduciary duties to the RPO shareholders because RPO was being managed solely for the benefit of the Deepdale Golf Club and not for the benefit of RPO or its shareholders. A copy of an opinion in that case was included in at least some of the binders that were given to new the Holding Corp. Directors. Barron said that there were "discussions from time to time" about Deepdale and its "very weird structure." (Barron Tr., at 23.)

255.   Barry thought he likely learned of the Deepdale case from the opinion in the binder he received. (Barry Tr., at 29 to 30.) Although that case could have been discussed by the Holding Corp.'s Board, no effort was undertaken to investigate whether the issues raised there were relevant to the Holding Corp.'s situation and whether anything should be done by the Holding Corp. to address any such issues. (Barry Tr., at 223-224.)

256.   Heanue did not allow what he learned about the Deepdale situation to lead him to personally look into it and how it affected the Holding Corp; he thought that the lawyers on the Holding Corp. Board had an interest in what had happened in the Deepdale case, which was a

subject of a discussion among Board members, and he deferred to them on the subject after they indicated that they would look into it. (Heanue Tr., at 98-100.)

257.   Kelly did not recall reading the various court decisions that were in the binder that he received, but did not talk to anyone about them. (Kelly Tr., at 226.)

258.   While Egan recalls reading decisions in the Deepdale litigation and other cases that were in his binder, he does not recall similarities between the facts of those cases and Winged Foot. (Egan Tr., at 125-127.)

### (4)   **The Lease**

259.   The Holding Corp.'s prime asset is the Property, together with the structures and improvements made by the Club, which pass to the Holding Corp. upon the termination of the lease. Yet none of the Director Defendants showed the slightest concern for how the extensions on the Lease affected the Holding Corp. itself and ultimately the Holding Corp.'s shareholders.

260.   On May 6, 2013, the Holding Corp. entered into an agreement with the Club giving the Club the option to extend the lease to October 31, 2071 on the same terms, which would include the $30,000 per year rent, as the prior leases since the late 1940s. There is no evidence to suggest that the Director Defendants engaged in any substantive deliberations in connection with the approval of the lease extension.

261.   To the contrary, in June 2012, at Kelly's suggestion, the Director Defendants concluded that they should take the initiative to suggest to the Club that because the Club was about to embark on an expensive long-range plan, the Club should come to the Holding Corp. with a proposal to extend the lease and do so before it actually voted on the plan so that it could be offering its willingness to engage new plan as consideration for the lease extension.

262.  The Holding Corp.'s Directors admitted that there was no thought given at the time to the actual value of the Holding Corp.'s property and that there was no negotiation, in any respect, concerning the terms pursuant to which the additional 21-year extension would be granted.

263.  Barron pointed out that the Lease bore no relation to the value of the Holding Corp.'s property and claimed that that was the point, i.e., it showed that the Holding Corp. and the Club were "conjoined" and that there was no desire that the Holding Corp. earn anything from its property. (Barron Tr., at 242-44, 254.) Not only were "negotiations" about any lease extensions not arm's length, (*ibid*, at 275-77), but there was no reason for the Holding Corp. to seek "improved" terms when addressing a long-term extension because it existed solely to serve the Club, (*ibid*, at 359).

264.  Egan thought that considering all that the Club paid to the Holding Corp., including taxes, insurance, and capital improvements, plus the $30,000, the deal struck for the 2013 lease extension "sounded compatible" with the founders' intent that the two be "mutually beneficial interconnected enterprises". (Egan Tr., at 139-140.) But he knows of no attempt undertaken in 2012-2013 to inquire into the value of the Holding Corp.'s property, when the prospect of a further Lease extension was raised. (Egan Tr., at 142.)

265.  Although Kelly acknowledged that the Holding Corp.'s major asset is its land, as a member of the Board he was not concerned about its value because it was occupied by a golf club, which is "inherently a lousy business," and the value of the land was ultimately the value that Club members gave it as a golf club. (Kelly Tr., at 228-229.) Because in his view all the Holding Corp.'s property could be used for was the operation of a golf course, Kelly did not believe that he, as a Holding Corp. Director, had a duty "to at least understand what the property was worth." (Kelly Tr., at 233.) So there was no negotiation about the Lease extension. (Kelly Tr., at 267-268.)

266.   Heanue admitted that none of the Holding Corp.'s Directors expressed any concern about the extent to which the 2013 Lease extension created benefits to the Club at the expense of the Holding Corp. (Heanue Tr., at 333.) He, too, admitted that no attempt was made at the time to determine what the Property was worth before granting the extension. (*Ibid*, at 311-19). In his view, the value of the Property was irrelevant because the whole point of the Holding Corp.'s existence was to allow for the Club to have its courses and all that the Holding Corp. needed in the Lease was enough from the Club to pay for expenses that the Club did not pay and the Lease was simply a device to have the Holding Corp. receive that money. (*Ibid*, at 151-52.)

267.   Barry admitted that there was no negotiation between the Holding Corp. and the Club concerning the 2013 Lease extension. (Barry Tr., at 375.) He also did not see that there was any financial benefit to the Holding Corp. in the 2013 Lease extension. (*Ibid,* at 372.) Barry too thought the actual value of the Holding Corp.'s Property was irrelevant, including to his ability to carry out his duties as a Holding Corp. Director. (*Ibid*, at 109-11.)

**D.    THE CLUB'S SWEETHEART LEASE AGREEMENTS WITH THE HOLDING CORP. CONSTITUTE BREACHES OF FIDUCIARY DUTY**

268.   Currently, the only revenue that the Holding Corp. receives is rental of the land it leases to the Club. The base rent is still fixed at $30,000 per year plus certain necessary expenses. This rental revenue plainly is not a market rental. Rather it is partial reimbursement for necessary expenses related to the land owned by the Holding Corp., such as utilities, taxes and insurance expenses. For 2012, the Club reported that this amount was $970,105.

269.   Because the Club has effectively dominated the Holding Corp., contrary to the best interests of the Holding Corp. and its shareholders, Defendants and their predecessors, in breach of their fiduciary duties, have perpetuated sweetheart lease deals at below-market rates and have otherwise prevented and obstructed the ability of the Holding Corp. to obtain reasonable value for

its extraordinarily valuable property, thereby further wrongfully depressing the perceived value of the Holding Corp. shares.

270.   The Club has very substantial sources of revenue. In addition to its originally intended activities as a membership social club, the Club makes itself available to the public for outings, at a price of up to $1,000 per person. Because of the popularity of the Winged Foot logo with the golfing public, the Club's pro shop also generates millions of dollars in revenue for the Club. (The Club has taken direct control of the pro shop, unlike most golf clubs which traditionally allow the pro shop to be run as the business of the head golf professional.)

271.   Club revenues have been increasing almost exponentially for several years. In 2000, reported total Club revenues were $13.1 million. In seven years, that figure grew to $20.6 million for 2007. Reported Club revenues for 2009, 2010, 2011, and 2012 were $13.7, $16.9 million, $17.4 million, and $19.0 million, respectively. In addition, total assets for the Club increased as well. Between 2000 and 2007 assets increased from $13.1 million to $20.6 million. For 2009, 2010, 2011, and 2012, assets reported by the Club were $22.3 million, $24.5 million, $26.0 million and $29.3 million, respectively. These Club revenues, among others, should be a source of the payment of a reasonable rental to the Holding Corp. thereby also enhancing the perceived value of the Holding Corp. shares.

272.   Even though the non-profit Club is making money, the for-profit Holding Corp. is not, thereby depressing the value of its shares and the ability of the Holding Corp. shareholders to receive fair value in a sale. The rent paid by the Club on the Holding Corp. Property, is still set at the 1947 rate of $30,000 plus necessary expenses (such as property insurance and taxes) a year. The Club's consolidated financial statements and other documents indicate that, while the Club has reported net income of about $2.5 million per year, the Holding Corp. suffers net operating losses.

273. Typically, landlords that are for-profit entities, such as the Holding Corp., require the payment of market rent, which is, in many instances, a combination of base rent and percentage rent to achieve the highest possible return on the leased asset value. Specifically, market rent is customarily based on a percentage of gross revenue, with a minimum base, along with other potential provisions such as (a) percentage rent calculated on food and beverage or other specific gross revenues, (b) net cash flow rent, and (c) payment of all utilities, property taxes and insurance. The critical factor in the calculation of the rent amount is the value of the assets and the underlying land being leased. The extraordinarily iconic and valuable clubhouse with its accompanying eating and drinking facilities, generates substantial revenues and provides further sources of significant income that should be part of an annual rental.

274. This, however, is not what is occurring here. Here, Defendants have failed in their duties of loyalty and care to the Holding Corp., by failing to obtain for it a market-based rental amount for its Property leased to the Club, thereby further depressing the value of the shares in connection with their sale to the Club, and in addition, further fraudulently concealing the true value of Holding Corp. and its shares.

E.   **THE CLUB'S DOMINATION OF THE HOLDING CORP.'S ANNUAL SHAREHOLDER MEETINGS**

275. Leveraging its current, controlling position in the Holding Corp., the Club has structured the annual meetings of the Holding Corp. shareholders as pro forma affairs. Shareholders receive a Notice of Meeting and no other information. The slate of Directors is proposed at the meeting by the Club's designee and then elected by the Club. The Holding Corp. directors are chosen, in advance, by the Club's governing board from Club members, and owe their loyalty entirely to the Club. The Holding Corp. Directors are the Club's agents and do the Club's bidding.

276. As a result, the Holding Corp. directors are "dominated" by the controlling shareholder and act as agents for the Club to effectuate its agenda. From the perspective of the Holding Corp. board, their only "boss" is the Club and their responsibility is to their friends and business associates who are Club members, and the Club management. The slate of Holding Corp. director nominees is chosen from Club members based principally on their loyalty to the Club, in order to do the Club's bidding by insuring that the Property remains available to the Club, despite the fact that the Club does not own it.

**F.    THE CLUB AND ITS AGENTS ON THE HOLDING CORP. BOARDS SOUGHT TO ENSURE THE CLUB'S DOMINANCE OVER THE HOLDING CORP BY FAILING TO PROVIDE SUFFICIENT NOTICE OF HOLDING CORP. SHAREHOLDER MEETINGS TO NON-MEMBER SHAREHOLDERS**

277. Although Article I, Section 1 of the Holding Corp.'s Certificate of Incorporation required that the Holding Corp. hold annual shareholder meetings at which directors were elected and other business transacted, the Holding Corp. directors and the Club failed to do so starting relatively early in the Club's history. There are numerous indications in the record that proper notice was not regularly or properly provided, in particular to non-member shareholders, and thus it is highly questionable that on various occasions that Holding Corp. directors were properly and legally elected to the Holding Corp. board and that lease extensions to the Club were properly or legally granted by Holding Corp. directors to the Club. The Kelley Drye Legal Memo itself was highly critical of the Club's substantial disregard of corporate formalities in addressing this issue.

278. Because of this practice over the very same years that the Club sought to consolidate its voting power over the Holding Corp., the Club and its members on the Holding Corp. board of directors effectively disenfranchised and neutralized more than 200 non-member shareholders and substantially damaged the Holding Corp. by depriving it of more than one-third of its shareholders

whose primary interest would have been to stand up for the best interests of the Holding Corp., even if those interests conflicted with the best interests of the Club. Knowing that non-Club members would be more interested in what was best for the Holding Corp. under the law that it was incorporated, i.e., retaining increased financial value, the Club sought to prevent any involvement by non-member Holding Corp. shareholders in the management of the Holding Corp.

279.  For example, there is no record of the Holding Corp. holding any shareholder meetings from 1931 through 1936, but when meetings resumed in 1937, they were held at the same time as the Club's annual member meetings, through 1961 or possibly 1973. In this period, however, there were years in which there is no record of notices going out to any shareholders, e.g., 1937 and 1938 and 1940 to 1945, years in which notice was posted somewhere in the Club's clubhouse and mailed only to members of the Club, e.g., 1946 to 1954, and solely to members of the Club, from 1955 to 1961.

280.  More significantly, in more recent years, the Club and Holding Corp. directors have made no genuine effort to locate "missing" shareholders, i.e., shareholders for whom there is no current address. It should be no surprise that many of these shareholders were affluent and successful professionals and business persons, who had significant wealth, significant property including real estate, had large families and oftentimes lived for many years in close proximity to the Club. As pointed out above in connection with the share certificates of Karl Schmieg, Roland Gsell and the Estate of Loretta Mandeville, many of these purportedly lost shares are neither so lost nor difficult to locate. Based upon Plaintiffs' counsel's limited investigation into the existence of existing shareholders and shareholders who sold shares to the Club, many, if not most, of the descendants of these shareholders can be located without great difficulty and Defendants' failure constitutes one of the gravest breaches of fiduciary duty that can occur, the disenfranchisement of

the vote.  Attached hereto as Exhibit A, is the present list of Holding Corp. shareholders, as shown in the Club's books and records, and Exhibit B, which is a list of Holding Corp. shareholders who sold their shares to the Club and others.

**G.    DEFENDANTS CONTINUE TO OFFER TO PURCHASE HOLDING CORP. SHARES BASED UPON MATERIALLY MISLEADING STATEMENTS AND OMITTING TO DISCLOSE MATERIAL INFORMATION**

281.   The Club's scheme to purchase Holding Corp shares for itself is founded on continued misleading representations to current shareholders regarding the nature of the Holding Corp. and the value of its shares. These materially misleading representations and omissions sought to and continue to seek to denigrate and minimize the value of Holding Corp. shares in order to facilitate their acquisition by the Club.

282.   In or about late 2013 and continuing to early 2014, Holding Corp. shareholder Kevin T. Hoffman ("Hoffman") met on several occasions with Barron to sell his share to the Club at market or a reasonable fair value. Barron offered Hoffman a nominal amount, understood to be approximately $3,000 for Hoffman's share, and stated that the Club would not consider purchasing any Holding Corp. share for anything greater than that amount. The Club has made other recent share purchases for around $3,000.

283.   In or around January 2012, Kevin Clune ("Clune"), as executor of his late-mother Barbara Clune's estate, communicated with Barry concerning disposition of the estate's Winged Foot share. Clune, as executor of an estate, understood that he was required to obtain maximum value for the share on behalf of the estate. Barry represented to Clune, as described above in detail, that (1) the Holding Corp. was never setup to be a for profit corporation and that his Holding Corp. share was never intended to be a genuine investment, (2) the Holding Corp. shares had no significant value and that all that could be received for a share, depending upon the point in time,

was the $3,000 being offered by the Club, and (3) the shares could only be sold or transferred back to the Club. Barry also falsely represented to Clune that the Holding Corp.'s lease was profitless, was intended to be permanent, and that the Holding Corp. had never paid, and could never pay, dividends. To facilitate the fraudulent acquisition of the share, Barry explained to Clune that transfer of the share to any outsider was simply prohibited. Furthermore, Barry omitted to disclose to Clune the substantial existing conflict of interest between Barry's fiduciary duty to the Holding Corp. shareholders as a director of the Holding Corp. and his interest as a member of the Club in seeing the Club acquire all shares of the Holding Corp. for as little as possible to in order to effectuate the longstanding scheme. Barry also failed to disclose to Clune the motivation for the offer, i.e., that the Club was trying to obtain the Holding Corp. for itself and that Clune's share did have substantial value.

284.   Clune believed the materially false and misleading representations made by Barry and reasonably relied upon those misrepresentations in agreeing to sell the single Holding Corp. share that was held by the estate. As a result of Barry's materially false and misleading representations and his failure to disclose other material facts, Clune endorsed the share certificate over to the Club in exchange for a nominal payment of $3,000.

285.   In or around June 29, 2015, James E. Fisher ("Fisher"), who had inherited a Holding Corp share from his father, called the Club and spoke to Robert Dougherty, the controller, to enquire as to whether he could transfer his Holding Corp. share from his name into the name of his then 27 year old daughter. He eventually spoke to Barry regarding this issue. Barry represented to Fisher that the Club would not allow the transfer of the share from his own name to his daughter. During the same telephone conversation, Fisher inquired of Barry as to whether he could sell his share to another Club member. Barry responded that if the sale price of the share were an "excessive" or

large dollar number, such a sale and/or transfer would not be approved. Subsequently in the Spring of 2016, Fisher had another telephone conversation with Barry in which he advised Barry that he desired to sell his share to a non-resident member, Matthew Dent, for $8,000. Barry subsequently advised Fisher that the Holding Corp. board would approve of the sale and transfer and the transaction was consummated.

286.   Despite the fact that Barry was the chairman of the board of directors of the Holding Corp. and as such owed to fiduciary duties to Fisher, Barry omitted to disclose to Fisher numerous material facts indicating that the value of the Holding Corp. share that he was selling for $8,000 was worth many times that value and that it was the subject of at least one lawsuit, this Action, in which the value of a single share was disputed and claimed to be worth as much as several hundred thousands of dollars. If Fisher had known of any of the facts and details regarding this Action he most certainly would never have sold his Holding Corp. share for $8,000.

287.   Under Barry as President, the restrictions that Holding Corp. illegally imposed on the transfer of its shares were significantly tightened in order to increase the pressure on shareholders to sell to the Club. While the Holding Corp. board under Gillespie had generally permitted shares to be transferred to close relatives of Club members (such as to an heir upon the death of a shareholding Club member), the board under Barry adopted a stricter policy of rejecting any proposed transfer to any non-member of the Club. Since Barry took over as President of the Holding Corp., the board rejected at least four share transfers between close relatives that were proposed to it, and solicited sales of the shares to the Club instead—in one instance successfully obtaining the share for the Club. The board also took note of deaths and resignations among shareholding Club members, so that Barry or a designee could approach or write the heir or former member and solicit a stock sale to the Club.

288.  The wrongful conduct described above, committed by the Club, the Director Defendants and others (presently unknown to Plaintiffs) demonstrates that the Holding Corp. board of directors both now and historically have not been independent, but have acted as agents for the Club. Former president George Gillespie and Barry and others, communicated with Holding Corp. shareholders not only as directors of the Holding Corp. but also in effect as members or representatives of the Club, with unified messages advocating for the Club that:

(a)   The Holding Corp.'s sole corporate purpose is to hold title to land leased to the Club;

(b)   The Club has a continuing outstanding offer to purchase all shares of the Holding Corp.'s stock at a nominal price; and

(c)   The Holding Corp.'s shareholders might as well sell their stock at the depressed price offered because, as Gillespie explained in his 1981 letter, "[i]n my judgment it is extremely unlikely that dividends will be paid on the Holding Corporation shares, or that the purchase price fixed by the Board of Governors [of the Club] will be increased."

289.  The Club's policy of making paltry offers for Holding Corp. shares, which was actively implemented and advocated by Defendants, enabled the Club to acquire Holding Corp. shares at a price artificially depressed by, among other things, Defendants' refusal to charge the Club a net market or fair value rental for the Property (or to contemplate a sale of the Property), and thereby protected and entrenched the Club's interests in the Holding Corp. at the expense of other shareholders, allowing the Club to benefit directly from the unfairly low price at which it acquired the shares.

290.  Several documents show the extremely undervalued nature of the prices offered for shares of $250 to $3,000 over the years. For example, the 2013 audited financial report states that the book value of the consolidated net assets per share are worth almost 45 times the amount being

offered (i.e., net assets of $27,252,552 ÷ 600 shares = $45,421 per share). Thus, even under Defendants' own artificially and fraudulently depressed, self-serving calculations, Defendants continued to misrepresent to shareholders that the value of a Holding Corp. share was a small fraction of their own self-serving calculations.

291.  Even if the Property were sold for continued use as a golf club, the sale likely would yield much more for the Holding Corp. shareholders than $1,000 to $3,000 per share. For example, another famous golf club, Pebble Beach, although not necessarily directly comparable, was sold for $820 million in July 1999, approximately 17 years ago. Pebble Beach is ranked by Golf Digest for 2016 as the 6th of the "Greatest 100 Golf Courses in America." The Club's West course is right behind it, ranking 8th in the same publication. Golf Digest for the same years ranked Winged Foot West as the third "Best In State Ranking" out of the 30 "top" clubs in New York State.

**H.    THE SUBSTANTIAL FINANCIAL VALUE OF THE HOLDING CORP.'S PROPERTY, ONE OF THE MOST WORLD RENOWNED AND ICONIC GOLF PROPERTIES IN EXISTENCE, IS THE PRIMARY BASIS FOR THE <u>SUBSTANTIAL MONETARY DAMAGES CAUSED BY DEFENDANTS</u>**

292.  It is undisputed that the Winged Foot Property is one of the most world renowned and iconic golf properties. Even one of Defendants' expert witnesses placed the Winged Foot Property in the top 15 golf properties in the entire world. Because the Winged Foot Property is one of the best known and correspondingly most valuable golf properties in the world, the damages caused by the wrongful misconduct by the Club, the Director Defendants and their predecessors, over decades, are expectedly substantial. According to appraisal and financial experts retained by Plaintiffs, who examined and analyzed the Property based upon a variety of financial metrics, the value of the Property is estimated to range from approximately $70 million based on an estimate largely derived from the Club's own historically depressed revenues (as a not for profit) to $350 million when

evaluated, as ultimately required for appraisal purposes, in terms of the Property's income generating potential.

293.   Defendants, understandably, have a different view. But, in contesting Plaintiffs' experts on the financial value of the Property and its corresponding relationship to total damages, Defendants seek to perpetuate and continue the fraud and breaches of fiduciary duty that have been alleged regarding their prior conduct. Defendants retained Laurence A. Hirsh as their appraisal expert on the financial value of the Winged Foot Property. Hirsh has a well-documented track record of aiding and abetting wrongful conduct of others. For example, Hirsh previously was involved in valuing a golf course on Long Island that resulted in a law suit in Delaware Chancery Court in which an LLC manager sought to buyout equity partners for grossly and fraudulently inadequate consideration.

294.   The LLC's manager retained Hirsh "for the purpose of justifying a lower buyout price" than was in the manager's initial offer to buyout the other equity holders in the LLC. The manager intentionally failed to provide certain material information to Hirsh, which caused Hirsh's appraisal to be inaccurate. Even after Hirsh learned that the LLC Manager had intentionally misled him for the purpose of defrauding his LLC partners, Hirsh continued to provide services to the LLC manager in support of the manager's further efforts to defraud his partners into selling their shares for inadequate consideration.

295.   In a court decision written by then Chancellor Leo Strine (now Chief Justice of the Delaware Supreme Court), Judge Strine commented: "I am also troubled that Hirsh took no offense when learning that [the manager] Gatz had failed to provide him with material information relevant to his appraisal work, thus displaying the blinkered results-oriented, client-directed focus that generates skepticism about hired experts." *Auriga Capital Corp. v. Gatz Properties, LLC*, 40 A.3d

839, 874, n.154 (Del. Ch.), *aff'd*, 59 A.3d 1206 (Del. 2012). In another appraisal assignment, Hirsh was substantially fined by the Internal Revenue Service for knowingly employing improper appraisal techniques in order to [under-value] a conservation easement.

296. Even more troubling, in or about 2008, Hirsh was retained by the Town of Mamaroneck (the "Town") to provide an appraisal of the Winged Foot Property in connection with a tax assessment proceeding between the Town and the Club. When it was in the interest of the Town to obtain a high appraisal, Hirsh appraised the property—not even at fair value but for tax assessment purposes—in a range of $35 million to $52 million.

297. However, when Hirsh was retained by Defendants to furnish a fair market appraisal of the Property, Hirsh estimated the Property to be worth less than $20 million. Defendants knew that Hirsh would be providing a results-driven, low-ball appraisal, that would depart from his earlier tax assessment appraisal performed for the Town (again, that had not even evaluated the Property's fair market value); and knowingly retained Hirsh to commit the type of same wrongdoing involved in his prior assignment in the Auriga Capital Corp. case, to squeeze out equity partners for fraudulently inadequate consideration.

I.    **DEFENDANTS' ACQUISITION OF DISPROPORTIONATE AMOUNTS OF D&O LIABILITY INSURANCE AND INDEMNITYAGREEMENTS SHORTLY AFTER BEING THREATENED WITH LITIGATION OVER THEIR MANAGEMENT OF THE HOLDING CORP. EVIDENCES SCIENTER AND CULPABILITY**

298. Defendants' knowledge of their own substantial likelihood of liability as a consequence of their breaches of fiduciary duty to the Holding Corp. and its shareholders is substantially evidenced by their acquisition of extraordinary amounts of D&O liability insurance coverage and by an indemnity agreement involving the Club that are completely out of proportion with a purported non-profit operation that has shareholders yet no real investment purpose. There

is substantial factual evidence in the record that demonstrates that Defendants knew that they had committed breaches of fiduciary duty for which they could be held liable for substantial damages, and in order to protect themselves they solicited and procured tens of millions of dollars of insurance to cover anticipated claims against them for personal liability. It appears, however, that Defendants may have failed to disclose the existence of claims, and circumstances that could potentially give rise to claims, in their applications for insurance, and may thereby have rendered such policies void ab initio.

299.   In a letter dated May 14, 2005, from Hoffman to Gillespie, Hoffman queried Gillespie about a lawsuit regarding a Mr. Kupersmith involving the Club and/or the Holding Corp. Hoffman commented:

> I have heard of the lawsuit involving Mr. Kupersmith. I am deeply troubled that the assets of WF Holding may be placed in jeopardy due to the foolish acts of a few members. I hope that the Board of WF Holding is taking all steps necessary to protect our assets.
>
> Along those lines, I have several questions for the Board. I believe that as a shareholder, I have a right to this information without making a more formal demand.
>
> Here are my requests:
>
> (1) Please send me a copy of the current WF Holding By-Laws and any amendments to those by-laws in the last twenty-five years.
>
> (2) I would like a list of all shareholders with other non-member shareholders similarly situated to me denoted separately. How many shares are outstanding? How many does Winged Foot Golf Club own?
>
> (3) I would like a current copy of the lease between Winged Foot Golf Club and WF Holding.
>
> (4) I would like to know what has happened to those shares that WP Holding cannot locate. Are shares being escheated to the State of New York in those circumstances?
>
> (5) Please send me the current financials for WF Holding.

(6) I have heard rumors that WF Holding's Board would like to dissolve WF Holding and put the equity in WFGC. Is that true? What type of appraisal will you consider to ensure that the non-member shareholders are adequately compensated?

I am asking for this information because I am concerned that WF Holding's Board is not protecting the interests of all shareholders-most notably, the non-member owners of the property.

300.   Any experienced attorney, as was Gillespie, a partner at the prestigious firm of Cravath Swaine & Moore, would have immediately understood Hoffman's demands to be a prelude to a lawsuit against the Holding Corp. directors for breach of fiduciary duty. And that is precisely how Gillespie interpreted Hoffman's demands in subsequent correspondence. In a letter/memorandum dated February 5, 2008 from Gillespie to W.B. O'Keefe, which recounted the May 15th 2005 letter from Hoffman, Gillespie wrote:

Over the years, Winged Foot has had questions raised by WFHC stockholders concerning the relationship between the Club and WFHC. Occasionally, a non-member stockholder (usually a family member of a deceased member) attends an annual meeting and asks a question or two. Such questions are responded to and almost always the questioner has been satisfied with the answer.

Recently, however, one stockholder wrote a letter to WFHC asking a number of questions. That stockholder did not have the facts. He threatened litigation.

301.   Within several weeks or months after Gillespie received Hoffman's May 15, 2005 letter, which Gillespie interpreted as threatening litigation, the Club, acting through one or more unnamed persons, increased its D&O liability coverage from approximately $10,000,000, to approximately $45,000.000, an unheard of amount of coverage for a putative not for profit that has shareholders but no real investment purpose.

302.   Considering that the Holding Corp. has been consistently described as a de facto non-profit entity, whose shareholders have no real investment interest, these coverage amounts are extraordinarily large. There are numerous public companies that are engaged in billions of dollars of business and transactions and that have thousands of shareholders that do not carry the amount

of D&O liability coverage obtained by the Club and the Holding Corp. directors. More troubling, however, is the apparent fact that nowhere in the insurance applications seeking the additional coverage was there any disclosure of the anticipated or threatened litigation which Gillespie admittedly believed was anticipated. Accordingly, it appears likely that in the midst of breaching their fiduciary duties to the Holding Corp. and its shareholders and believing that such breaches of fiduciary duty could make them liable for tens of millions of dollars, or more, the Club and the Holding Corp. directors apparently failed to disclose the existence of already-threatened litigation in order to obtain protection for their earlier wrongful acts.

303.   In addition to the substantial D&O policies described above, in or about the same time that the Holding Corp. directors were agreeing to further extend a lease agreement between the Holding Corp. and the Club for grossly inadequate consideration yet again, Barry, as President of the Holding Corp., secured an Agreement of Indemnification dated October 15, 2013, between the Holding Corp. and the Club, in which the Club indemnified and held harmless the Holding Corp. and the Holding Corp directors for any liability for, among other things, "any acts or omissions of officers or directors of WFHC, acting in their respective capacities as such…" Thus, Barry and the other Defendants were able to secure additional monetary protection in connection with their 2013 improper extension of the lease to the Club if they were found to have breached their fiduciary duties to the Holding Corp. and its shareholders in doing so.

**J.     FALSE AND MISLEADING STATEMENTS MADE AND
       MATERIAL STATEMENTS OMITTED TO BE MADE TO
       PLAINTIFFS AND OTHER HOLDING CORP. SHAREHOLDERS**

304.   As set forth above, Defendants misrepresented the value of the Holding Corp. shares, knowing that the shares were worth far more than the nominal amount being paid for them. Defendants also acquired the shares in violation of the law by illegally restricting the purchase of

the shares to only one entity: The Club. Further, Defendants and others intentionally failed to disclose material information such as that the Club made itself the sole market for the purchase of the Holding Corp. shares in order to seek complete ownership of the Holding Corp. when at the same time Defendants and other participants knew that the Holding Corp.'s shares that they solicited to purchase had substantial value, far exceeding the price that was offered.

305.   As a result, Defendants had the power to set the price for the purchase of the shares and to prevent a shareholder from selling the share to anyone else. Thus Defendants' statements, conduct and omissions were fraudulent, and also breached their fiduciary duties.

**(1)   Defendants' Knowledge of their Fiduciary**
**Breaches Based on Share Purchases**

306.   Each Director Defendant was personally and intimately involved in the operations of the Club and the Holding Corp., including the scheme to permit the Club to acquire Holding Corp. shares at purchase prices which were set by the Club and represented as fair prices when Defendants knew they were not. In addition, Defendants substantially furthered their scheme by representing to the sellers of Holding Corp. shares that the Club was the only permitted buyer of the shares, when Defendants knew that such conduct was illegal. Further, Defendants and other participants failed to disclose material information concerning the motivation behind the purchases, the fact that the Club was trying to obtain the Holding Corp. for itself and that the shares had substantial value. The scheme thus operated allowed the Club to acquire a number of shares, to be determined at trial, based on conduct that Defendants knew was illegal, false and misleading, and in violation of the fiduciary duty owed to the Holding Corp. shareholders.

307.   Each Defendant had knowledge of the long-standing scheme as the Club and other members of its Governing Board had engaged in the same conduct for many years.

(2)  **Fraudulent Motives to Commit the Fiduciary Breaches**

308.   Defendants and other participants had strong motive to commit the fiduciary breaches alleged herein. Defendants and other Board members were very concerned that the ownership of the Holding Corp. was increasingly held by shareholders who were not members of the Club. As that number increased, Defendants were very concerned that the Club would be forced to purchase the Holding Corp. shares at fair value, which was many times the amount that the Club wanted to pay for the shares. As a result, the Club enforced the illegal share restriction which made the Club the only buyer and falsely represented that the shares had only nominal value, when they knew that the shares had significant value and that the Club was acquiring them to forestall claims that the Club had stolen the value of the Holding Corp. by buying shares through fraudulent means.

309.   In addition, Defendants were motivated to engage in the fraudulent acquisition of the members' shares, and to preserve the fiction that the Holding Corp.'s lease was profitless, in order to maintain the amount of dues they paid at artificially low levels, to entrench their own positions of power in the Club and thereby benefit from any disposition of the shares by the Club in the future; and, of course, the Club itself was the direct beneficiary of the fraudulent share acquisition scheme.

K.    **FRAUDULENT CONCEALMENT**

310.  Defendants have engaged in longstanding and extensive efforts to fraudulently conceal the true nature of the purposes and functions of the Holding Corp. and the true value of its shares. It was not until the early generation of original Holding Corp. investors and shareholders moved away, became too old to continue to be actively involved or passed away that the leaders of the Club were able to concoct the present materially false and misleading representations disseminated to unsuspecting shareholders, as described above in detail. The newer generations of

shareholders who inherited or otherwise acquired shares were not aware of the initial selling brochures, representations and history regarding the significant investment component aspect of owning a Holding Corp. share along with a Club membership, if in fact the shareholder maintained such a membership. Moreover, Defendants and other participants have sought over the past decades to perpetuate the aforementioned false and misleading statements in both successful and unsuccessful attempts to purchase shares from estates of deceased Holding Corp. shareholders and others.

311.   Moreover, in connection with its annual dissemination of the Winged Foot Golf Club, Inc. and Winged Foot Holding Corp. consolidated financial statements for numerous prior years, such financial reports contain a representation which states that "[T]he principle business activity of [Winged Foot Holding Corporation] is to hold title to the certain land and facilities, which are leased to the Club." For the reasons set forth herein, Defendants and the Holding Corp. board knew this statement, which was repeated and disseminated to the Holding Corp. shareholders on an annual basis, fraudulently concealed the true nature and purpose of the Holding Corp., and was intended to dissuade and discourage any shareholder from asserting their rights or conducting a further investigation.

312.   In or about 2013, as described above, Hoffman sought to sell his Holding Corp. share back to the Club at what he considered to be fair value, and raised the prospect of litigation in connection with the fair value of his share. In response to the possible threat of litigation, the Club amended its by-laws specifically to threaten and intimidate any present Winged Foot member from exercising his or her right to assert any legal claims against the Club or to support any active or threatened litigation against the Club. Section 7.8 of Winged Foot's by-laws read in pertinent part:

> Section 7.8. Censure, Suspension or Expulsion. The Board may by the vote
> of at least eight members thereof censure, suspend or expel any Member for

violation of the By-laws or Rules or Regulations, or for unbecoming conduct, which in its opinion, is prejudicial to the interests or repute of the Club. Unbecoming conduct may include (i) actual or threatened litigation against the Club, or Winged Foot Holding Corporation that the Board believes is without merit or otherwise unwarranted and (ii) active support of any such actual or threatened litigation.

313.   Accordingly, Defendants have made every effort to threaten and intimidate any member or those persons with any connection or relationship to the Club member from disclosing or otherwise disseminating any adverse information relating to the claims asserted in this action. Notwithstanding that all of Plaintiffs' claims are timely, Defendants are equitably estopped based on such conduct from raising the statute of limitations as an affirmative defense.

314.   Even after the original shareholder action was filed in June, 2014, the Club sought to manage and conceal, as much as possible, the dissemination of information in its unique authoritarian manner. The Club sent a message to all Club members providing them with notice of the law suit, alerting them to possible news media inquiries and admonishing them in pertinent part: "It is important that you please refer any media inquiries you may receive on this matter to Colin Burns … [a Club employee, General manager] You should not speak to the media on the Club's behalf concerning this matter, and please refrain from discussing this matter with club staff or anyone who is not a member of the Club."

## VII.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

315.   Plaintiffs assert all Claims in this Action, *except* for the Fifth Claim for Common-Law Dissolution Claim, (the "Derivative Claims") derivatively pursuant to Rule 23.1 of the Federal Rules of Civil Procedure in the right and for the benefit of the Holding Corp. to redress injuries suffered, and to be suffered, by the Holding Corp. as a direct result of the breaches of fiduciary duties owed by Defendants to the Holding Corp. alleged herein. The Holding Corp. is named as a nominal defendant solely in a derivative capacity.

316.   Plaintiff will adequately and fairly represent the interests of the Holding Corp. in enforcing and prosecuting its rights. The Derivative Claims are not collusive ones meant to confer jurisdiction that the Court would otherwise lack. Plaintiffs were or are the legal successors of shareholders at the time of the wrongdoing complained of, have continuously been shareholders since that time, and are currently shareholders.

317.   The board of directors of the Holding Corp. at the time of the filing of the original Complaint consisted of the following five individuals: Desmond T. Barry, Jr., Thomas T. Egan, John P. Heanue, William M. Kelly, and Francis T. Barron.

318.   Plaintiffs have not made any formal demand on the board to institute this action because such a demand would be futile, wasteful, and a useless act, as set forth below.

319.   The Holding Corp. board is not independent on the issues raised herein and cannot fairly assess pre-suit demand for the following reasons:

320.   All the Holding Corp. board members are controlled and dominated by the Club. The Club is the Holding Corp.'s majority shareholder; the slate of Holding Corp. directors is selected and nominated by the Club's Board of Governors. They are chosen based on their undivided loyalty to the Club and not to the Holding Corp. and their acts have demonstrated that they do not represent the interests of the Holding Corp. As a result, they cannot fairly address a demand to have the Holding Corp. bring this action and sue themselves given the wrongs alleged. Nor can they take any action to benefit the Holding Corp. to the detriment of the Club, such as seek to effect a market rate for the lease of the Property, as they are opposed to any such result.

(a)   For the Holding Corp. to charge a market rent for the Property would force the Club to substantially raise its dues, require a member assessment, or incur significant debt. Thus, all of the members of the Club, including the Director Defendants, have a strong motive to prevent the Holding

Corp. from charging a market rent, despite the fact that the Director Defendants owe the Holding Corp. their undivided loyalty. Accordingly, since these Defendants are interested, they could not fairly address a pre-suit demand and thus demand is futile.

(b)   The Director Defendants have orchestrated the Holding Corp. annual meetings of shareholders and negotiated the purchase of the Holding Corp. shares for the benefit of the Club. The former and present directors of Holding Corp. participated in or acquiesced in the plan to have the Club acquire majority ownership of the Holding Corp., and to do so by restricting the transfer of such shares to the Club or other Club members only and allowing the Club to pay a non-market purchase price for the shares as the most likely buyer. In doing so, the current Holding Corp. directors have conspired with the Club to breach their fiduciary duty, have not acted in good faith and could not fairly address a pre-suit demand relating to charging the Club a market rate for the use of the Property.

(c)   To prevent any opposition being raised to the Club's abuse of the Holding Corp., the prior directors and the current Holding Corp. directors have acted in conscious bad faith with respect to a large number of the Holding Corp. shareholders whose identities are presently not determined. As the Holding Corp.'s share ownership changed as the original owners died, Holding Corp. directors made little effort to locate those who would own the shares in their place. As time went on the number of such shares, where the owners were not identifiable kept increasing, and now stands at approximately 200 shares out of the 600 shares outstanding. While the Defendant Directors owe these shareholders the highest obligations of good faith and fair dealing, they continue to have no interest in learning who the current owners are. This was and is done for the purpose of keeping these equitable owners in the dark and out of the picture lest they claim that the Property should be leased at a market rate. Given the Defendant Directors' bad faith in dealing with such equitable holders, it

is clear that the Holding Corp. board could not fairly address a demand related to charging the Club a market rent for the Property.

(d)    Since each of the Director Defendants has agreed with the Club's position that the value of the Holding Corp.'s principal asset, the Property, should not be maximized for the benefit of the Holding Corp.'s shareholders, but rather it should be used essentially rent-free for the benefit of the Club, the Director Defendants have demonstrated that they are consciously disloyal to the Holding Corp. and loyal only to the Club, and do not exercise independent business judgment. Further, they have pre-judged the issue and cannot be deemed independent. They have consciously failed to acquaint themselves with their duties and have consciously rejected the fact that they possess any fiduciary duties to the Holding Corp. or its shareholders. As a result, they could not fairly address a pre-suit demand, since their actions are not the product of valid exercise of business judgment and thus demand is futile.

(e)    The current Holding Corp. Directors have embraced the conduct effectuated by previous Holding Corp. boards and failed to investigate or inform themselves that Holding Corp. shareholders not affiliated with the Club were being injured as a result of their conduct which was not being exercised in good faith. Rather than address these issues, they acquiesced and then adopted the previous wrongful conduct which favored only the Club. As a result, the Defendant Directors are uninformed and could not fairly address a demand related to charging the Club a market rent for the Property.

(f)    The Defendant Directors had the obligation to discharge all corporate responsibilities in good faith and with conscientious fairness, morality and honesty in purpose.  Such fiduciaries have the obligations of candor and of good and prudent management of the corporation. In the instant

case, the Defendant Directors have not acted honestly, with candor or in good faith and as a result cannot address a pre-suit demand relating to charging the Club a market rent for the Property.

(g)   The Director Defendants have also consciously violated their fiduciary duties by violating positive law, such as the two-thirds shareholder voting requirement in the Company's Certificate before approving any long-term lease of the Property, by buying shares in violation of the federal securities laws, by consciously failing to inform the shareholders of corporate actions and by failing to make any effort to locate shareholders owning a significant number of the Company's shares.  In addition, the Director Defendants have taken action which were illegal and *ultra vires* which cannot be ratified and evince a conscious indifference to their fiduciary dues and in all constitute  violations of their duties of loyalty, candor, good faith and assuring that they acted on an informed basis.

321.   In the instant case, for the reasons alleged above, a pre-suit demand is clearly futile.

## VIII.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### PURSUANT TO BCL 720
### (Derivatively on behalf of the Holding Corp. and
### Against the Director Defendants for Misconduct)

322.   Plaintiffs repeat and re-allege each and every allegation set forth above.

323.   This Claim for Relief is brought derivatively in the right of the Holding Corp. pursuant to NY BCL § 720, as a derivative action permitted by NY BCL § 626, to recover for injuries suffered by the Holding Corp. as a result of the breaches by the Director Defendants of the fiduciary duties that each of them owe to the Holding Corp.

324.   The Director Defendants have refused to protect the assets of the Holding Corp. by failing to negotiate a fair lease for the Property at a market rental, and by effecting a *de facto* sale of the Property by agreeing to extend the lease to 2071. These Defendants have violated their

fiduciary duties owed to the Holding Corp. and its shareholders by entering into long-term leases for the Property on unreasonable terms that provide the Holding Corp. with no net rental on the Property, and by effecting a *de facto* sale of the Property, thus permitting the entire value of the Holding Corp.'s sole significant asset to be appropriated by and for the Club, and also for themselves; by failing to properly manage the assets of the Holding Corp. and flagrantly committing waste; by facilitating the Club's offers to purchase additional the Holding Corp. shares at unfairly low prices that were artificially depressed by the various breaches of fiduciary duty, so as acquire such shares for the Club and to entrench themselves and the Club in control.

325.  At all relevant times, each Director Defendant was a director of the Holding Corp. and as such each Director Defendant owed fiduciary duties to the Holding Corp.

326.  Notwithstanding the existence of such duties, each Director Defendant breached them as alleged herein, which breaches included:

(a)   "The neglect of, or failure to perform, or other violation of his duties in the management and disposition of corporate assets committed to his charge." NY BCL § 720(a)(1)(A); and

(b)   "The . . . loss or waste of corporate assets due to any neglect of, or failure to perform, or other violation of his duties." NY BCL § 720(a)(1)(B).

327.  The breaches committed by each Director Defendant were done intentionally.

328.  As a result of the Director Defendants' breaches of their fiduciary obligations, the Holding Corp. has been damaged in an amount to be proved at trial. These Defendants should be held personally liable for that amount, plus interest, costs, and attorneys' fees, and any illegal restrictions on the free sale of the Holding Corp. shares.

329.  In the alternative, the Holding Corp. is entitled pursuant to section 720(a)(2) of the NY BCL to have the transactions in which it transferred its assets to the Club rescinded, specifically

each Lease extension beyond the expiration in 1987 of the Original Leases' final renewal term should be set aside, as each extension, and the extensions collectively, constituted an unlawful conveyance, assignment, or transfer of corporate assets, of which the Club and Director Defendants, as applicable, were aware at the time each such extension occurred.

330.  Further, the Court should enter a decree terminating any lease arrangements that were the product of Defendants' violations of fiduciary duty, and order that such arrangements be modified *nunc pro tunc* to reflect the terms that they would contain had they been negotiated on an arm's length basis, which they were not.

331.  In addition, unless enjoined, those of the Director Defendants who remain on the Holding Corp. Board will continue to breach their fiduciary obligations to the Holding Corp. by causing the Holding Corp. to take action for the benefit of the Club and not for the benefit of the Holding Corp. and its shareholders and, accordingly, the Court should enter an injunction permanently enjoining the members of the Holding Corp. Board of Directors from taking action as directors for the benefit of the Club.

332.  In addition, the Court should enter a decree removing any and all restrictions that exist with respect to the ability of the owner of a share of the Holding Corp. stock to transfer it to a third-party on any terms and requiring that all requests from the record owner or beneficial owner of a share of Holding Corp. stock to have ownership of such share on the books of the Holding Corp. be made promptly or that new shares to replace such shares be issued to such third-party promptly.

### SECOND CLAIM FOR RELIEF
### COMMON LAW BREACH OF FIDUCIARY DUTY
### (Derivatively on behalf of the Holding Corp. and Against Defendants
### for Breach of Fiduciary Duty, Waste and Misappropriation)

333.  Plaintiffs repeat and reallege each and every allegation set forth above.

334.  For the reasons set forth herein, the Director Defendants breached their fiduciary duties to the Holding Corp. and have engaged in acts of waste and misappropriation of the Holding. Corp's assets with respect to having caused the Holding Corp. to take actions that are in the interest of the Club and to the detriment of the Holding Corp. and its shareholders.

335.  At all times and with respect to such actions, the Director Defendants have been acting as agents of the Club and as such the Club is liable to the Holding Corp. for the Director Defendants' breaches-of-duty.

336.  In addition, at all relevant times the Club has been the controlling shareholder of the Holding Corp. and as such owed a fiduciary duty not to engage in transactions with the Holding Corp. solely for the Club's interest and to the detriment of the interests of the Holding Corp. and its other shareholders. This duty continued once the Club obtained over a majority of the Holding Corp.'s outstanding shares.

337.  The Club breached its own duties to the Holding Corp. and its shareholders when the Holding Corp. entered into lease extensions with the Club that were exclusively for the benefit of the Club to the detriment of the Holding Corp., by entering such long-term leases for the Property on unreasonable terms that provide the Holding Corp. with no net rental on the Property, and by effecting a *de facto* sale of the Property to itself by causing the Holding Corp. to extend the lease to 2071, and by dominating the Holding Corp. in a manner that ensures that the Club will benefit from further lease extensions in perpetuity.

338.  The Club further breached its own duties to the Holding Corp. and its shareholders when it entered into and carried out the plan by which Holding Corp. shareholders were told that there is no market for their shares, and that the shares had no value, but that the Club would purchase them for a small, nominal sum.

339.   Defendants have violated their fiduciary duties owed to the Holding Corp. and its shareholders by appropriating the entire value of the Holding Corp.'s sole significant asset for themselves and for the Club; by failing to properly manage the assets of the Holding Corp. and committing waste; by facilitating the Club's offers to purchase additional Holding Corp. shares at an unfairly low price that was artificially depressed by the various breaches of fiduciary duty, so as acquire such shares for the Club and to entrench themselves and the Club in control.

340.   Further, the Director Defendants breached their fiduciary duties by entering into long-term leases for the Property on unreasonable terms that provide the Holding Corp. with no net rental on the Property, and by effecting a *de facto* sale of the Property by agreeing to extend the lease to 2071.

341.   At all relevant times, each Director Defendant was a director of the Holding Corp. and as such each Director Defendant owed fiduciary duties to the Holding Corp.

342.   The breaches committed by each Defendant were done intentionally.

343.   As a result of Defendants' breaches of their fiduciary obligations, the Holding Corp. has been damaged in an amount to be proved at trial. Defendants should be held liable jointly and severally for that amount, plus interest, costs, and attorneys' fees, and any illegal restrictions on the free sale of the Holding Corp. shares.

344.   In addition, unless enjoined, Defendants other than those who are no longer on the Holding Corp. Board will continue to breach their fiduciary obligations to the Holding Corp. by causing the Holding Corp. to take action for the benefit of the Club and not for the benefit of the Holding Corp. and its shareholders and, accordingly, the Court should enter an injunction permanently enjoining the members of the Holding Corp. Board of Directors from taking action as directors for the benefit of the Club.

345.   Further, the Court should enter a decree terminating any lease arrangements that were the product of Defendants' violations of fiduciary duty and order that such arrangements be modified *nunc pro tunc* to reflect the terms that they would contain had they been negotiated on an arm's length basis, which they were not.

346.   In addition, the Court should enter a decree removing any and all restrictions that exist with respect to the ability of the owner of a share of the Holding Corp. stock to transfer to a third-party on any terms and requiring that all requests from the record owner of a share of the Holding Corp. stock to have ownership of such share on the books of the Holding Corp. be made promptly or that new shares to replace such shares be issued to such third-party promptly.

**THIRD CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**
**(Against the Club for Unjust Enrichment)**

347.   Plaintiffs repeat and re-allege each and every allegation set forth above.

348.   Throughout its history, the Club has enjoyed significant benefits at the expense of the Holding Corp. and the shareholders of the Holding Corp.

349.   This Claim is asserted in the alternative insofar as it is determined that the Club's enjoyment of these benefits were not in breach of any contractual or other obligations that the Club owed to the Holding Corp. or its shareholders.

350.   The Club has been enriched at the expense of the Holding Corp. in that it has paid a rent for the Holding Corp.'s property that is materially lower than the market rent was for that Property.

351.   The Club has been further enriched at the expense of the Holding Corp. by effecting a *de facto* sale of the Property to itself by causing the Holding Corp. to extend the lease to 2071,

and by dominating the Holding Corp. in a manner that ensures that the Club will benefit from further lease extensions in perpetuity.

352.   Under all of the circumstances, including that the shares of the Holding Corp. were meant to allow for a reasonable return on the investment made by the original and all later shareholders, and based upon the facts set forth herein, equity and good conscience require that the Club make restitution to the Holding Corp.

353.   Plaintiffs, derivatively on behalf of the Holding Corp., are entitled to a decree requiring the Club to pay over to the Holding Corp. the amounts by which it has been unjustly enriched at the expense of the Holding Corp., an amount to be determined at trial.

**FOURTH CLAIM FOR RELIEF**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES**
**(Derivatively on Behalf of the Holding Corp. and against the Club**
**For Aiding and Abetting Breach of Fiduciary)**

354.   Plaintiffs repeat and re-allege each and every allegation set forth above.

355.   As set forth herein, the Holding Corp.'s entering into various Lease extensions for years after 1987 ("Lease Extensions") was a waste of the Holding Corp.'s assets and the Holding Corp. directors at the time breached their fiduciary obligations to the Holding Corp. when they caused the Holding Corp. to enter into that Lease Extension.

356.   As set forth herein, the Holding Corp. suffered damages as a result of these breaches.

357.   The Holding Corp. directors who caused the Holding Corp. to enter into the Lease Extensions were, upon information and belief, elected to the Holding Corp. Board through and as a result of the vote of the Club as effective controlling-shareholders of the Holding Corp.

358.   As a result of the foregoing the Club knowingly induced the breach by the Holding Corp. Board and participated in the Board's fiduciary breaches.

359.   The Club aided and abetted the breaches by the Holding Corp. Board members who caused the Holding Corp. to enter into the Lease Extensions.

360.   As a result of the foregoing, the Club is liable to the Holding Corp.

**FIFTH CLAIM FOR RELIEF**
**COMMON-LAW DISSOLUTION**
**(Against All Defendants)**

361.   Plaintiffs reallege the allegations of paragraphs 1 through 314 as if fully set forth herein.

362.   This Claim seeks the dissolution of the Holding Corp. pursuant to the common law by Plaintiffs directly as shareholders of the Holding Corp. It is made in the alternative to the Claims that are asserted by Plaintiffs in a derivative capacity as shareholders of the Holding Corp.

363.   At all relevant times, the Director Defendants have operated, and continue to operate, the Holding Corp. solely for the benefit of the Club at the expense of the interests of the Holding Corp. itself and its shareholders, including individual shareholders who are members of the Club.

364.   Unlike shareholders who are not Members and thus get zero benefit from their ownership of the Holding Corp. shares, Member shareholders indirectly and individually, as well as non-shareholding Club Members, receive a significant benefit from, *inter alia*, the Club's payment of a non-market rent for renting the Holding Corp.'s land in the form of reduced dues and other fees.

365.   As detailed above, each of the Holding Corp.'s Directors testified that he believes that the purpose of the Holding Corp. is to serve the Club and the decisions that they have taken as Directors of the Holding Corp. have been taken exclusively to benefit the Club.

366.   None of the Director Defendants is a shareholder of the Holding Corp. Each of the Director Defendants is a Member of the Club. Insofar as they take actions as Directors that benefit

the Club and not as a Holding Corp. shareholder, or in non-Member shareholders' interests, they are Interested Directors.

367.  As a result of the foregoing, the Director Defendants and the Club as the majority shareholder of the Holding Corp. have so palpably breached the fiduciary duties they owe to the minority shareholders – by effectively asserting that they owe no duties to the minority shareholders in acting exclusively for the benefit of the Club, the majority shareholder – that they are disqualified from exercising the exclusive discretion and the dissolution power otherwise given to them by the Business Corporation Law.

368.  The Club as majority shareholder of the Holding Corp. has looted the assets of the Holding Corp., *i.e.*, the value of its real property, for its own individual benefit and it has been allowed to do so by its own breaches and the breaches by the Director Defendants, each of whom acknowledges that the decisions he has taken as a member of the Holding Corp. Board of Directors has been to benefit the Club and without regard the interests of the Holding Corp. shareholders, Members and non-Members alike.

369.  The Club and the Director Defendants have acted to deny the Holding Corp. shareholders the true value of their shares in the Holding Corp. but instead have advised the Holding Corp. shareholders who are interested in selling their shares that, first, there is no market for them, including because the Holding Corp. will not approve any transfer to a non-Member of the Club – which in and of itself is a breach because it is contrary to the interests of the Holding Corp. and its shareholders – and, second, that the Club would be willing to take them off the holder's hands for (most recently) $3,000. Upon information and belief, the Club has used this take-it-or-leave-it tactic to acquire a majority stake in the Holding Corp. and thereby to ensure that only compliant, Club-friendly individuals will be elected to the Holding Corp. Board.

370.   The Club and the Director Defendants are allowing the Holding Corp. to continue to operate solely to benefit the Club, which is the majority shareholder of the Holding Corp.

371.   As a result of the foregoing, under the common law, Plaintiffs are entitled to an order judicially dissolving Winged Foot Holding Corporation and appointing a referee to wind up the affairs of the Holding Corp. and distribute the assets of the Holding Corp., after accounting for all of its creditors and outstanding obligations, to the shareholders of the Holding Corp. on a pro rata basis.

372.   As an alternative to dissolution, the Court may exercise its equitable jurisdiction and permit the Club to buy out the interests of the non-Member shareholders of the Holding Corp. for the fair value of their shares, which share values must include the value of the derivative claims of the Holding Corp. insofar as they seek the recovery of injury caused to the Holding Corp. by Defendants

## IX.   **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs demand judgment as follows:

(i)   On the First Claim for Relief, derivatively on behalf of the Holding Corp. against the Director Defendants on behalf of the Holding Corp. for monetary damages in an amount to be proved at trial, together with a permanent injunction enjoining each of them from breaching their fiduciary duties to the Holding Corp. and its shareholders and a mandatory injunction:  (A) modifying the terms of the Lease between the Holding Corp. and the Club *nunc pro tunc*  to reflect the fair-market rent and/or fair market value for the Property that is the subject of the Lease, (B) causing the Holding Corp. to remove any and all restrictions on the transferability of its shares, and, (C) pursuant to section 720(a)(2) of the NY BCL, setting the Lease extensions beyond termination of the Original Lease in 1987 aside;

(ii)   On the Second Claim for Relief, derivatively on behalf of the Holding Corp. against the non-nominal Defendants on behalf of the Holding Corp. for monetary damages in an amount to be proved at trial together with a permanent injunction enjoining each of them from breaching their fiduciary duties to the Holding Corp. and its shareholders and a mandatory injunction (A) modifying the terms of the Lease between the Holding Corp. and the Club *nunc pro tunc* to reflect the fair-market rent and/or fair market value for the Property that is the subject of the Lease, (B) causing the Holding Corp. to remove any and all restrictions on the transferability of its shares, and, (C) setting the Lease extensions beyond termination of the Original Lease in 1987 aside;

(iii)   On the Third Claim for Relief, derivatively on behalf of the Holding Corp. against Defendant the Club requiring the Club to pay over to the Holding Corp. the amounts by which it has been unjustly enriched at the expense of the Holding Corp., an amount to be determined at trial.

(iv)   On the Fourth Claim for Relief, derivatively on behalf of the Holding Corp. against the Club on behalf of the Holding Corp. for monetary damages in an amount to be proved at trial for damages incurred by the Holding Corp. by the breaches of duty by the directors of the Holding Corp., including but not limited to the Director Defendants.

(v)   On the Fifth Claim for Relief, directly by Plaintiffs as Holding Corp. shareholders ordering the judicial dissolution of the Holding Corp. and the appointment of a referee to wind up the affairs of the Holding Corp. and distribute the assets of the Holding Corp., after accounting for all of its creditors and outstanding obligations, to the shareholders of the Holding Corp. on a pro rata basis or, as an alternative to dissolution, permitting the Club to buy out the interests of all shareholders of the Holding Corp. for the fair value of their shares, which share

values must include the value of the derivative claims of the Holding Corp. insofar as they seek

the recovery of injury caused to the Holding Corp. by Defendants.

    (vi)   Awarding Plaintiffs the costs and attorney's fees incurred in this Action.

    (vii)   Granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
       September 5, 2017

                                 **LOVELL STEWART HALEBIAN**
                                 **JACOBSON LLP**

                                 By:
                                 John Halebian
                                 Adam C. Mayes
                                 420 Lexington Avenue, Suite 2440
                                 New York, New York 10170
                                 Telephone (212) 500-5010
                                 Telecopier (212) 208-6806

## **VERIFICATION**

John Halebian hereby verifies that I have read the Amended Shareholders' Derivative and Direct Complaint brought on behalf of Winged Foot Holding Corp. and that I believe that the allegations are true to the best of my knowledge and belief. As one of Plaintiff Meredith Busher's counsel, I am providing the verification because the Plaintiff does not reside in the county or the state where the action is being filed.

John Halebian

September 7, 2017

1

## VERIFICATION

John Halebian hereby verifies that I have read the Amended Shareholders' Derivative and Direct Complaint brought on behalf of Winged Foot Holding Corp. and that I believe that the allegations are true to the best of my knowledge and belief. As one of Plaintiff Ellen Busher's counsel, I am providing the verification because the Plaintiff does not reside in the county or the state where the action is being filed.

John Halebian

September 7, 2017

2

## <u>VERIFICATION</u>

John Halebian hereby verifies that I have read the Amended Shareholders' Derivative and Direct Complaint brought on behalf of Winged Foot Holding Corp. and that I believe that the allegations are true to the best of my knowledge and belief. As one of Plaintiff Nancy Tumposky's counsel, I am providing the verification because the Plaintiff does not reside in the county or the state where the action is being filed.

John Halebian

September 7, 2017

3

# EXHIBIT

# A

*PBC*

MBI 1/16/14
HF 1/26/15

## Winged Foot Golf Club, Inc
## Holding Corp

| Member # | Member Name | Status |
|---|---|---|
| 0001 | Winged Foot Golf Club | HC |
| 0002 | Peters, Norman W | HC |
| 0004 | Engel, Edward S | HC |
| 0015 | Rodman, Robert W | HC |
| 0016 | Toujes, John H | HC |
| 0018 | Grote, John H | HC |
| 0019 | McCarthy, Jos F | HC |
| 0020 | McAuliffe, Geo B | HC |
| 0022 | Martin, James A | HC |
| 0025 | Collins, Martin L | HC |
| 0037 | Zimmerman, Wm | HC |
| 0043 | Dwyer, J G | HC |
| 0060 | Masten, Selah B | HC |
| 0065 | McKitterick, Leonard B | HC |
| 0079 | Kenny, Patrick T | HC |
| 0085 | Tosi, Charles A | HC |
| 0092 | McGoldrick, Edward J | HC |
| 0096 | Costello, J George | HC |
| 0106 | Vogel, Henry G | HC |
| 0107 | Garey, Eugene S | HC |
| 0121 | Lopez, Virgil J | HC |
| 0125 | Arnold, Edward A | HC |
| 0126 | Martin, Francis | HC |
| 0131 | Kerwin, Andrew J | HC |
| 0158 | Daly, Joseph S | HC |
| 0161 | McQuade, Francis X | HC |
| 0166 | Craig, C Burns | HC |
| 0188 | Spain, William J | HC |
| 0193 | Ames, Frank D | HC |
| 0194 | Hulbert, Murray | HC |
| 0209 | Cunningham, Edward F | HC |
| 0220 | Lefferts, Lewis L | HC |
| 0225 | Wilson, Alexander | HC |
| 0227 | Orteig, Jules P | HC |
| 0238 | Barbarisi, Alfred F | HC |
| 0242 | Sheehy, John E | HC |
| 0256 | Orvis, Homer S | HC |
| 0259 | Cavanaugh, Wm P | HC |

38

CONFIDENTIAL

H-2a:1

*PBC*

*on 1/5/13*

*KF 1/26/16*

| | | |
|---|---|---|
| 0263 | Rock, John B | HC |
| 0265 | Tower, Peter | HC |
| 0266 | Geng, William | HC |
| 0268 | McMullen, J R | HC |
| 0273 | Thompson, Joseph N | HC |
| 0298 | Mahoney, Daniel F | HC |
| 0304 | Schmieg, Karl | HC |
| 0313 | Grier, Ernest C | HC |
| 0314 | Somers, Harry G | HC |
| 0318 | Carlson, Oscar C | HC |
| 0321 | Walsh, Grover C | HC |
| 0330 | Huston, Tillinghast L | HC |
| 0340 | Brown, Arthur J | HC |
| 0360 | Smith, Leroy | HC |
| 0364 | Murray, Robert J | HC |
| 0367 | Mott, Elgen E | HC |
| 0374 | Sheils, William J | HC |
| 0376 | Enderly, Charles F | HC |
| 0387 | Reid, Albert Louis | HC |
| 0394 | Garcia, Antonio F | HC |
| 0400 | Gulliver, Francis D | HC |
| 0409 | Hamonn, W A | HC |
| 0414 | Dalen, Thomas J | HC |
| 0419 | Durcan, Patrick J | HC |
| 0440 | Riley, Dominick G | HC |
| 0441 | Burrars, Walter F | HC |
| 0447 | Bell, Edward M | HC |
| 0453 | Casey, Maurice M | HC |
| 0470 | Gardner, Edward M | HC |
| 0473 | Mara, Timothy J | HC |
| 0482 | Sedquick, Walter N | HC |
| 0485 | Sinnott, James Paul | HC |
| 0489 | Gossweiler, Ernest | HC |
| 0497 | Billingsley, Sherman | HC |
| 0507 | Gibbs, Richard H | HC |
| 0510 | Carroll, Thomas F | HC |
| 0512 | Buckman, George L | HC |
| 0514 | Held, Harry R | HC |
| 0518 | Fagan, John J | HC |
| 0529 | Austin, John T | HC |
| 0531 | Russell, Thomas F | HC |
| 0546 | Riley, Gustavis J | HC |

*42*

CONFIDENTIAL

*#2a2*

| | | |
|------|----------------------|----|
| 0547 | Maxwell, Thomas H | HC |
| 0553 | Daugan, Samuel C | HC |
| 0558 | Eckart, Edmund Albert | HC |
| 0559 | Bannon, Joseph D | HC |
| 0562 | O'Rourke, John C | HC |
| 0581 | Cook, Algar | HC |
| 0592 | Shorten, Thomas S | HC |
| 0597 | Harper, Harvey W | HC |
| 0602 | Est Of John A Sexauer | HC |
| 0608 | Scott, Raymond A | HC |
| 0614 | Cella, Frederick A | HC |
| 0634 | Kaesche, Wm C | HC |
| 0646 | Burrell, Harry | HC |
| 0649 | Williams, C E | HC |
| 0655 | Croive, C N | HC |
| 0657 | Murphy, William J | HC |
| 0660 | Lauter, Sefton | HC |
| 0661 | O'Brien, Joseph F | HC |
| 0677 | Wilke, Theodore C | HC |
| 0683 | Larkin, Wm P | HC |
| 0684 | Campagna, Anthony | HC |
| 0689 | Ockendon, William T | HC |
| 0690 | Cahill, John R | HC |
| 0694 | Kane, Thomas | HC |
| 0699 | Fennell, George W | HC |
| 0702 | Raylor, Ernest M | HC |
| 0705 | Scribner, Samuel | HC |
| 0706 | McCormick, James | HC |
| 0707 | Nietz, Herman A | HC |
| 0719 | Keane, Edward B | HC |
| 0729 | Raymor, Harold H | HC |
| 0732 | Dixon, William H | HC |
| 0737 | Cusick, P F | HC |
| 0744 | Smith, Henry | HC |
| 0748 | Rockwell, Louis D | HC |
| 0749 | White, Neal R | HC |
| 0751 | McQuade, John | HC |
| 0753 | Sexton, Jere A | HC |
| 0757 | O'Brien, Robert C | HC |
| 0760 | Cole, Frank C | HC |
| 0765 | Newton, Arthur L | HC |
| 0766 | Miller, A W | HC |

CONFIDENTIAL

H-2603

| | | |
|---|---|---|
| 0767 | Cooper, C C | HC |
| 0770 | Lawrence, T H | HC |
| 0772 | Real, Leo M | HC |
| 0778 | Cronan, Johnny | HC |
| 0781 | Lewis, G Wendell | HC |
| 0787 | Schaefer, George J | HC |
| 0800 | Carpenter, William H | HC |
| 0805 | Craig, Sam | HC |
| 0806 | Horstman, Otto | HC |
| 0812 | Winninger, Charles J | HC |
| 0819 | Burhaus, Joseph S | HC |
| 0823 | Flynn, John L | HC |
| 0826 | Hoggen, John M | HC |
| 0829 | Herbig, George F | HC |
| 0834 | Wright, William | HC |
| 0835 | Malthressen, E P | HC |
| 0838 | Curley, William A | HC |
| 0845 | McGovern, Arthur A | HC |
| 0846 | Johnston, Oswald | HC |
| 0849 | O'Hare, Frank A | HC |
| 0851 | Duke, B Lawrence | HC |
| 0855 | Shield, Edward F | HC |
| 0858 | Peterson, Harry E | HC |
| 0862 | Guttzert, Charles W | HC |
| 0863 | Murray, Hugh E | HC |
| 0864 | Ramsbaugh, W Darsey | HC |
| 0867 | Dockstader, L A | HC |
| 0868 | Lyddane, C V | HC |
| 0872 | Corwin, Ambrose | HC |
| 0886 | Froelich, Charles | HC |
| 0905 | Murphy, James R | HC |
| 0909 | Hayden, James R | HC |
| 0910 | Clough, Robert M | HC |
| 0925 | Gsell, Roland | HC |
| 0928 | Fetzer, John E | HC |
| 0933 | Durcan, Edward F | HC |
| 0936 | Waugh, Herman M | HC |
| 0945 | Quigley, William J | HC |
| 0947 | Kirby, John J | HC |
| 0948 | Gallagher, Wm H | HC |
| 0957 | McManus, Charles E | HC |
| 0960 | McDonald, Edwin J | HC |

CONFIDENTIAL

| 0967 | Hines, James J | HC |
| 0969 | Coleman, John A | HC |
| 0975 | McCauley, Paul J | HC |
| 0979 | Wiberg, Paul | HC |
| 0981 | Burnham, Harry S | HC |
| 0986 | Anderson, Alexander E | HC |
| 0989 | Bitler, James S | HC |
| 0998 | Bannon, Joseph D | HC |
| 1005 | Depass, Fandell L | HC |
| 1008 | Gillespie, George J | HC |
| 1015 | Lemault, Adolph | HC |
| 1018 | Wharry, G Austin | HC |
| 1026 | Skinner, Orville B | HC |
| 1029 | Maust, John Ray | HC |
| 1031 | Sullivan, Arthur B | HC |
| 1032 | Silver, Louis V | HC |
| 1034 | Griffiths, F J | HC |
| 1046 | Nagle, John J | HC |
| 1049 | Walsh, Edward R | HC |
| 1051 | Miller, Hugh E | HC |
| 1055 | Beyer, Harold E | HC |
| 1062 | Schindler, R W | HC |
| 1065 | Campbell, Louis Smith | HC |
| 1071 | McAleenan, Kenneth | HC |
| 1072 | Salisbury, E F W | HC |
| 1075 | Fitts, George R | HC |
| 1081 | Spillane, Wm J | HC |
| 1082 | Macneil, John W | HC |
| 1087 | McCormack, George H | HC |
| 1088 | Elliott, James M | HC |
| 1092 | Emerson, Thomas H | HC |
| 1093 | Winship, William M | HC |
| 1094 | Est Of Charles A Ruggles | HC |
| 1095 | Booth, Almond E | HC |
| 1102 | Manson, Howell T | HC |
| 1106 | Rickaby, Hamilton C | HC |
| 1108 | Shipman, W Alfred | HC |
| 1114 | Irons, Frederick C | HC |
| 1133 | Dumont, Ruth N | HC |
| 1134 | Est Of John A Forster | HC |
| 1146 | Lamorte, William F | HC |
| 1147 | Ponvert, E R | HC |

CONFIDENTIAL

| | | |
|---|---|---|
| 1149 | Bruckner, Henry | HC |
| 1154 | DiclC Co, Ollie | HC |
| 1167 | Maver, J D | HC |
| 1168 | Tuthill, H S | HC |
| 1173 | Est Of C W Benedict | HC |
| 1174 | Watson, James W | HC |
| 1184 | Winged Foot Golf Club | HC |
| 1185 | Winged Foot Golf Club | HC |
| 1186 | Winged Foot Golf Club | HC |
| 1187 | Winged Foot Golf Club | HC |
| 1188 | Winged Foot Golf Club | HC |
| 1189 | Winged Foot Golf Club | HC |
| 1190 | Winged Foot Golf Club | HC |
| 1191 | Winged Foot Golf Club | HC |
| 1192 | Winged Foot Golf Club | HC |
| 1193 | Winged Foot Golf Club | HC |
| 1194 | Winged Foot Golf Club | HC |
| 1195 | Winged Foot Golf Club | HC |
| 1196 | Winged Foot Golf Club | HC |
| 1197 | Winged Foot Golf Club | HC |
| 1198 | Winged Foot Golf Club | HC |
| 1199 | Winged Foot Golf Club | HC |
| 1200 | Winged Foot Golf Club | HC |
| 1201 | Winged Foot Golf Club | HC |
| 1202 | Winged Foot Golf Club | HC |
| 1203 | Winged Foot Golf Club | HC |
| 1204 | Winged Foot Golf Club | HC |
| 1205 | Winged Foot Golf Club | HC |
| 1206 | Winged Foot Golf Club | HC |
| 1207 | Winged Foot Golf Club | HC |
| 1208 | Winged Foot Golf Club | HC |
| 1209 | Winged Foot Golf Club | HC |
| 1210 | Winged Foot Golf Club | HC |
| 1211 | Winged Foot Golf Club | HC |
| 1212 | Winged Foot Golf Club | HC |
| 1213 | Winged Foot Golf Club | HC |
| 1214 | Winged Foot Golf Club | HC |
| 1215 | Winged Foot Golf Club | HC |
| 1216 | Winged Foot Golf Club | HC |
| 1217 | Winged Foot Golf Club | HC |
| 1218 | Winged Foot Golf Club | HC |
| 1219 | Winged Foot Golf Club | HC |

CONFIDENTIAL

| 1220 | Winged Foot Golf Club | HC |
|------|-----------------------|-----|
| 1221 | Winged Foot Golf Club | HC |
| 1222 | Vernon, Murray | HC |
| 1223 | Winged Foot Golf Club | HC |
| 1224 | Winged Foot Golf Club | HC |
| 1225 | Winged Foot Golf Club | HC |
| 1226 | Winged Foot Golf Club | HC |
| 1227 | Winged Foot Golf Club | HC |
| 1229 | Winged Foot Golf Club | HC |
| 1230 | Winged Foot Golf Club | HC |
| 1231 | Winged Foot Golf Club | HC |
| 1232 | Winged Foot Golf Club | HC |
| 1233 | Winged Foot Golf Club | HC |
| 1234 | Behre, Lucie Bell | HC |
| 1235 | Behre, Lucie Bell | HC |
| 1236 | Winged Foot Golf Club | HC |
| 1239 | Winged Foot Golf Club | HC |
| 1240 | Winged Foot Golf Club | HC |
| 1244 | Winged Foot Golf Club | HC |
| 1247 | Winged Foot Golf Club | HC |
| 1248 | Winged Foot Golf Club | HC |
| 1249 | Winged Foot Golf Club | HC |
| 1250 | Winged Foot Golf Club | HC |
| 1251 | Winged Foot Golf Club | HC |
| 1252 | Winged Foot Golf Club | HC |
| 1253 | Winged Foot Golf Club | HC |
| 1254 | Winged Foot Golf Club | HC |
| 1255 | Winged Foot Golf Club | HC |
| 1256 | Winged Foot Golf Club | HC |
| 1260 | Winged Foot Golf Club | HC |
| 1261 | Winged Foot Golf Club | HC |
| 1262 | Hammons, Earle W | HC |
| 1265 | Winged Foot Golf Club | HC |
| 1266 | Winged Foot Golf Club | HC |
| 1267 | Winged Foot Golf Club | HC |
| 1269 | Winged Foot Golf Club | HC |
| 1270 | Winged Foot Golf Club | HC |
| 1271 | Anderson, John M | HC |
| 1272 | Winged Foot Golf Club | HC |
| 1273 | Winged Foot Golf Club | HC |
| 1274 | Winged Foot Golf Club | HC |
| 1276 | Winged Foot Golf Club | HC |

CONFIDENTIAL

 

| 1277 | Winged Foot Golf Club | HC |
| 1278 | Winged Foot Golf Club | HC |
| 1280 | Winged Foot Golf Club | HC |
| 1281 | Winged Foot Golf Club | HC |
| 1284 | Winged Foot Golf Club | HC |
| 1285 | Winged Foot Golf Club | HC |
| 1288 | Winged Foot Golf Club | HC |
| 1289 | Winged Foot Golf Club | HC |
| 1290 | Winged Foot Golf Club | HC |
| 1294 | Winged Foot Golf Club | HC |
| 1295 | Winged Foot·Golf Club | HC |
| 1297 | Winged Foot Golf Club | HC |
| 1301 | Winged Foot Golf Club | HC |
| 1302 | Winged Foot Golf Club | HC |
| 1303 | Winged Foot Golf Club | HC |
| 1304 | Winged Foot Golf Club | HC |
| 1305 | Winged Foot Golf Club | HC |
| 1309 | Winged Foot Golf Club | HC |
| 1310 | Winged Foot Golf Club | HC |
| 1313 | Winged Foot Golf Club | HC |
| 1316 | Winged Foot Golf Club | HC |
| 1317 | Winged Foot Golf Club | HC |
| 1318 | Winged Foot Golf Club | HC |
| 1321 | Winged Foot Golf Club | HC |
| 1322 | Winged Foot Golf Club | HC |
| 1323 | Winged Foot Golf Club | HC |
| 1324 | Winged Foot Golf Club | HC |
| 1326 | Winged Foot Golf Club | HC |
| 1327 | Winged Foot Golf Club | HC |
| 1329 | Winged Foot Golf Club | HC |
| 1330 | Winged Foot Golf Club | HC |
| 1331 | Winged Foot Golf Club | HC |
| 1332 | Winged Foot Golf Club | HC |
| 1333 | Winged Foot Golf Club | HC |
| 1334 | Winged Foot Golf Club | HC |
| 1335 | Winged Foot Golf Club | HC |
| 1336 | Winged Foot Golf Club | HC |
| 1337 | Winged Foot Golf Club | HC |
| 1340 | Chambers, Eugenia P | HC |
| 1341 | Winged Foot Golf Club | HC |
| 1342 | Winged Foot Golf Club | HC |
| 1343 | Winged Foot Golf Club | HC |

CONFIDENTIAL

H-2a.8

| 1344 | Winged Foot Golf Club | HC |
| 1346 | Winged Foot Golf Club | HC |
| 1347 | Masten, Selah B | HC |
| 1348 | Rowland, Van C | HC |
| 1349 | Rowland, Mark C | HC |
| 1351 | Winged Foot Golf Club | HC |
| 1352 | Winged Foot Golf Club | HC |
| 1353 | Winged Foot Golf Club | HC |
| 1355 | Winged Foot Golf Club | HC |
| 1356 | Winged Foot Golf Club | HC |
| 1357 | Winged Foot Golf Club | HC |
| 1358 | Winged Foot Golf Club | HC |
| 1360 | Winged Foot Golf Club | HC |
| 1361 | Winged Foot Golf Club | HC |
| 1363 | Winged Foot Golf Club | HC |
| 1364 | Winged Foot Golf Club | HC |
| 1365 | Filardi, Virginia | HC |
| 1366 | Winged Foot Golf Club | HC |
| 1367 | Winged Foot Golf Club | HC |
| 1368 | Winged Foot Golf Club | HC |
| 1369 | Winged Foot Golf Club | HC |
| 1370 | Winged Foot Golf Club | HC |
| 1374 | Winged Foot Golf Club | HC |
| 1375 | Winged Foot Golf Club | HC |
| 1376 | Est Of Harry J McNally | HC |
| 1377 | Winged Foot Golf Club | HC |
| 1378 | Winged Foot Golf Club | HC |
| 1380 | Winged Foot Golf Club | HC |
| 1382 | Creamer, John F | HC |
| 1387 | Winged Foot Golf Club | HC |
| 1388 | Winged Foot Golf Club | HC |
| 1389 | Winged Foot Golf Club | HC |
| 1391 | Winged Foot Golf Club | HC |
| 1392 | Winged Foot Golf Club | HC |
| 1393 | Winged Foot Golf Club | HC |
| 1394 | Winged Foot Golf Club | HC |
| 1395 | Winged Foot Golf Club | HC |
| 1396 | Winged Foot Golf Club | HC |
| 1397 | Winged Foot Golf Club | HC |
| 1399 | Winged Foot Golf Club | HC |
| 1400 | Winged Foot Golf Club | HC |
| 1401 | Winged Foot Golf Club | HC |

CONFIDENTIAL

| | | |
|---|---|---|
| 1405 | Winged Foot Golf Club | HC |
| 1406 | Winged Foot Golf Club | HC |
| 1407 | Winged Foot Golf Club | HC |
| 1408 | Winged Foot Golf Club | HC |
| 1409 | Winged Foot Golf Club | HC |
| 1410 | Winged Foot Golf Club | HC |
| 1412 | Winged Foot Golf Club | HC |
| 1413 | Winged Foot Golf Club | HC |
| 1414 | Winged Foot Golf Club | HC |
| 1415 | Winged Foot Golf Club | HC |
| 1416 | Winged Foot Golf Club | HC |
| 1417 | Winged Foot Golf Club | HC |
| 1418 | Winged Foot Golf Club | HC |
| 1419 | Winged Foot Golf Club | HC |
| 1420 | Winged Foot Golf Club | HC |
| 1421 | Winged Foot Golf Club | HC |
| 1424 | Winged Foot Golf Club | HC |
| 1425 | Winged Foot Golf Club | HC |
| 1427 | Winged Foot Golf Club | HC |
| 1429 | Winged Foot Golf Club | HC |
| 1430 | Winged Foot Golf Club | HC |
| 1431 | Beach, Marion | HC |
| 1432 | Winged Foot Golf Club | HC |
| 1435 | Winged Foot Golf Club | HC |
| 1437 | Winged Foot Golf Club | HC |
| 1438 | Gillespie, George J | HC |
| 1439 | Winged Foot Golf Club | HC |
| 1441 | Winged Foot Golf Club | HC |
| 1442 | Winged Foot Golf Club | HC |
| 1443 | Winged Foot Golf Club | HC |
| 1444 | Winged Foot Golf Club | HC |
| 1446 | Williams, James A | HC |
| 1447 | Winged Foot Golf Club | HC |
| 1449 | Winged Foot Golf Club | HC |
| 1450 | Winged Foot Golf Club | HC |
| 1451 | Winged Foot Golf Club | HC |
| 1452 | Winged Foot Golf Club | HC |
| 1453 | Winged Foot Golf Club | HC |
| 1454 | Winged Foot Golf Club | HC |
| 1456 | Winged Foot Golf Club | HC |
| 1460 | Winged Foot Golf Club | HC |
| 1461 | Winged Foot Golf Club | HC |

COMD 0002717

*PBC*

| | | |
|------|------------------------|----|
| 1463 | Winged Foot Golf Club | HC |
| 1464 | Winged Foot Golf Club | HC |
| 1465 | Winged Foot Golf Club | HC |
| 1466 | Winged Foot Golf Club | HC |
| 1467 | Winged Foot Golf Club | HC |
| 1468 | Daly, J Spencer | HC |
| 1470 | Winged Foot Golf Club | HC |
| 1472 | Winged Foot Golf Club | HC |
| 1473 | Stevenson, Lincoln | HC |
| 1474 | Mason, Francis Hawkins | HC |
| 1475 | Winged Foot Golf Club | HC |
| 1476 | Winged Foot Golf Club | HC |
| 1477 | Winged Foot Golf Club | HC |
| 1478 | Winged Foot Golf Club | HC |
| 1479 | Winged Foot Golf Club | HC |
| 1484 | Winged Foot Golf Club | HC |
| 1485 | Winged Foot Golf Club | HC |
| 1486 | Winged Foot Golf Club | HC |
| 1487 | Kelly, Geraldyn | HC |
| 1488 | Winged Foot Golf Club | HC |
| 1489 | Winged Foot Golf Club | HC |
| 1491 | Winged Foot Golf Club | HC |
| 1492 | Winged Foot Golf Club | HC |
| 1493 | Winged Foot Golf Club | HC |
| 1494 | Winged Foot Golf Club | HC |
| 1495 | Winged Foot Golf Club | HC |
| 1498 | Winged Foot Golf Club | HC |
| 1500 | Winged Foot Golf Club | HC |
| 1501 | Winged Foot Golf Club | HC |
| 1502 | Laucks, Gayle B | HC |
| 1503 | Winged Foot Golf Club | HC |
| 1504 | Winged Foot Golf Club | HC |
| 1505 | Winged Foot Golf Club | HC |
| 1506 | Winged Foot Golf Club | HC |
| 1507 | Winged Foot Golf Club | HC |
| 1510 | Winged Foot Golf Club | HC |
| 1511 | Winged Foot Golf Club | HC |
| 1514 | Connor, Mary | HC |
| 1515 | Winged Foot Golf Club | HC |
| 1517 | Winged Foot Golf Club | HC |
| 1519 | Winged Foot Golf Club | HC |
| 1520 | Winged Foot Golf Club | HC |

CONFIDENTIAL

| | | |
|---|---|---|
| 1521 | Winged Foot Golf Club | HC |
| 1522 | Winged Foot Golf Club | HC |
| 1523 | Winged Foot Golf Club | HC |
| 1525 | Winged Foot Golf Club | HC |
| 1526 | Winged Foot Golf Club | HC |
| 1527 | Winged Foot Golf Club | HC |
| 1529 | Winged Foot Golf Club | HC |
| 1530 | Winged Foot Golf Club | HC |
| 1531 | Winged Foot Golf Club | HC |
| 1532 | Winged Foot Golf Club | HC |
| 1533 | Winged Foot Golf Club | HC |
| 1534 | Winged Foot Golf Club | HC |
| 1535 | Winged Foot Golf Club | HC |
| 1536 | Winged Foot Golf Club | HC |
| 1537 | Winged Foot Golf Club | HC |
| 1538 | Winged Foot Golf Club | HC |
| 1539 | Lamarche, Roy | HC |
| 1542 | Mara (Nugent), Helen P | HC |
| 1543 | Winged Foot Golf Club | HC |
| 1544 | Winged Foot Golf Club | HC |
| 1547 | Winged Foot Golf Club | HC |
| 1548 | Winged Foot Golf Club | HC |
| 1549 | Morris, William G | HC |
| 1551 | Winged Foot Golf Club | HC |
| 1552 | Winged Foot Golf Club | HC |
| 1553 | Brady, Helen C | HC |
| 1554 | Fisher, James E | HC |
| 1555 | Winged Foot Golf Club | HC |
| 1556 | Busher, Josephine L | HC |
| 1557 | Winged Foot Golf Club | HC |
| 1558 | Est Of Loretta Mandeville | HC |
| 1563 | Winged Foot Golf Club | HC |
| 1564 | Winged Foot Golf Club | HC |
| 1565 | Winged Foot Golf Club | HC |
| 1566 | Winged Foot Golf Club | HC |
| 1567 | Winged Foot Golf Club | HC |
| 1568 | Winged Foot Golf Club | HC |
| 1570 | Winged Foot Golf Club | HC |
| 1572 | Winged Foot Golf Club | HC |
| 1573 | Winged Foot Golf Club | HC |
| 1575 | Winged Foot Golf Club | HC |
| 1576 | Winged Foot Golf Club | HC |

CONFIDENTIAL

COMD 0002719

PBC

| | | |
|------|---------------------------|----|
| 1577 | Winged Foot.Golf Club | HC |
| 1578 | Winged Foot Golf Club | HC |
| 1579 | Winged Foot Golf Club | HC |
| 1580 | Winged Foot Golf Club | HC |
| 1581 | Winged Foot Golf Club | HC |
| 1582 | Winged Foot Golf Club | HC |
| 1583 | Winged Foot Golf Club | HC |
| 1584 | Winged Foot Golf Club | HC |
| 1585 | Winged Foot Golf Club | HC |
| 1586 | Winged Foot Golf Club | HC |
| 1587 | Winged Foot Golf Club | HC |
| 1588 | Winged Foot Golf Club | HC |
| 1589 | Winged Foot Golf Club | HC |
| 1590 | Winged Foot Golf Club | HC |
| 1591 | Winged Foot Golf Club | HC |
| 1592 | Winged Foot Golf Club | HC |
| 1593 | Hardart, Augustin S | HC |
| 1594 | Est of Joseph E. McLough | HC |
| 1595 | Winged Foot Golf Club | HC |
| 1596 | Winged Foot Golf Club | HC |
| 1597 | Winged Foot Golf Club | HC |
| 1598 | Winged Foot Golf Club | HC |
| 1599 | Winged Foot Golf Club | HC |
| 1600 | Winged Foot Golf Club | HC |
| 1601 | Winged Foot Golf Club | HC |
| 1605 | Winged Foot Golf Club | HC |
| 1606 | Winged Foot Golf Club | HC |
| 1608 | Stevens Farrington, Steph | HC |
| 1609 | Winged Foot Golf Club | HC |
| 1611 | Winged Foot Golf Club | HC |
| 1612 | Winged Foot Golf Club | HC |
| 1613 | Winged Foot Golf Club | HC |
| 1614 | Winged Foot Golf Club | HC |
| 1615 | Winged Foot Golf Club | HC |
| 1616 | Cortellesi, Jerome P. | HC |
| 1617 | Winged Foot Golf Club | HC |
| 1618 | Winged Foot Golf Club | HC |
| 1619 | Winged Foot Golf Club | HC |
| 1620 | Winged Foot Golf Club | HC |
| 1622 | Winged Foot Golf Club | HC |
| 1623 | Alfenito, Josephine | HC |
| 1624 | Est Of Warner Pyne, Jr. | HC |

CONFIDENTIAL

H-2a.13

*PBC*

| | | |
|---|---|---|
| 1627 | Winged Foot Golf Club | HC |
| 1629 | Winged Foot Golf Club | HC |
| 1631 | Winged Foot Golf Club | HC |
| 1633 | Winged Foot Golf Club | HC |
| 1634 | Winged Foot Golf Club | HC |
| 1636 | Winged Foot Golf Club | HC |
| 1637 | Winged Foot Golf Club | HC |
| 1638 | Winged Foot Golf Club | HC |
| 1639 | Winged Foot Golf Club | HC |
| 1640 | Winged Foot Golf Club | HC |
| 1641 | Winged Foot Golf Club | HC |
| 1642 | Winged Foot Golf Club | HC |
| 1643 | Winged Foot Golf Club | HC |
| 1644 | Winged Foot Golf Club | HC |
| 1646 | Winged Foot Golf Club | HC |
| 1647 | Winged Foot Golf Club | HC |
| 1648 | Winged Foot Golf Club | HC |
| 1649 | Winged Foot Golf Club | HC |
| 1650 | Winged Foot Golf Club | HC |
| 1651 | Winged Foot Golf Club | HC |
| 1652 | Winged Foot Golf Club | HC |
| 1653 | Winged Foot Golf Club | HC |
| 1654 | Winged Foot Golf Club | HC |
| 1657 | Winged Foot Golf Club | HC |
| 1658 | Winged Foot Golf Club | HC |
| 1659 | Winged Foot Golf Club | HC |
| 1660 | Lee, John B | HC |
| 1662 | Est Of Generoso Pope | HC |
| 1663 | Est Of Richard K. Barry | HC |
| 1665 | Carter, J Michael | HC |
| 1666 | Marcato, David N | HC |
| 1667 | Winged Foot Golf Club | HC |
| 1668 | Mahoney, Daniel P | HC |
| 1669 | Winged Foot Golf Club | HC |
| 1670 | Winged Foot Golf Club | HC |
| 1671 | Smith, Girard L. | HC |
| 1672 | Gagliardi, Joseph F | HC |
| 1673 | Winged Foot Golf Club | HC |
| 1674 | Kelly, Est. of James F | HC |
| 1675 | Winged Foot Golf Club | HC |
| 1676 | Gagliardi, Anthony | HC |
| 1677 | Winged Foot Golf Club | HC |

*PBC*

on
1/15/13

| 1678 | Winged Foot Golf Club | HC |
| 1679 | Hoffman, Kevin Thomas | HC |
| 1680 | Winged Foot Golf Club | HC |
| 1681 | Winged Foot Golf Club | HC |
| 1682 | Winged Foot Golf Club | HC |
| 1683 | Doetsch, James F | HC |
| 1684 | Williamson, Susan | HC |
| 1687 | Duffy, Donald F. | HC |
| 1688 | Winged Foot Golf Club | HC |
| 1689 | Winged Foot Golf Club | HC |
| 1690 | Ryan, Kevin A. | HC |
| 1691 | Winged Foot Golf Club | HC |
| 1692 | Walsh, James R. | HC |
| 1693 | Walsh, James R. | HC |
| 1694 | Winged Foot Golf Club | HC |
| 1695 | Winged Foot Golf Club | HC |

Lines Printed  600

16

42 members
x13 pgs. (H-2a.2 - H-2a.14)
546
38  H-2a.1
16  H-2a.15
600  members

CONFIDENTIAL

A-2a.15

# EXHIBIT

# B

**Potential Class Member List**

**(Appended to Plaintiff Kevin P. Clune's**
**Third Set of Interrogatories to All Defendants)**

1. Estate of Harry M. Durning
2. Stephen E. Budd
3. Carl T. Ulrich
4. Raymond L Patterson
5. Chris Kinderwaters
6. Louene H. Geran
7. Thomas A. Mcgrath
8. Louis W. Doyle
9. Ella M Senn
10. Estate of Joseph F. McCarthy
11. Frank J. Adams
12. Leo J. Ehrhart
13. John F Kerrey
14. Kane Chase
15. Harold H. Sharps
16. Francis W. Collins
17. The First National Bank & Trust Company of Northport as trustee of the trust created by paragraph fifteen of the Will of John H. Vanderveer, deceased
18. James F. Levens
19. Arthur J. Brown
20. Frances W. Baldwin
21. Edward D. Lane
22. Thomas E. Croake
23. John J. Cavanagh
24. Ralph A Kennedy
25. Thomas R. Thorburn
26. Herman A. Acker
27. Estate of Hanford Main
28. Estate of Arthur Bills
29. Burnett B. Benson
30. Edward F. Watsons
31. Joseph Paterman Jr.
32. Theodore Timmers
33. Edward M. Hoffman
34. Agnes E. Clarendon
35. Edward F. Gleason
36. F.L. Yarrington
37. John Whitney Richmond
38. Frank W. Aigeltinger
39. John B. Kennedy
40. Ernest W. Freudenberg
41. Harry J. Kelton

i

42. John A. Sullivan
43. Thomas S. Delehar(n)ty
44. Raymond C. Yard
45. Edward F. Byrne
46. Estate of Louis Kissling
47. Estate of Lucy Mcallister Martin
48. Estate of Robert Greene
49. Matthew F. Kelly
50. Estate of Thomas Kelley
51. Estate of Patrick Casey
52. Walter Bockstahler
53. Estate of Willard Rosar
54. Estate of Wilfrid F. Rosar
55. Henery F. Hauck
56. Herbert L. Bockstahler
57. Estate of John S. Burke
58. Fred W. Kaestner
59. Estate of Thomas F. MacMahon
60. Thomas F. Commellaw
61. Elizabeth V. Mac Namee
62. Joseph P. Doyle
63. Walter H. Coyle
64. Herman F. Ball
65. Charles Gersbach (Joan K Gersbach Executrix)
66. William P. Thomas
67. Julius L. Stillie
68. William B. Cardoza
69. Walter F. Purcell
70. Harry Walters
71. Billy Jones
72. Edwin B. Hayes Jr.
73. Estate of William H. Stewart
74. Estate of John Chester Ray
75. Clinton L. Jennings
76. Edward L. Chapman
77. Mathias P. Niewenhous
78. Walter M. Mason
79. Mrs. Loretta Von Stamwitz
80. Estate of Frank  Paladino
81. H.F Lamarche
82. Rudolph O. Hanbold
83. Frank J. Mulhfeld Jr.
84. Alfred F. Sinclair
85. Annett Fennell
86. Edwin Kuttroff
87. Karl N. Becker

ii

88. Elizabeth L. Cropsey
89. Wyman J. Crocker
90. Homer H. Johnson
91. Raymond A. O'Brien
92. John J. Hanley
93. John D. Reilly
94. Estate of Joseph McCallahan
95. Louise Regan
96. Grace Murdock
97. Dr. Zimmerman
98. Frank Bergrisch
99. Robert A. Mart
100. Edwin C. Walton
101. Estate of Kenneth L. Patterson
102. James F. McNamara and Lauran McNamara
103. Eugene P Schanz
104. Henery F. Fell
105. Samuel Milligan
106. Ludd Lo
107. Paul H. Douglas
108. Robert Fisher
109. Estate of Mr. Homer Eagles
110. Homer M. Eagles
111. Thomas Fisher
112. George Hammel
113. George A. Hammel
114. Jeremiah T. Mahoney
115. Louis B. Rice
116. Alfred Foster
117. Harry C. Van Ness or Helen K. Van Ness
118. Walter H. Caswell
119. Joseph A. Kermin
120. Paul E. Forsman
121. J. Christopher Marks
122. Elmer Gault
123. William M. Byrnes Jr.
124. Marie Byrnes
125. Holst-Knudesen
126. James E. Sheilds
127. S. Holst Knudsen
128. Joseph G. Jacob
129. Richard V. Arnold
130. B.S. Pidgeon
131. Claudia Baum
132. Raymond J. McCabe
133. George W. Kern

134. John M. Regan (or Regar, or Regas)
135. Phillip J. Curry
136. Michael B. McHugh or Ethel R. McHugh
137. Frederick  Williamson
138. Leonard G. Blumenshine (or Blumenshire)
139. Joseph F. Gallo
140. Stugh J Sheran
141. Ann Sheeran
142. Jacob A. Ottman
143. Marjorie W. Rowe
144. Gordon I. Logan
145. Philip J. Stevens
146. William J. McCormack
147. Ernest R. Breech
148. Josephine Duffy Lee
149. Eugene J. Busher
150. Edwin D. Schanz
151. Harry L. Maley
152. Philip J. Stevens
153. John J. McGowan
154. Michael H. Lynch
155. Mary C. Healy
156. Boyd W. Robinson
157. Anne Z. Lyons
158. Malcolm S. Burroughs
159. William F. Carroll
160. Margaret Mcaleenan
161. Ruth Norton
162. E.J. Tranter
163. William Betzig Sr.
164. Catherine Whelan
165. Patricia Clancy
166. Grace E. Murdock
167. Gus H. Zimmerman
168. Alfred P. Bell
169. William F. Harrington
170. Walter E. Kolb
171. Gerald Shattuck
172. Hugh M. Busher
173. Alexander Gillespie Jr.
174. Dorothy Anne Urmaston
175. Richard A. Picard
176. Charles Nobles
177. Charles R. Leo Jr.
178. Florence Hammel
179. Charles A. J. Gachot, Jr.

iv

180. Richard Gachot
181. Winifred M. Schumacher
182. Dorothy Kelly
183. Paul E. Forsman Jr.
184. Walter F. Hahn
185. George C. Gaffney
186. Catherine L. McGovern Executor of the Estate of Arthur F. Lynch
187. J. Howard Carter
188. John A. Mulcahy
189. Joseph F. Gagliardi, Anthony L. Gagliardi, Lee P. Gagliardi Trustee u/w of Frank M. Gagliardi, Martial Trust A.
190. Lee Gagliardi
191. Craig R. Falk
192. Lee Parson Gagliardi
193. William J. Forbes
194. James Cullo
195. Cynthia Wilson
196. Diana G. Collins
197. Mary A. Ryan
198. C. Eugene Tully Jr.